## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FEDERAL-MOGUL GLOBAL INC., ) <br> T&N LIMITED, *et al.*, ) <br> ) <br> Reorganized Debtors. ) <br> —————————————————) <br> ) | Chapter 11 <br><br> Bankruptcy Case No. 01-10578 |

```
———————————————————————)
                                        )
FEDERAL-MOGUL GLOBAL INC.,              )   Chapter 11
T&N LIMITED, et al.,                    )
                                        )   Bankruptcy Case No. 01-10578
               Reorganized Debtors.     )
———————————————————————)
                                        )
CERTAIN UNDERWRITERS AT LLOYDS,         )   Civil Action Nos. 08-0229 and 08-0230
LONDON, et. al.,                        )
                                        )
               Appellants,              )   Judge Joseph H. Rodriguez
                                        )
        v.                              )
                                        )
FEDERAL-MOGUL GLOBAL INC., et al.,      )
                                        )
               Appellees.               )
———————————————————————)
```

### BRIEF OF APPELLEE OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue, 35th Floor
New York, NY  10052-3500
(212) 319-7125

Peter Van N. Lockwood
Walter B. Slocombe
Kevin C. Maclay
One Thomas Circle, NW
Washington, DC  20005-5802
(202) 862-5000

CAMPBELL & LEVINE, LLC
Marla R. Eskin
Mark T. Hurford
800 N. King Street, Suite 300
Wilmington, DE  19801
(302) 426-1900

*Counsel for Appellee Official Committee of Asbestos Claimants*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................. 1

ARGUMENT ................................................................................. 5

I.    THE BANKRUPTCY COURT CORRECTLY RULED THAT THE THIRD
      CIRCUIT'S DECISION IN COMBUSTION ENGINEERING IS
      CONTROLLING AUTHORITY HERE. ............................................. 5

II.   THE BANKRUPTCY COURT CORRECTLY RULED THAT SECTION
      1123(a)(5) PREEMPTS ANY ANTI-ASSIGNMENT CLAUSES IN THE
      RELEVANT INSURANCE POLICIES............................................... 11

III.  THE BANKRUPTCY COURT CORRECTLY RULED THAT
      APPELLANTS' ARGUMENTS AGAINST EXPRESS PREEMPTION OF
      THE ANTI-ASSIGNMENT PROVISIONS IN THEIR POLICIES ARE
      MERITLESS. ....................................................................... 16

      A.    The Bankruptcy Court's preemption analysis is correct. .................. 17

            1.    There is no basis to ignore the express preemptive language
                  in section 1123(a). ...................................................... 18

            2.    Moreover, the specific ways Appellants seek to limit the
                  scope of section 1123(a) are unsupportable. ...................... 21

                  a.    Section 1123(a)(5) is a substantive, "empowering"
                        section of the statute, not merely "administrative,"
                        and has preemptive effect. ................................... 21

                  b.    The Bankruptcy Court's analysis is fully consistent
                        with the statutory context and, in particular, with
                        section 524(g). .................................................. 22

      B.    Section 1123(a) preempts provisions of private contracts. ................ 24

      C.    Preemption under section 1123(a)(5) is not limited to laws
            "relating to the financial condition" of a debtor........................... 28

      D.    Section 363(*l*) is not applicable. ........................................... 34

      E.    Section 365 is not applicable. ................................................ 36

IV.   THE APPELLANT INSURERS SEEK A WINDFALL HERE. ................. 37

CONCLUSION.............................................................................. 40

# TABLE OF AUTHORITIES

## CASES

In re Babcock & Wilcox Co., 2004 WL 4945985 (Bankr. E.D. La. Nov. 9, 2004),
*vacated on other grounds*, 2005 WL 4982364 (E.D. La. Dec. 28, 2005)..................*passim*

Bldg. & Constr. Trades Council v. Associated Builders & Contractors, 507 U.S. 218
(1993)......................................................................................................................... 24

Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. 182 (1999)..................................... 33

In re Buttonwood Partners, Ltd., 111 B.R. 57 (Bankr. S.D.N.Y. 1990)..................................... 40

Camp v. St. Paul Fire & Marine Ins. Co., 616 So. 2d 12 (Fla. 1993) ........................................ 39

In re Carolina Tobacco, 360 B.R. 702 (D. Or. 2007) ................................................................. 29

Cipollone v. Liggett Group, Inc., 505 U.S. 504 (1992)..........................................................25, 26

Cisneros v. Alpine Ridge Group, 508 U.S. 10 (1993).............................................. 18, 19, 20, 29

Cohen v. De La Cruz, 523 U.S. 213 (1998)................................................................................ 30

In re Combustion Eng'g, Inc., 391 F.3d 190 (3d Cir. 2004)...................................................*passim*

Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833 (1986)....................................... 33

Egelhoff v. Egelhoff ex rel. Breiner, 532 U.S. 141 (2001)....................................................18, 20

Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist., 541 U.S. 246 (2004) ....................19, 20

In re FCX, Inc., 853 F.2d 1149 (4th Cir. 1988) ....................................................................*passim*

In re Farmers Mkts., Inc., 792 F.2d 1400 (9th Cir. 1986)............................................................ 18

In re Fed. Press Co., 104 B.R. 56 (Bankr. N.D. Ind. 1989)........................................................ 38

In re Federal-Mogul Global Inc., 385 B.R. 560 (Bankr. D. Del. 2008) ................................*passim*

Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1 (2000)..................... 31

Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 885 F.2d 1149 (3d Cir. 1989)..36, 37

Holywell Corp. v. Smith, 503 U.S. 47 (1992) ............................................................................... 6

In re Indian Palms Assocs., Ltd., 61 F.3d 197 (3d. Cir. 1995) .............................................25, 28

Integrated Solutions, Inc. v. Serv. Support Specialties, Inc., 124 F.3d 487 (3d Cir. 1997) ...*passim*

In re Kaiser Aluminum Corp., 343 B.R. 88 (D. Del. 2006)....................................*passim*

Kawaauhau v. Geiger, 523 U.S. 57 (1998) ........................................................... 31

Medtronic, Inc. v. Lohr, 518 U.S. 470 (1986) ...................................................... 20

Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot., 474 U.S. 494 (1986) ................... 31

In re Moore, 290 B.R. 851 (Bankr. N.D. Ala. 2003)............................................... 27

Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co., 534 U.S. 327 (2002)................. 33

New York v. FERC, 535 U.S. 1 (2002)................................................................. 19

Norfolk & W. Ry. Co. v. Train Dispatchers Ass'n, 499 U.S. 117 (1991)................... 26

Pac. Gas & Elec. Co. v. California, 350 F.3d 932 (9th Cir. 2003)...................28, 29, 32

In re Pac. Gas & Elec. Co., 273 B.R. 795 (Bankr. N.D. Cal. 2002) ........................ 32

In re Pub. Serv. Co., 108 B.R. 854 (Bankr. D.N.H. 1989) .................................. 6, 22

SEC v. Nat'l Sec., Inc., 393 U.S. 453 (1969) ....................................................... 21

In re Stone & Webster, Inc., 286 B.R. 532 (Bankr. D. Del. 2002) ..................12, 13, 29

In re Tate, 253 B.R. 653 (Bankr. W.D.N.C. 2000) ................................................ 40

Trojan Techs., Inc. v. Pennsylvania, 916 F.2d 903 (3d Cir. 1990) ........................... 34

United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365
    (1988).................................................................................................22, 23

United States v. Ron Pair Enters., Inc., 489 U.S. 235 (1989)................................... 30

U.S. Dep't of Treasury v. Fabe, 508 U.S. 491 (1993)........................................20, 21

In re Vanderveer Estates Holding, LLC, 328 B.R. 18 (Bankr. E.D.N.Y. 2005)........... 38

Vujosevic v. Rafferty, 844 F.2d 1023 (3d Cir.1988) .............................................. 29

In re W. Asbestos Co., 313 B.R. 456 (Bankr. N.D. Cal. 2004) .....................6, 25, 29, 36

## DOCKETED CASES

Global Indus. Techs., Inc., Case No. 02-21626 (Bankr. W.D. Pa. Sept. 21 2007, modified Sept. 24, 2007).................................................................................................................... 11

In re Pittsburgh Corning Corp., No. 00-22876 (Bankr. W.D. Pa. Dec. 21, 2006)................*passim*

## STATUTES

11 U.S.C. § 363(b)(1) ...........................................................................................................15, 22

11 U.S.C. § 363(*l*) ............................................................................................................15, 34, 35

11 U.S.C. § 364(d) ................................................................................................................... 37

11 U.S.C. § 365 ...................................................................................................................36, 37

11 U.S.C. § 365(c)(3) ............................................................................................................... 27

11 U.S.C. § 365(n)(1)(B) .......................................................................................................... 27

11 U.S.C. § 502(b)(7) ............................................................................................................... 37

11 U.S.C. § 506(b) ................................................................................................................... 37

11 U.S.C. § 510 ....................................................................................................................... 36

11 U.S.C. § 524(g)...............................................................................................................*passim*

11 U.S.C. § 541 ...........................................................................................................9, 10, 14, 28

11 U.S.C. § 541(c)(1) .........................................................................................................*passim*

11 U.S.C. § 544 ....................................................................................................................... 37

11 U.S.C. § 552(a) ................................................................................................................... 37

11 U.S.C. § 704 ....................................................................................................................15, 22

11 U.S.C. § 728(b) ................................................................................................................... 15

11 U.S.C. § 1123(a)...........................................................................................................*passim*

11 U.S.C. § 1123(a)(5) .......................................................................................................*passim*

11 U.S.C. § 1123(a)(5)(B) ...................................................................................................*passim*

11 U.S.C. § 1123(a)(5)(C) ........................................................................................................ 22

11 U.S.C. § 1123(a)(5)(D) ................................................................................12, 35

11 U.S.C. § 1123(a)(5)(F) ........................................................................................ 27

11 U.S.C. § 1123(a)(5)(G) ....................................................................................... 27

11 U.S.C. § 1123(a)(5)(H) ..........................................................................27, 28, 31

11 U.S.C. § 1123(a)(5)(I) ...................................................................................22, 31

11 U.S.C. § 1123(a)(5)(J) ........................................................................................ 22

11 U.S.C. § 1123(a)(6) .......................................................................................27, 31

11 U.S.C. § 1123(b)(2) ............................................................................................ 35

11 U.S.C. § 1123(b)(3)(B) ....................................................................................... 13

11 U.S.C. § 1129 ...................................................................................................... 13

11 U.S.C. § 1129(a)(1) ............................................................................................ 23

11 U.S.C. § 1129(a)(7) ............................................................................................ 13

11 U.S.C. § 1142 ...........................................................................................29, 30, 32

11 U.S.C. § 1142(a) .........................................................................................*passim*

11 U.S.C. § 1322(c)(1) ............................................................................................ 27

## OTHER AUTHORITY

Alan N. Resnick & Henry J. Summer, 7 Collier on Bankruptcy ¶ 1123.LH[1][a]
    (15th ed. 2008) ................................................................................................ 32

This brief is filed by Appellee the Official Committee of Asbestos Claimants ("Committee") in the above-captioned matter and responds to the briefs filed by Appellant LMI[1] ("LMI") and Appellant Hartford[2] ("Hartford") (collectively, "Appellants").  The Committee hereby joins the briefs filed by Appellee the Reorganized Debtors and by Appellee the Legal Representative for Future Asbestos Claimants ("FCR").

## **INTRODUCTION**

At issue in this appeal is a question of vital importance to debtors overwhelmed with mass tort liabilities arising out of the manufacture and distribution of asbestos-containing products, and to all their creditors.  That issue is whether such debtors whose own directly-held assets are woefully inadequate to pay the tort claims against them can effectively utilize insurance coverage they purchased in the past for the purpose of protecting themselves and their assets from such tort claims to partially satisfy the claims of those creditors in a Chapter

---

[1]     Certain Underwriters at Lloyd's, London, and Certain London Market Companies, joint submitters of Brief of Appellants (cited as "LMI Br.").

[2]     Hartford Accident and Indemnity Company; First State Insurance Company; New England Insurance Company; Allianz Global Corporate & Specialty AG (as successor-by-partial merger to Allianz Verischerungs AG as to Policy No. H. 0 001 456); Allianz Global Risks U.S. Insurance Company (f/k/a Allianz Insurance Company); Allianz Underwriters Insurance Company (f/k/a Allianz Underwriters, Inc.); AIG Casualty Company; AIU Insurance Company; American Home Assurance Company; Granite State Insurance Company; Insurance Company of the State of Pennsylvania; Lexington Insurance Company; National Union Fire Insurance Company of Pittsburgh, Pa; New Hampshire Insurance Company; Columbia Casualty Company; Continental Casualty Company; The Continental Insurance Company, Both In Its Individual Capacity and As Successor To Certain Interests Of Harbor Insurance Company, joint submitters of Certain Appellants' Brief on Appeal (cited as "Hartford Br.").

11 reorganization plan under section 524(g) of the Bankruptcy Code.[3]  Appellants say no.  The Committee demonstrates here why the answer must be yes.

The Debtor Federal-Mogul Corporation ("FMC") and various of its subsidiaries (collectively "FM") filed for bankruptcy in October 2001 because, *inter alia*, of the crushing weight of asbestos claims being brought against it and several of those subsidiaries.  Like many other similarly situated former manufacturers and distributors of asbestos-containing products, prior to seeking bankruptcy court protection, the combination of FM's obligations to its commercial creditors, such as banks, bondholders and trade creditors, and to its asbestos personal injury tort creditors could no longer be met with the financial assets available to pay them.

From the beginning of its Chapter 11 case, FM made clear its intention to propose a plan of reorganization under section 524(g) of the Bankruptcy Code — a provision enacted expressly for asbestos-driven bankruptcies — that would allow it to resolve not only present claims against it but also future claims (labeled "demands" in the statute) that would otherwise be non-dischargeable in bankruptcy.  At a relatively early point in the case, FM, the Committee and the FCR entered into an agreement in principle concerning a plan of reorganization that would create a section 524(g) trust (i) to which all of FM's asbestos personal injury liabilities — which arise out of long-past manufacture, sale, distribution, or use of asbestos-containing materials — would be transferred for resolution and payment and (ii) which would be funded with (x) 50.1 percent of the stock of FMC and (y) the rights to all

---

[3]      All statutory citations herein, unless otherwise specified, are to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

remaining FM insurance coverage for the transferred asbestos personal injury liabilities.  This

agreement came to be referred to in the case as the "Central Deal."

The Central Deal was aimed at avoiding extended litigation over the magnitude

of FM's asbestos liabilities while providing a fair and equitable recovery for all of FM's

commercial creditors through a combination of cash payments and distributable shares of the

remaining 49.9% of the FMC stock.  The transfer to the trust of FM's remaining asbestos

personal injury insurance was a key component of the balance agreed to in the Central Deal

inasmuch as FM lacked sufficient unencumbered assets to pay cash in a lump sum amount

equal to the billions of dollars of insurance coverage to the proposed trust upon emergence and

then later seek reimbursement for the payments from its insurers.

After several years of plan negotiations and drafting and litigation with certain

other creditor constituencies and other parties in interest, a reorganization plan embodying the

Central Deal was confirmed and consummated at the end of 2007 (the "Plan").  Among the

objectors to confirmation of the FM Plan were the Appellants, who contended that the Plan

violated their contractual rights under their insurance policies by, among other things,

transferring FM's asbestos insurance coverage rights to the proposed trust over their

objections.  As a result of stipulations entered into between the proponents of the FM Plan and

the Appellants, the issue of whether the Bankruptcy Code preempted certain provisions of the

Appellants' policies purporting to prohibit "assignments" of the policies and interests therein

was, by consent of all parties concerned, split off from the balance of the confirmation issues

for separate resolution by the Bankruptcy Court.  The Bankruptcy Court subsequently in early

2008 issued its decision, holding that under applicable Third Circuit precedent and various

sections of the Bankruptcy Code, the Plan could properly provide for the transfer of the FM asbestos insurance rights, notwithstanding arguably inconsistent anti-assignment policy provisions, to the trust that succeeded to the insured FM asbestos personal injury liabilities. This appeal followed.

Appellants' view of this case is that they, in effect, have a veto over the right of any insured but otherwise financially distressed debtor such as FM to utilize its existing insurance to satisfy insured liabilities in a section 524(g) case through transfer of the insurance pursuant to a plan of reorganization to a successor trust that assumes the debtor's insured liabilities, regardless of the impact of that veto on the debtor's ability to reorganize. In that connection, it should be noted that insurers such as Appellants have no economic incentive to grant such consent because, if they prevail on this appeal, and their contentions that subsequent coverage litigation will uphold their anti-assignment arguments (notwithstanding other provisions in their insurance policies that purport to preclude them from avoiding coverage as a result of the insolvency or bankruptcy of the insured) prove correct, they will seek a Catch-22 windfall eliminating all their coverage obligations by then arguing (1) that they don't insure the trust that has assumed the FM asbestos liabilities and (2) that, notwithstanding section 524(e) of the Bankruptcy Code (which provides that the discharge of a debtor (FM) from a liability does not free any other entity (such as an insurer) that is also liable for the same debt), FM no longer has any insured asbestos liabilities because, under section 524(g), those liabilities have all been transferred to the trust.

Needless to say, were that result to occur, no debtor whose principal (or even a major) asset available to fund a section 524(g) trust is insurance would ever be able to utilize

section 524(g) and Chapter 11 to reorganize, and liquidation of such debtors, with attendant

greater losses to both their commercial and tort creditors, as well as costs to other stakeholders

such as the employees of the debtor and the communities in which they operate, would be the

only alternative.  Not only is that result one which this Court should be reluctant to hold is

mandated by the Bankruptcy Code, but as will be set out below, it is a result which is

precluded by controlling authority in this Circuit, *see* In re Combustion Engineering, Inc., 391

F.3d 190 (3d Cir. 2004), and is inconsistent with the relevant provisions of the Bankruptcy

Code.

**ARGUMENT**

I.      **THE BANKRUPTCY COURT CORRECTLY RULED THAT THE THIRD
        CIRCUIT'S DECISION IN COMBUSTION ENGINEERING IS
        CONTROLLING AUTHORITY HERE.**

        The Bankruptcy Court correctly held that "[it] is established in this circuit that

under § 1123(a)(5) assignment of policy proceeds to a § 524(g) trust is not prohibited by anti-

assignment provisions in insurance policies."[4]  In re Federal-Mogul Global Inc., 385 B.R. 560,

567 (Bankr. D. Del. 2008).  In reaching this conclusion, the Bankruptcy Court applied the

holding of In re Combustion Engineering, 391 F.3d 190 (3d Cir. 2004), which it recognized as

controlling authority in this Circuit.  In Combustion Engineering, as here, a plan of

reorganization provided for the assignment of a debtor's rights to insurance proceeds from the

_____

[4]      With respect to the Bankruptcy Court's discussion of whether state law would prohibit
assignment, the Committee agrees with Appellants that such discussion was reserved by
stipulation, and accordingly, pursuant to the stipulations, does not address that or any other
state law issue.  Appellants are likewise barred from raising state law issues or other issues
outside of what was stipulated.  For example, their attacks on the TDP, LMI Br. at 4, are both
meritless, and, as the subject of a properly confirmed plan, are not subject to challenge before
this Court.

debtor's estate to a section 524(g) trust, *see* 391 F.3d at 206-07, 207 n.11, & 218, and in that case, as here, the assignment was upheld as authorized by the Bankruptcy Code, despite insurers' contention that provisions of the policy prevented such assignment.[5]

Appellants argue that the Bankruptcy Court erred because it allegedly "misconstrues CE to involve the assignment of proceeds to a *trust*" but "CE does not involve such an assignment," but only the transfer of proceeds to the *estate*.[6] This description of Combustion Engineering by Appellants fundamentally mischaracterizes that decision, both as to the facts about what was at issue and as to the Third Circuit's legal analysis.

---

[5] The Third Circuit's holding in Combustion Engineering is supported by virtually every reported decision interpreting section 1123(a)(5) of the Bankruptcy Code. *See, e.g.,* In re Kaiser Aluminum Corp., 343 B.R. 88, 95 (D. Del. 2006) (following Combustion Eng'g, and holding that sections 541(c)(1) and 1123(a)(5)(B) of the Bankruptcy Code expressly permit the assignment of a debtor's interest in insurance policies to a trust or other entity, even if the subject insurance policies purport to prohibit assignment); In re Pittsburgh Corning Corp., No. 00-22876, Memorandum Opinion Confirming Plan, at 47, D.I. 5192 (Bankr. W.D. Pa. Dec. 21, 2006) (the "Pittsburgh Corning Op.") (attached hereto as Exhibit 1) (holding that insurance rights can be vested in a trust under section 1123(a)(5)(B), notwithstanding state law or contractual provisions to the contrary); Holywell Corp. v. Smith, 503 U.S. 47, 55 (1992) (finding that section 1123(a)(5)(B) authorizes transfer of estate property to a liquidating trust); FCX, 853 F.2d at 1155 (holding that debtor could release collateral securing claim in satisfaction of claim despite allegedly contrary bylaw provision because section 1123(a)(5) preempted any restrictions in bylaws regarding surrender); In re W. Asbestos Co., 313 B.R. 456, 462 (Bankr. N.D. Cal. 2004) (holding that insurance assets could be assigned to section 524(g) trust "pursuant to Bankruptcy Code section 1123(a)(5)(B), notwithstanding any state law or private contractual provisions to the contrary"); In re Pub. Serv. Co., 108 B.R. 854, 882 (Bankr. D.N.H. 1989) (holding that transfer of electric utility under plan was proper despite state regulations restricting transfer because section 1123(a)(5) preempted state regulations); In re Babcock & Wilcox Co., 2004 WL 4945985, at *17-18 (Bankr. E.D. La. Nov. 9, 2004) (holding that section 1123(a) "constitutes an explicit express Congressional intent to supersede state law restrictions on the transfer of estate property"), *vacated on other grounds*, 2005 WL 4982364 (E.D. La. Dec. 28, 2005).

[6] LMI Br. at 34 (emphasis added); *see also* Hartford Br. at 26.

The Combustion Engineering case involved the transfer, arising out of the plan, of insurance rights from the estate to a section 524(g) trust. The Third Circuit opinion expressly states in numerous places that the insurance proceeds at issue were not simply part of the assets of the estate, but were being assigned to a trust under the plan — that was the whole point in dispute. *See, e.g.,* 391 F.3d at 208 ("Certain insurance companies argued that Plan provisions *assigning policy proceeds to the Asbestos PI Trust* violated existing policies and/or settlement agreements with Combustion Engineering.") (emphasis added); *id.* at 206 ("The parties agreed *the post-confirmation trust would be funded* by contributions from Combustion Engineering [the debtor], ABB Limited, U.S. ABB, Lummus and Basic. The Bankruptcy Court found that *under the Plan Combustion Engineering would contribute its rights to proceeds under certain insurance policies* and settlement agreements with a face amount exceeding $320 million.") (emphasis added); *id.* at 216 ("The Bankruptcy Court found the assignment of insurance proceeds *to the Asbestos PI Trust* did not impair the rights of insurers") (emphasis added).

It is incontrovertible that the Third Circuit was correct in so characterizing the plan, for the Combustion Engineering plan terms make clear that the insurance proceeds and the rights to sue insurers were being assigned from the debtor's estate to a trust. *See* Combustion Engineering Plan, at 7.2.1, 7.2.10 and 7.2.13 (excerpt attached hereto as Exhibit 2).[7]

---

[7]    LMI argues that the Kaiser and Combustion Engineering cases only addressed whether the right to insurance proceeds could be assigned, whereas the assignment in the current case is supposedly broader. LMI Br. at 35-36. LMI is incorrect, and its proposed distinction is irrelevant in any event. As in this Plan (for example, at 1.1.218, 1.1.219, 10.3 and 10.6), the *(Footnote continued on next page.)*

The specific issue addressed by the district court that gave rise to the appeal in Combustion Engineering was the insurers' contention, as set forth by Judge Wolin, that the assignment of the right to insurance proceeds "*to the personal injury trust * * * violates anti-assignment provisions in their policies and impermissibly varies their rights under their insurance policies.*" *See* In re Combustion Eng'g, Inc., Case No. 03-10495, Hr'g Tr., July 31, 2003, at 145, D.I. 1220 (Bankr. D. Del. Aug. 14, 2003) (emphasis added). A copy of the relevant portion of the July 31, 2003 transcript is attached hereto as Exhibit 4.

The arguments presented to the Third Circuit in Combustion Engineering also demonstrate that the issue presented to the Third Circuit was the assignment of insurance rights to the trust and not merely their inclusion in the property of the debtor's estate. Travelers, for example, argued to the Third Circuit that "[t]he district court erred as a matter of law in concluding that rights under the policies could be assigned without the Insurers' consent." Brief of the Travelers Appellants at 25, In re Combustion Eng'g, Inc., No. 03-3414 (3d Cir. Sept. 15, 2003) (excerpt attached as Exhibit 5). The Unsecured Creditors Committee ("UCC") argued to the contrary, stating to the Third Circuit that "[t]he District Court properly held that, under the Plan, the Debtor's rights to insurance proceeds *may be assigned to the Asbestos PI Trust* as a matter of law, despite any clauses that may be present in the policies

---

*(Footnote continued from previous page.)*

plans in Kaiser and Combustion Engineering assigned the right to sue insurers to the trusts. *See, e.g.,* Kaiser Plan, at 1.1(145), 5.1(e)(ii) & (g), 5.2(e) (excerpt attached hereto as Exhibit 3); Combustion Engineering Plan, at 7.2.1, 7.2.10 and 7.2.13. The holdings of those cases are fully applicable here with respect to the assignability of the insurance rights, any semantic differences notwithstanding. Even if LMI were correct, however, that there was some difference between the contractual rights assigned here and in those cases, LMI still fails to show why that fact would lead to a different legal outcome here. It would not.

restricting their assignment without Certain Insurers' consent." Brief of Appellee the Official Committee of Unsecured Creditors of Combustion Engineering, Inc. at 11, In re Combustion Eng'g, Inc., No. 03-3414 (3d Cir. Sept. 25, 2003) (the "UCC CE Br.) (emphasis added) (excerpt attached as Exhibit 6).  The UCC argued not only that under section 541, insurance rights were "automatically transferred to a debtor's estate," UCC CE Br. at 13, but also that section 1123(a)(5)(B) "specifically preempts [any objection to] a transfer of rights from the Debtor's estate to the Asbestos PI Trust."  Id.

The Third Circuit's opinion clearly demonstrates that it recognized that the issue being decided was the transfer to the trust, not just to the estate.  In contrasting the rights under policies held by the debtor with rights under policies held by the non-debtors, the Third Circuit expressly stated that it "agreed with the district court" that the anti-assignment provisions of the debtor's own policies would not prohibit assignment of the debtor's own insurance proceeds — an assignment that the District Court had approved in accordance with the Plan's terms, i.e., an assignment from the estate to the trust.  Combustion Eng'g, 391 F.3d at 218-19.

The Third Circuit specifically addressed the assignability of insurance rights as property of the estate to other entities: having held that the debtor's insurance policies were property of the estate, despite the anti-assignment provisions in the policies, the Third Circuit went on to say more generally that "[s]ection 541 effectively preempts any contractual provision that purports to limit or restrict the rights of a debtor to transfer or assign its interests in bankruptcy."  Id. at 219 n.27.  In support of this conclusion, it pointed to section 1123(a)(5)(B), which authorizes the transfer of property of the estate to "one or more

entities."[8]  The Third Circuit's reliance on both section 1123(a)(5) and section 541 (rather than

on section 541 alone) confirms that it agreed with the District Court ruling that a debtor's right

to insurance proceeds not only is part of its bankruptcy estate pursuant to section 541 but that

section 1123(a)(5)(B) expressly authorizes the transfer of such right to proceeds, as property of

the estate, to a section 524(g) trust.[9]

      The Third Circuit's analysis was correctly described and applied by the

Bankruptcy Court in this case.  Judge Fitzgerald pointed out that in Combustion Engineering,

"[t]he Court of Appeals for the Third Circuit explained that '[p]ut simply, § 541 prohibits

restrictions on the interests of the debtor, which includes the insurance policies held by [the

debtor],' id. at 219, and, with respect to property of the estate, section 1123(a)(5)(B) expressly

contemplates that the debtor's interests in the policies may be assigned to a trust or other

entity.  Id. at n. 27."  Federal Mogul, 385 B.R. at 567.[10]

      This Court, and several bankruptcy court decisions within the Third Circuit,

have, like the Bankruptcy Court here, held that section 1123(a)(5)(B) permits the assignment,

under a plan, of asbestos insurance-related rights and proceeds to a trust.  See Kaiser, 343

---

[8]    Combustion Eng'g, 391 F.3d at 219 n.27.

[9]    Appellants' position amounts to saying that when the Third Circuit said it "agreed with" the District Court, which had upheld the assignment of the debtor's insurance rights to the section 524(g) trust, what it "really" meant was that it declined to resolve the very point in controversy that the District Court had decided — which was, as the Third Circuit repeatedly stated, not simply the validity of the transfer of those rights to the estate, but the transfer to the trust under the Plan.  This attempt to impose so nonsensical a reading of the Combustion Engineering decision is utterly implausible.

[10]    The Bankruptcy Court Judge in this case, Judge Judith Fitzgerald, was also the Bankruptcy Court Judge in Combustion Engineering, and thus was intimately familiar with the context of that case.

- 10 -

B.R. at 95; <u>Global Indus. Techs., Inc.</u>, Case No. 02-21626, Memorandum Op. at 7, D.I. 7703

(Bankr. W.D. Pa. Sept. 21 2007, modified Sept. 24, 2007) (attached hereto as <u>Exhibit 7</u>);

<u>Pittsburgh Corning</u> Op., at 49.  For example, the reading of <u>Combustion Engineering</u> in <u>Kaiser</u>

mirrors the Bankruptcy Court's analysis here.  "In <u>Combustion Engineering</u>, the Third Circuit

discussed the same issue raised here, i.e. whether a plan of reorganization can provide for the

assignment of insurance proceeds *to a Section 524(g) trust*, and concluded that Section

541(c)(1) and *Section 1123(a)(5)(B)* of the Bankruptcy Code expressly permit[] the assignment

of a debtor's interest in insurance policies *to a trust or other entity*, even if the subject

insurance policies contain a prohibition on assignment."  <u>Kaiser</u>, 343 B.R. at 95 (emphasis

added).

      In short, there can be no valid dispute over whether a debtor's right to insurance

proceeds may be assigned to a section 524(g) trust pursuant to a plan of reorganization,

because that was the issue posed to and decided by the Third Circuit in <u>Combustion</u>

<u>Engineering</u>.  This is the same issue on which the Bankruptcy Court here correctly followed

that precedent and it is the same issue now presented to this Court.  The Third Circuit's

decision is controlling here as it was there.

## II.    THE BANKRUPTCY COURT CORRECTLY RULED THAT SECTION 1123(a)(5) PREEMPTS ANY ANTI-ASSIGNMENT CLAUSES IN THE RELEVANT INSURANCE POLICIES.

      Even assuming this issue had not already been determined by the Third Circuit,

the objections by Appellants to the Bankruptcy Court's holding on the effect of

section 1123(a)(5)(B) have no merit.

      Pursuant to section 1123(a)(5)(B), "[n]otwithstanding any otherwise applicable

nonbankruptcy law, a plan shall * * * provide adequate means for the plan's implementation,

such as * * * transfer of all or any part of the property of the estate to one or more entities,

whether organized before or after the confirmation of such plan." 11 U.S.C. § 1123(a)(5)(B).

Numerous courts have found that section 1123 of the Bankruptcy Code expressly preempts

nonbankruptcy rights that might otherwise interfere with the provisions of a Chapter 11 plan as

described in that section. In In re FCX, Inc., 853 F.2d 1149, 1155 (4th Cir. 1988) the Fourth

Circuit described section 1123(a)(5) as an "empowering statute" and held that "section

1123(a)(5)(D) then does not simply provide a means to exercise the debtor's pre-bankruptcy

rights; it enlarges the scope of those rights, thus enhancing the ability of a trustee or debtor in

possession to deal with property of the estate." FCX, 853 F.2d at 1155. In this connection,

the FCX court adopted the formulation of Collier's authoritative bankruptcy treatise, which

states that section 1123(a)(5) is "self-executing" with the result that "the plan may propose

such actions [specified in section 1123(a)(5)] notwithstanding nonbankruptcy law or

agreements") (quoting 5 Collier on Bankruptcy ¶ 1123.01). Id. The holding in FCX that

section 1123(a)(5) "enhances the ability of ... a debtor in possession *to deal with* property of

the estate" underscores the fundamental conclusion of Combustion Engineering, followed by

the Bankruptcy Court here — that once a debtor's insurance rights become property of the

estate with the filing of the petition, they are not, as Appellants claim, thereafter frozen in the

estate. Rather the statute means they can be "dealt with" as part of the plan, in accordance

with the provisions of section 1123(a)(5).[11]

---

[11]    *See also* In re Stone & Webster, Inc., 286 B.R. 532, 543 (Bankr. D. Del. 2002)
("[Section] 1123(a) can be effected without regard to otherwise applicable nonbankruptcy law
* * * ."). LMI argues that In re FCX and Stone & Webster looked to other sections of the
Code to determine the scope of 1123(a)(5). LMI misstates the analysis of those cases. In
*(Footnote continued on next page.)*

LMI criticizes the Bankruptcy Court here for allegedly relying on section 541 to "invalidate[] any contractual restrictions on assignment,"[12] and cites the Third Circuit decision in Integrated Solutions, Inc. v. Service Support Specialties, Inc., 124 F.3d 487 (3d Cir. 1997) as having "made it absolutely clear that § 541 does not eliminate any restrictions on an interest in property once it has passed to the estate."[13] LMI, however, is simply misreading the Bankruptcy Court decision in this case. Judge Fitzgerald was relying, not solely on section 541, but also on section 1123(a) and other provisions,[14] as made clear by the very

_____

*(Footnote continued from previous page.)*
Stone & Webster, 286 B.R. at 543, the court's conclusion that "provisions of a plan as articulated in § 1123(a) can be effected without regard to otherwise applicable nonbankruptcy law * * *" was independent of its discussion of section 1129(a)(7). Likewise the discussion of section 1123(a)(5) in Part II of In re FCX was independent of the separate discussion of section 1129 in Part III, and the section 1123(a)(5) discussion makes no reference whatever to section 1129. *See* FCX, 553 F.2d at 1153-58.

Hartford argues that In re FCX "accorded section 1123(a)(5) preemptive scope only with respect to laws concerning the debtor's financial condition and the restructuring of its debt obligations," Hartford Br. at 25 n.22. In fact, In re FCX in no way limited the scope of section 1123(a)(5) preemption to laws relating to financial condition, and Hartford's attempt to suggest otherwise is unsupported by the language and analysis of that case. In any event, the issue in FCX was the propriety of a plan provision allowing a member of a cooperative to offset its debt to the cooperative by surrendering unredeemed "patronage certificates" despite a contrary provision in the cooperative's bylaws; this is hardly a matter of overriding a law relating to "financial condition." Hartford also argues that the Stone & Webster court "did no statutory analysis of its own," but instead relied on In re FCX and the district court decision in Pacific Gas. But Stone & Webster's analysis, although it appropriately cited In re FCX, which is directly on point, was primarily based upon the "clear meaning" of the "notwithstanding" clause of section 1123.

[12]    LMI Br. at 17.

[13]    LMI Br. at 18.

[14]    While the Bankruptcy Court noted section 1123(b)(3)(B), along with many other sections of the Code, it did not rely on any preemptive effect of that section to support its holding. Accordingly, LMI's statement that "there is no preemptive language in § 1123(b)(3)(B) whatsoever," LMI Br. at 16, is not only incorrect (insofar as section 1123(b), *(Footnote continued on next page.)*

- 13 -

section of her opinion criticized by LMI: "However, both the express language of § 541(c)(1) and courts construing that text have held that § 541(c)(1) prohibits a contractual restriction on the rights of a debtor to transfer or assign its interests in bankruptcy *and § 1123(a)(5) permits the transfer of the property to a § 524(g) trust*."[15]  LMI Br. at 17-18 n.14 (emphasis added). The Bankruptcy Court's conclusion is the same as that reached by the Third Circuit in Combustion Engineering, 391 F.2d at 219 n.27 (citing both §§ 541 and 1123(a)(5)(B)), and by this Court in Kaiser: "Section 541(c)(1) and Section 1123(a)(5)(B) of the Bankruptcy Code expressly permit[] the assignment of a debtor's interest in insurance policies to a trust or other entity, even if the subject insurance policies contain a prohibition of assignment." 343 B.R. at 95.

Indeed, the Integrated Solutions case further supports the Bankruptcy Court's interpretation of the preemptive effect of section 1123(a).  In Integrated Solutions, the purchaser, who had apparently acquired a chapter 7 bankruptcy estate's prejudgment tort claims pursuant to a section 363 sale, sought to prosecute those claims in contravention of applicable state law prohibiting the assignment of such claims. 124 F.3d at 493.  The purchaser argued that it had properly been sold those claims notwithstanding applicable state law, which the purchaser argued was preempted by the Bankruptcy Code.  *Id.*  In support of

_____

*(Footnote continued from previous page.)*
by its terms, is expressly "[s]ubject to subsection (a) of this section," which, of course, contains the broad "[n]otwithstanding any otherwise applicable nonbankruptcy law" preemption language at issue), it is also irrelevant.

[15]    Indeed, the Bankruptcy Court's conclusion was set forth even more clearly in language LMI does not cite: "Thus, the insurance policies are property of these estates by virtue of § 541 and their transfer to the § 524(g) trust is permitted notwithstanding anti-assignment clauses in or incorporated in the policies or applicable state law by virtue of § 1123(a)(5) and § 541(c)(1), as applicable." 385 B.R. at 571.

its preemption argument, the purchaser cited to sections 704(1) and 363(b)(1) of the

Bankruptcy Code. *Id.* Given that neither of these statutes contains any express preemption

language, the Third Circuit had little problem in finding that "neither § 363(b)(1) nor § 704(1)

expressly authorizes the trustee to sell property in violation of state law transfer restrictions."

*Id.* More importantly, the Third Circuit contrasted those two sections with other sections of

the Bankruptcy Code that do contain express preemption provisions, including section 1123(a),

noting that "[t]he clear lack of Congressional intent to preempt state law restrictions on

transferring property of the estate is even more telling given the explicit language that

Congress uses when it intends to displace state nonbankruptcy law in other provisions of the

Bankruptcy Code." *Id.* (citing as examples of such explicit preemption provisions

sections 1123(a), 541(c)(1), 728(b) and 363(*l*) of the Bankruptcy Code).

In Kaiser, this Court followed the Third Circuit's approach in Integrated

Solutions, where it affirmed the Bankruptcy Court's ruling that section 1123(a)(5)(B) did

preempt the anti-assignment provisions of asbestos insurance policies to permit the assignment

of policy proceeds to a section 524(g) trust. *See* 343 B.R. at 95 (noting that the "Third Circuit

[in Integrated Solutions] distinguished Sections 363 and 704 from Section 1123(a) of the

Bankruptcy Code, which expressly provides for the preemption of nonbankruptcy law.

Accordingly, the Court concludes that the Bankruptcy Court did not err in concluding that the

anti-assignment clauses in the [debtor's] insurance policies are preempted by the Bankruptcy

Code."). The Court should reach the same conclusion here.

## III.    THE BANKRUPTCY COURT CORRECTLY RULED THAT APPELLANTS' ARGUMENTS AGAINST EXPRESS PREEMPTION OF THE ANTI-ASSIGNMENT PROVISIONS IN THEIR POLICIES ARE MERITLESS.

In an attempt to distract attention from the governing law set forth in Combustion Engineering, to overcome the clear language and purpose of section 1123(a)(5), and to somehow address the overwhelming weight of authority squarely contrary to their position, Appellants attempt various additional arguments to support their erroneous assertion that section 1123(a)(5), despite its broad and express preemption language, does not affect the enforceability of the anti-assignment provisions in their policies.[16]  First, LMI contends that even though the statute expressly provides for preemption, section 1123(a)(5) should be applied only in situations in which the contemplated action is specifically authorized elsewhere in the

----

[16]    LMI's argument that "[t]he Court should not find that there is an actual conflict between the Bankruptcy Code, properly interpreted, and the applicable state law that allows LMI to enforce their Assignment Restrictions," LMI Br. at 20-21, is simply a reformulation of its argument that the Bankruptcy Code does not preempt the anti-assignment provisions of its policies.  LMI takes the position that the assignment of rights under its policies to the trust would be prohibited under those policies and state law.  As Appellees demonstrate throughout this brief, the Bankruptcy Code preempts such provisions to allow the assignment of the policy rights to the trust, and thus there is an indisputable actual conflict.

Hartford's argument that nothing in the Bankruptcy Code "requires" the debtor to transfer property of the estate to another entity, Hartford Br. at 29, is likewise irrelevant.  If the Bankruptcy Code permits such transfer under a plan notwithstanding nonbankruptcy law and contracts, then contrary law and contracts are preempted regardless of whether such transfers are "required" by the Code, nor does Hartford cite any authority to the contrary.  Moreover, as shown throughout the brief, transfers of insurance rights to a section 524(g) trust are necessary and appropriate for the proper functioning of the Bankruptcy Code and section 524(g) in particular, and the language of section 1123(a)(5) is that a plan "*shall * * * provide adequate means for the plan's implementation, such as * * * transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan.*"  This use of the mandatory term "shall" makes clear the provision is more than merely permissive.

- 16 -

Bankruptcy Code.[17]  Second, relying on a textually unsupportable and unworkable reading of the statute, Appellants claim that section 1123(a)(5) preempts only state laws and regulations but not contract provisions.  Third, relying on a single Ninth Circuit case that squarely conflicts with the Third Circuit's opinion in Combustion Engineering and the holdings of every other court, including this one and the Third Circuit, that has interpreted section 1123(a)(5), Appellants argue that section 1123(a)(5) should be interpreted to apply only to laws relating to the financial condition of a debtor, importing such language from a different section of the statute, section 1142(a).  Finally, LMI contends that section 363(*l*) and/or section 365, not section 1123(a)(5), govern the transfer of the rights to proceeds.  Each of these arguments is meritless.

>       **A.**       **The Bankruptcy Court's preemption analysis is correct.**

LMI contends that "[t]he Bankruptcy Court erred in ruling that the plain language of § 1123(a)(5) overcomes the presumption against preemption,"[18] arguing in part that section 1123(a)(5) "is merely an administrative section" that simply "specifies the minimum requirements that the Plan must satisfy to be confirmed,"[19] and that the Bankruptcy Court should have considered the surrounding statutory framework.[20]  LMI's objections are not well taken.

---

[17]       LMI Br. at 30, 32.

[18]       LMI Br. at 23.

[19]       LMI Br. at 25.

[20]       LMI Br. at 27.

1.    **There is no basis to ignore the express preemptive language in section 1123(a).**

Pursuant to its constitutional power to "establish * * * uniform Laws on the subject of Bankruptcies throughout the United States" [Art II, sec. 8, cl. 4], "Congress may abrogate state law entitlements in bankruptcy." In re Farmers Mkts., Inc., 792 F.2d 1400, 1403 (9th Cir. 1986). Appellants do not argue, nor could they, that Congress does not have the power to override state law and contractual restrictions that otherwise would preclude the assignment of rights under insurance contracts. On its face, the "notwithstanding" language of section 1123(a)(5) is a direct and explicit exercise of that power. The plain meaning of section 1123(a)(5)(B) is therefore that it reflects a clear congressional intent to override non-bankruptcy restrictions regarding the transfer of property of the estate to another entity as necessary for implementation of a plan. Indeed, LMI acknowledges that it is arguing against the plain language of the statute, noting the allegedly "absurd results arising from a literal reading of § 1123(a)(5)."[21]

While Appellants recite formulas to the effect that there is a presumption against preemption, such presumptions give way when interpreting statutes such as section 1123(a) that explicitly provide for preemption. See Egelhoff v. Egelhoff ex rel. Breiner, 532 U.S. 141, 151 (2001) (noting that presumption against preemption "can be overcome where * * * Congress has made clear its desire for pre-emption"). As the Supreme Court has noted, it is well-recognized that the term "notwithstanding" as found in section 1123(a) expresses a clear statement of intent "to supersede all other laws." Cisneros v. Alpine Ridge Group, 508 U.S.

---

[21]    LMI Br. at 33.

10, 18 (1993).[22]  There is therefore no basis to attempt to construe section 1123(a) to neutralize its preemptive effect.[23]

LMI argues that the Bankruptcy Court's citation to <u>Cisneros</u> is inapposite because that case addressed a "notwithstanding" clause in the context of a contract and allegedly "[t]here is no logical connection between the rules of contract interpretation and the scope of preemption of the Bankruptcy Code."[24]  Unfortunately for LMI, the Supreme Court in <u>Cisneros</u> takes a contrary view, and was in fact relying on principles of statutory construction. "As we have noted previously in construing *statutes*, the use of such a 'notwithstanding' clause

---

[22]    Another decision of the Supreme Court also makes clear that section 1123(a)(5) must be interpreted without resort to any "presumption against preemption."  In <u>Engine Manufacturers Ass'n v. South Coast Air Quality Management District</u>, 541 U.S. 246 (2004), the Supreme Court declined to invoke the "presumption against preemption" with respect to an "express presumption" found in section 209(a) of the Clean Air Act.  Instead, the Court emphasized that the construction of the statute "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purposes."  *Id.* at 252 (quotation omitted).  The Court then rejected the lower court's holding that section 209(a) did not preempt state restrictions on vehicle purchases although it did preempt state restrictions on vehicle sales, and the Court stated: "We decline to read into § 209(a) a purchase/sale distinction that is not to be found in the text of § 209(a) or the structure of the CAA."  *Id.* at 255.  Here, just as the Supreme Court declined to apply a "presumption against preemption" in interpreting an express provision in the Clean Air Act, section 1123(a) of the Bankruptcy Code must be interpreted without resort to any such "presumption against preemption."

[23]    Additionally, no presumption against preemption should be applied here because no state law requires the presence of anti-assignment clauses in insurance contracts, and thus the historic police powers of the states are not implicated.  *See* <u>New York v. FERC</u>, 535 U.S. 1, 17-18 (2002) ("the Court 'start[s] with the assumption that the historic police powers of the States were not to be superseded * * * unless that was the clear and manifest purpose of Congress.' * * * These are not such cases, however, because the question presented does not concern the validity of a conflicting state law or regulation.") (citations omitted); <u>Babcock & Wilcox</u>, 2004 WL 4945985, at *17 ("a presumption against preemption is not present because state police powers are not implicated.").

[24]    LMI Br. at 24.

- 19 -

clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." Cisneros, 508 U.S. at 18 (emphasis added) (citing cases).

Appellants' argument that the "presumption against preemption" applies to determine the scope of an express preemption clause[25] does not change the primacy of the broad "notwithstanding" language itself, as recognized by one of Appellants' own cases.[26] Indeed, the Supreme Court has rejected the use of such a presumption to limit the scope of clear language. In Engine Mfrs. Ass'n v. South Coast Air Quality Management District, 541 U.S. 246, 256 (2004), the Supreme Court applied the plain language of the statute as written because "[t]he language of § 209(a) is categorical" and noted that "[t]he dissent objects to our interpretive method, which neither invokes the 'presumption against preemption' to determine the *scope* of pre-emption nor delves into legislative history." *See also* Egelhoff, 532 U.S. at 151.[27]

---

[25]    LMI Br. at 24; Hartford Br. at 17.

[26]    *See, e.g.*, Medtronic, Inc. v. Lohr, 518 U.S. 470, 484 (1986) (when "interpreting a statutory provision that expressly pre-empts state law," holding that the plain preemptive language means that "we need not go beyond that language to determine whether Congress intended the [provision] to pre-empt at least some state law").

[27]    Similarly, Appellants' invocation of the McCarran-Ferguson Act, LMI Br. at 25 n.20 and Hartford Br. at 17, is irrelevant here: the assignment provisions of the policies are not a "law enacted by any State for the purpose of regulating the business of insurance," nor do Appellants cite any case to the contrary. Indeed, LMI's cases address neither the McCarran-Ferguson Act nor preemption. Hartford's cases illustrate that the purpose of the McCarran-Ferguson Act is to protect policy holders (unlike Hartford's attempted use of it) and likewise fail to demonstrate that a state law regulating insurance is at issue here. Hartford does not, nor can it, demonstrate that the anti-assignment clauses are required under governing state law. U.S. Dep't of Treasury v. Fabe, 508 U.S. 491, 504 (1993) (refusing to equate "laws enacted *(Footnote continued on next page.)*

>    **2.    Moreover, the specific ways Appellants seek to limit the scope of
>    section 1123(a) are unsupportable.**
>
>>    **a.    Section 1123(a)(5) is a substantive, "empowering" section of
>>    the statute, not merely "administrative," and has preemptive
>>    effect.**

LMI's claim that section 1123(a)(5) is a "minor, administrative Bankruptcy

Code section" that "merely satisfies the minimum requirements that a plan must satisfy to be

confirmed, nothing more"[28] fails to cite a single case in support of LMI's position and it

ignores both the plain and preemptory language of that section and the numerous holdings that

it is an "empowering" provision that adds substantive scope to the power of the bankruptcy

process to deal with the debtor's property despite conflicting non-bankruptcy law.  FCX, 853

F.2d at 1155.  *See* Part II, *supra*.

Furthermore, LMI's contention that section 1123(a) is merely administrative and

does not expand preemption beyond what is specifically authorized in other sections of the

Bankruptcy Code renders the "notwithstanding any otherwise applicable non-bankruptcy law"

clause meaningless since the basis for any preemption would apparently have to be already

provided for elsewhere in the Bankruptcy Code, making section 1123(a) superfluous.

Moreover, that contention is facially inconsistent with the several subparts of

section 1123(a)(5) that list, and thereby preempt, non-bankruptcy law with respect to potential

---

*(Footnote continued from previous page.)*
for the purpose of regulating the business of insurance" with "the business of insurance itself")
(quotations and internal punctuation omitted); SEC v. Nat'l Sec., Inc., 393 U.S. 453, 463
(1969) (finding the McCarran-Ferguson Act not applicable because, *inter alia*, "Arizona has
not commanded something which the Federal Government seeks to prohibit.  It has permitted
respondents to consummate the merger; it did not order them to do so.").

[28]    LMI Br. at 15.

means for implementation of a plan that are not in fact authorized anywhere else in the Bankruptcy Code. *See, e.g.*, 11 U.S.C. §§ 1123(a)(5)(C) (merger or consolidation of the debtor), 1123(a)(5)(I) (amendment of charter) and 1123(a)(5)(J) (issuance of securities).

The many courts to consider the operation and effect of section 1123(a) have not limited its application only to situations where the contemplated action was authorized elsewhere in the Bankruptcy Code; to the contrary, the courts actually contrast the broader, substantive nature of section 1123(a) with the more limited reach of other sections in the Bankruptcy Code. *See, e.g.,* Integrated Solutions, 124 F.3d at 493 (contrasting § 363(b)(1) and § 704(1) with § 1123(a) and other preemptive sections); Kaiser, 343 B.R. at 95; Pittsburgh Corning Op. at 47-48; FCX, 853 F.2d at 1155 (noting § 1123(a)(5) is an "empowering statute" and contrasting it with more limited provisions of sections 363(b)(1) and 704 that merely "provide a means within the context of a bankruptcy proceeding for the exercise of a debtor's pre-bankruptcy rights"); Pub. Serv. Co., 108 B.R. at 887-88.

> **b.    The Bankruptcy Court's analysis is fully consistent with the statutory context and, in particular, with section 524(g).**

LMI claims that "[t]he Bankruptcy Court should have considered the surrounding statutory framework"[29] in determining the preemptive scope of section 1123(a)(5), citing United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365 (1988). But that case dealt with statutory interpretation where a provision was "ambiguous" and where language elsewhere in the statute was specifically applicable to the

---

[29]    LMI Br. at 27.

situation at issue, and did not address a preemptory provision such as section 1123(a). *Id.* at 371, 372-76. It thus provides no basis to disregard the plain meaning of section 1123(a)(5)(B).

Moreover, the Bankruptcy Court *did* consider the surrounding statutory framework. The Bankruptcy Court considered the language of the Bankruptcy Code and its structure and analyzed various of its provisions, ultimately concluding that "[t]he assignment of rights in certain insurance policies to the asbestos trust, as provided in part by Section 4.3 of the Plan, is valid and enforceable under §§ 524(g), 541(c)(1), 1123(a)(5)(B) and 1129(a)(1) of the Bankruptcy Code" and that "[t]he anti-assignment provisions in the policies and applicable state law are preempted." 385 B.R. at 566. In particular, the Bankruptcy Court noted the important role played by section 524(g) and the way in which section 1123(a)(5) supports that role by superseding limits on the assignment of insurance rights. For example, the Bankruptcy Court noted that "[s]ection 524(g) of the Bankruptcy Code creates a new form of entity: a trust to which asbestos liabilities are channeled and which addresses and pays those liabilities." *See id.* at 573.

Contrary to Hartford's contention otherwise,[30] the Bankruptcy Court correctly noted that "[a] § 524(g) trust is not a state law trust and likewise is not a creation of private agreement. Rather, a § 524(g) trust is one whose existence is authorized and whose contours are delineated by the Bankruptcy Code." *Id.* Under the Bankruptcy Code, "[s]uch a trust is the successor to the debtor's asbestos liabilities that are channeled to that trust, and those liabilities may include insured asbestos liabilities, inasmuch as § 524(g) clearly contemplates the transfer of insured liabilities to the trust." *Id.* Moreover, "[i]nsurance policies covering

---

[30]    Hartford Br. at 32 n.24.

asbestos liabilities are assets held by a debtor." *Id.* at 573-74. As insured asbestos liabilities are transferred to the trust, so should be the corresponding assets, the insurance policies that cover those liabilities. *Id.* at 574. In this context, it makes perfect sense to hold (as every court to consider the issue has done) that section 1123(a)(5)(B) applies to permit the transfer, pursuant to a plan of reorganization, of insurance policies or rights to proceeds thereunder from a debtor to the successor vehicle to the debtor with respect to the debtor's insured asbestos liabilities (*i.e.,* the section 524(g) trust). *Id.* In fact, unless such transfer can be part of a plan, it is difficult to see how there could be a workable plan using a section 524(g) trust in any case in which there is potentially significant insurance coverage. *See* Part IV, *infra.* The Bankruptcy Court's view of the proper scope of section 1123(a)(5)(B) is thus not only consistent with section 524(g) of the Code, but is necessary to achieve the goals of that section.

**B.    Section 1123(a) preempts provisions of private contracts.**

Appellants argue that because the "notwithstanding" language of section 1123(a)(5) does not specifically refer to contracts, and other provisions of the Bankruptcy Code do, therefore section 1123(a)(5) cannot preempt private contract rights.[31] They cite *no* case, however, that supports their overly constricted interpretation of section 1123(a)(5)[32] and they completely ignore that the Third Circuit and every other court

---

[31]    LMI Br. at 37-38; Hartford Br. at 19-21. Hartford also argues that "[a]bsent clear congressional intent to the contrary, courts presume that Congress does not intend to preempt private contracts and agreements," but no such principle is set forth in the cases it cites.

[32]    The <u>Building & Constr. Trades Council</u> case, cited by Hartford at Br. 19-20, does not address the application of an express preemptive provision of a statute at all, and none of the other several cases cited by Appellants hold that contracts cannot be expressly preempted. Indeed, most do not even address the Bankruptcy Code, much less section 1123(a), at all.

that has considered the issue have held that section 1123(a)(5) preempts the terms of private

contracts that would interfere with the adequate implementation of a plan. *See, e.g.*,

Combustion Eng'g, 391 F.3d at 218 n.27 (insurance contracts); Kaiser, 343 B.R. at 95

(insurance policies); Pittsburgh Corning Op. at 48 (insurance policies); FCX, 853 F.2d at

1154-55 (bylaws of cooperative); W. Asbestos Co., 313 B.R. at 462 (insurance contract);

Babcock & Wilcox, 2004 WL 4945985, at *18 (insurance contracts); *see also* In re Indian

Palms Assocs., Ltd., 61 F.3d 197, 209 (3d. Cir. 1995) (extending contractual maturity date of

mortgage pursuant to § 1123(a)(5)).

       Indeed, the dichotomy Appellants attempt to set up here between contract rights

and "nonbankruptcy law" is a false dichotomy, because the anti-assignment provisions of the

insurance contracts are only relevant if those provisions would be enforceable under state law.

*See, e.g.,* LMI Br. at 2 ("For the Court to find that the Bankruptcy Code authorizes the

Assignment, the Court must find that the Bankruptcy Code actually conflicts with, and thus

preempts, *the state law that gives effect* to the Anti-Assignment clause.  Thus, for purposes of

this determination, the Court must assume that applicable state law and the London Policies do

not permit the Assignment.") (emphasis added).  Thus, the Bankruptcy Court held that the

Bankruptcy Code preempted both the anti-assignment provisions of the policies and "applicable

state law."  385 B.R. at 566.

       Hartford cites to the plurality (not the majority) opinion in Cipollone v. Liggett

Group, Inc., 505 U.S. 504 (1992) for the proposition that a contract's terms are not state law

within the scope of an express preemption clause.  *See* Hartford Br. at 20 n.18 (citing

Cipollone at 526 n.24).  But Hartford misstates the analysis of the plurality, and ignores the

directly on-point controlling authority cited therein.  The Cipollone plurality analyzed a narrow

provision of federal law that stated "[n]o requirement or prohibition based on smoking and

health shall be imposed under State law," and decided that a warranty was not a requirement

or prohibition that was imposed under state law, but one which was imposed by the contracting

party upon itself.  505 U.S. at 515, 526 & n.24.  The plurality specifically distinguished the

preemption of a "*requirement or prohibition* imposed under State law" from the preemption of

a "*liability* imposed under state law" — which it acknowledged might require a different

result.  *Id.* at 526 n.24 (citations omitted).  This distinction is logical because, as the plurality

noted, while a *requirement or prohibition* in a warranty is self-imposed and not imposed by

state law, the *liability* for the breach of such a contract would be imposed by the state law.

The plurality opinion in Cipollone, therefore, does not support the proposition that a contract's

terms are not "state law."

　　　　Indeed, the Supreme Court decision in Norfolk & W. Ry. Co. v. Train

Dispatchers Ass'n, 499 U.S. 117 (1991), cited in Cipollone, is directly on point.  There, the

Supreme Court was analyzing a preemptive provision that exempted certain rail carriers from

"the antitrust laws and all other law, including State and municipal law."  *Id.* at 128.  The

Court noted that "[t]he exemption is broad enough to include laws that govern the obligations

imposed by contract," as "[a] contract depends on a regime of common and statutory law for

its effectiveness and enforcement."  *Id.* at 129-30.  Accordingly, the Court held that the

"exemption * * * from all other law *effects an override of contractual obligations*, as necessary

to carry out an approved transaction, by suspending application of the law that makes the

contract binding."  *Id.* at 130 (emphasis added).  Thus, the language of section 1123(a)(5) that

- 26 -

allows transfers from the estate "[n]otwithstanding any otherwise applicable nonbankruptcy law" on its face preempts the state law enforcing such contractual anti-assignment provisions, and thus the provisions themselves.

Precedent aside, LMI's narrow interpretation is also incorrect because it renders several subsections of section 1123(a) meaningless.[33] The clause "[n]otwithstanding any otherwise applicable nonbankruptcy law" applies to each of the subsections of section 1123(a). A number of these subsections refer to strictly contractual matters and would have no meaning if the "notwithstanding" clause were read to only preempt state statutes and regulations. *See* 11 U.S.C. § 1123(a)(5)(F) ("cancellation or modification of any indenture or similar instrument"), § 1123(a)(5)(G) ("curing or waiving of any default"), § 1123(a)(5)(H) (modifying certain terms of "outstanding securities") and § 1123(a)(6) (modifying certain terms of corporate charter). For example, if, as LMI contends, the "notwithstanding" clause only provides for the preemption of state laws and regulations and not privately agreed contract provisions, then section 1123(a)(5)(H), which explicitly authorizes a plan to extend the

---

[33]     LMI's reference to certain sections of the Bankruptcy Code where the term "contract" is specifically used also ignores that under various sections of the Bankruptcy Code, the term "applicable nonbankruptcy law" generally includes private contract rights, even where there is no explicit use of the term "contract" or "agreement." For example, section 365(c)(3) of the Bankruptcy Code prohibits a trustee from assuming a lease that has been "terminated under *applicable nonbankruptcy law* prior to the order for relief." 11 U.S.C. § 365(c)(3) (emphasis added). It is clear that the statute applies to leases that have expired or terminated under their own contractual terms as well as to the largely theoretical possibility that leases somehow are terminated pursuant to state statutory or regulatory law. *See* In re Moore, 290 B.R. 851, 879-80 (Bankr. N.D. Ala. 2003) (noting that section 365(c)(3) encompasses contractual termination or expiration of lease). The use of "applicable nonbankruptcy law" to encompass private contract rights is found in other sections of the Bankruptcy Code as well. *See, e.g.*, 11 U.S.C. §§ 365(n)(1)(B) (distinguishing between "exclusivity provision of * * * contract" and "any *other* right under applicable nonbankruptcy law") (emphasis added), 1322(c)(1) (plan may extend payment date on mortgage "notwithstanding * * * applicable nonbankruptcy law").

maturity date or change the interest rates or "other terms" of outstanding securities, is meaningless.

Not surprisingly, the Third Circuit agrees that section 1123(a) applies to private contracts. *See* Indian Palms Assocs., 61 F.3d at 209 (citing to § 1123(a)(5)(H) to find that "the plain terms of the Bankruptcy Code refute the proposition that a plan may not extend the maturity date of a mortgage"). Appellants nowhere explain how the "notwithstanding" language of section 1123(a) could not preempt contractual provisions regarding the transfers addressed in 1123(a)(5)(B) while simultaneously preempting other contract terms covered in other parts of the subsection — a piece of statutory gymnastics that would be necessary for many parts of the subsection to have any meaning under their interpretation of it.

**C.    Preemption under section 1123(a)(5) is not limited to laws "relating to the financial condition" of a debtor.**

Appellants contend that insofar as section 1123(a)(5) has preemptive effect, it preempts applicable nonbankruptcy law "only insofar as such law relates to a debtor's financial condition."[34] In doing so, Appellants rely primarily on a Ninth Circuit Court of Appeals holding, Pacific Gas & Electric Co. v. California, 350 F.3d 932 (9th Cir. 2003). In that reliance, Appellants ignore that the holding in Pacific Gas squarely conflicts with the holdings of the Third Circuit —which holdings are binding on this Court[35]— and every other court that

---

[34]    LMI Br. at 32-33; Hartford Br. at 21-25.

[35]    Hartford subtly attempts to attack the soundness of the Third Circuit's decision in Combustion Engineering, arguing, for example, that "[t]here is no discussion of the statute's preemptive effect" in that case. Hartford Br. at 26. As recognized by the Bankruptcy Court, Combustion Engineering holds that sections 541 and 1123(a)(5)(B) together mean that a debtor's insurance rights can be transferred to a section 524(g) trust despite arguably contrary *(Footnote continued on next page.)*

has considered the issue.  Among the cases that have applied section 1123(a)(5) without

limiting "applicable non-bankruptcy law" to laws relating to financial condition are

Combustion Eng'g, 391 F.3d at 219 n.27 (permitting insurance rights transfers); Kaiser, 343

B.R. at 93-95 (same); Pittsburgh Corning Op. at 47-48 (same); FCX, 853 F.2d at 1154

(cooperative bylaws); Stone & Webster, 286 B.R. at 543 (substantive consolidation); W.

Asbestos Co., 313 B.R. at 462 (insurance rights transfers); Babcock & Wilcox, 2004 WL

4945985, at *18 (same; explicitly disagreeing with Ninth Circuit's analysis in Pacific Gas); *see*

*also* Cisneros, 508 U.S. at 18 (citing FCX with approval regarding its interpretation of section

1123(a)(5) as "supersed[ing] all other laws").

       In any event, the Ninth Circuit's construction of section 1123(a) in Pacific Gas

is plainly wrong because its importation into section 1123(a)(5) of the words "relating to

financial condition"[36] from section 1142[37] violates the plain meaning rule of statutory

_____

*(Footnote continued from previous page.)*
policy terms, and the Third Circuit opinion in Combustion Engineering is controlling authority
here.  *See, e.g.,* Vujosevic v. Rafferty, 844 F.2d 1023, 1030 n.4 (3d Cir.1988) ("It is, of
course, patent that a district court does not have the discretion to disregard controlling
precedent simply because it disagrees with the reasoning behind such precedent.").

[36]    Hartford implies that the Ninth Circuit's decision in Pacific Gas was in part based on its
analysis of the term "financial condition" as meaning "relative solvency or insolvency of the
debtor."  Hartford Br. at 23.  But Pacific Gas did not define the term "financial condition,"
nor is that phrase defined by the Bankruptcy Code.  It is clear, however, that "financial
condition" means something more than the insolvency of the debtor.  *See, e.g.,* In re Carolina
Tobacco, 360 B.R. 702, 712  (D. Or. 2007) (rejecting a narrow definition of financial
condition as "actions triggered by a bankruptcy filing or the debtor's insolvency," holding that
"[t]he term financial condition represents a concept that is somewhat broader than operational
status," and that a statute that "would preclude Carolina from selling cigarettes if the company
failed to make the escrow payments" was "relate[d] to financial condition").

[37]    LMI states that "§ 1142(a) would not allow the debtor to carry out the plan because
§ 1142(a) only preempts state law 'relating to financial condition.'"  LMI Br. at 31.  Yet LMI
*(Footnote continued on next page.)*

interpretation.  *See, e.g.,* United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989)

("[W]here * * * the statute's language is plain, the sole function of the courts is to enforce it

according to its terms.") (internal quotations omitted).  As noted above, LMI acknowledges

that it is arguing against the literal meaning of section 1123(a)(5).[38]

        In an attempt to argue against applying the plain language of Section 1123(a)(5),

Hartford argues that "the Bankruptcy Code should not be read to break with prior practice

absent a clearly stated intent to do so," and cites several cases for that proposition.[39]  None of

those cases, however, supports disregarding the plain language of a statute.  Indeed, in one of

Hartford's cases, the Supreme Court in fact held that the "most straightforward reading" of the

statute supported its holding, Cohen v. De La Cruz, 523 U.S. 213, 218 (1998), while in the

other the Court merely stated that "[t]he normal rule of statutory construction is that if

Congress intends for legislation to change the interpretation of a judicially created concept, it

---

*(Footnote continued from previous page.)*
cites no authority, nor is there any, for the proposition that section 1142(a) precludes the
implementation of a plan in accordance with its terms where those terms appropriately
supersede state law or rights under section 1123(a).  To the contrary, section 1142 provides a
post-confirmation, and in some instances a post-bankruptcy, safe harbor for actions "carry[ing]
out a plan" (which are not necessarily spelled out in the plan) and for actions "comply[ing]
with any orders of the court" notwithstanding nonbankruptcy law, rules or regulation relating
to financial condition.  11 U.S.C. § 1142(a).

[38]     LMI cites Ron Pair for the proposition that "[t]he plain meaning rule does not apply
when 'the literal interpretation of a statute will produce a result demonstrably at odds with the
intentions of its drafters,'" LMI Br. at 27, but the Court in Ron Pair in fact enforced the plain
language rule in that case, and noted that "the plain meaning of legislation should be
conclusive, *except in the rare cases* [in which] the literal application of a statute will produce a
result demonstrably at odds with the intentions of its drafters."  489 U.S. at 242 (emphasis
added).  LMI can provide no legal support for the proposition that the assignment of insurance
rights under section 1123(a)(5)(B) is such a rare case, nor has any court ever so held.

[39]     Hartford Br. at 19, 24.

makes that intent specific." <u>Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.</u>, 474 U.S. 494, 501 (1986). In any event, subsequent Supreme Court authority ignored by Hartford makes clear that the plain language of a statute overcomes such rules of construction. "[W]hile pre-Code practice informs our understanding of the language of the Code, it cannot overcome that language. It is a tool of construction, not an extratextual supplement * * * . Where the meaning of the Bankruptcy Code's text is itself clear * * * its operation is unimpeded by contrary * * * prior practice." <u>Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.</u>, 530 U.S. 1, 10 (2000) (citations and internal quotation marks omitted).

The impropriety of Appellants' argument for preferring the Ninth Circuit's view of section 1123(a) to that of the Third Circuit is further demonstrated by the inconvenient fact that the Ninth Circuit's interpretation, like Appellants' own "no preemption of contract" argument, renders section 1123(a)'s "notwithstanding" clause meaningless with respect to several subsections of the statute, as those subsections do not relate to financial condition, including subsections (a)(5)(I) (amendment of debtor's charter); (a)(5)(H) (extension of maturity date or change in interest rate or other term of outstanding securities); and (a)(6) (mandatory inclusion in charter of provision restricting issuance of nonvoting equity securities). <u>See</u> <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 62 (1998) (noting that courts should be "hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law").[40]

---

[40]    Moreover, the Ninth Circuit's holding that sections 1123(a)(5) and 1142(a) must be construed to mean the same thing, notwithstanding their very different texts and the different temporal and procedural contexts in which these provisions apply, was based on a single sentence in which Senator DeConcini indicated that, under section 1123 as enacted in 1978, *(Footnote continued on next page.)*

Moreover, giving effect to the express preemptive language of

section 1123(a)(5) is not, as Appellants suggest, "breathtaking in its sweep."[41]  LMI cites the

bankruptcy court decision in Pacific Gas and conjures up wholly hypothetical plan terms

purporting to supersede state laws that section 1123(a)(5) clearly cannot circumvent, such as

laws that do not allow an entity to "sell liquor to minors," "trade with foreign enemies,"

"dump toxic wastes," or "merge with competitors to create a monopoly."  LMI Br. at 26-27

(citing In re Pac. Gas & Elec. Co., 273 B.R. 795, 806 (Bankr. N.D. Cal. 2002)).  Whatever

the limits of section 1123(a) may be with respect to plan provisions that are unrelated to

objectives of the Bankruptcy Code,[42] those limits certainly would not prevent a debtor from

_____

*(Footnote continued from previous page.)*
"[i]f the plan is confirmed, then any action proposed in the plan may be taken notwithstanding any otherwise applicable nonbankruptcy law in accordance with section 1142(a) of title 11." Pacific Gas, 350 F.3d at 942.  The Ninth Circuit also pointed to the fact that in 1984, Congress amended both section 1123(a) and the title of section 1142 to substitute the word "implementation" for "execution."  This amendment is hardly evidence of legislative intent sufficient to ignore the plain language of the statute and certainly does not demonstrate that Congress intended the preemptive effect of section 1123(a)(5) to be limited by section 1142(a)'s "relating to financial condition" language.  *See, e.g.,* 385 B.R. at 572 n.27 ("We note that the language of each of § 363(l), § 1142(a) and § 1123(a)(5) varies. * * * Inasmuch as the provisions address different time periods in the life cycle of a bankruptcy * * * we think it likely that Congress intended this difference in statutory language."); Alan N. Resnick and Henry J. Summer, 7 Collier on Bankruptcy ¶ 1123.LH[1][a] (15th ed. 2008) ("The Bankruptcy Amendments and Federal Judgeship Act of 1984 made some changes in section 1123, most of a minor or conforming nature.  The language commencing subsection (a), 'Notwithstanding any otherwise applicable nonbankruptcy law, a' *was added to make clear that the plan's mandatory provisions as encompassed by subsection (a) were not subject to change or alteration or controlled by state or other federal law.*") (emphasis added).

[41]     Hartford Br. at 24; *see also* LMI Br. at 26-27.

[42]     The great majority of these "imaginary horribles" simply cannot arise — section 1123(a) preempts nonbankruptcy law only to the degree that it would interfere with some action permitted under the section; it is not a general authority for a plan to dispense with applicable substantive law.  In the actual case here, for example, the only insurance policy
*(Footnote continued on next page.)*

transferring rights to a successor entity that assumes the debtor's insured asbestos liabilities, namely a section 524(g) trust, whose establishment and purpose are contemplated by the Bankruptcy Code, as all cases to address the issue have found (as set forth throughout this brief).  *See also* Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co., 534 U.S. 327, 341-42 (2002) (rejecting the argument that the court consider potentially absurd consequences of a literal reading of a statute and require a limiting principle, when the matters at issue in the case "did not test the margins of the Act [but] * * * fall within the heartland.").  Section 1123(a)(5) lists specific actions that may be included in a plan as a means for implementation and those actions, as well as the plan as a whole, must otherwise comply with all other applicable requirements in the Bankruptcy Code, *and* be approved by a Bankruptcy Court to become effective.  There is nothing "breathtaking" about it.

Indeed, "parade of horribles"/"slippery slope" arguments such as those raised by Appellants here are regularly rejected by the Supreme Court.  *See, e.g.*, Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. 182, 195 n.16 (1999) (rejecting "[t]he dissent's concern that hordes of 'convicted drug dealers,' *ibid*, will swell the ranks of petition circulators, unstoppable by legitimate state regulation * * * .  This familiar parade of dreadfuls calls to mind wise counsel: 'Judges and lawyers live on the slippery slope of analogies; they are not supposed to ski it to the bottom.'" (citation omitted)); Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 852 (1986) ("While wholesale importation of concepts of pendent or ancillary jurisdiction into the agency context may create greater constitutional

---

*(Footnote continued from previous page.)*
provisions that are preempted are those purporting to limit assignment, not the underlying substantive policy terms, *e.g.*, the scope and amount of coverage.

difficulties, we decline to endorse an absolute prohibition on such jurisdiction out of fear of where some hypothetical "slippery slope" may deposit us."); *see also* Trojan Techs., Inc. v. Pennsylvania, 916 F.2d 903, 915 (3d Cir. 1990) ("[A]ppellants set out a parade of horribles, e.g. is a wooden chair with nails a steel product? But rhetorical questions of this sort, though intriguing, are not to the point."). The issue before this Court is whether the Bankruptcy Code preempts anti-assignment provisions in insurance policies when a plan of reorganization transfers rights under those policies to a successor section 524(g) trust that assumes the debtor's insured asbestos liabilities. All courts to consider this issue have held yes, as should this Court.

> **D.    Section 363(*l*) is not applicable.**

Grasping at another straw by which to persuade the Court to ignore Combustion Engineering and the express preemption language of section 1123(a), LMI argues that "[a] broad interpretation of § 1123(a)(5) renders § 363(*l*) superfluous."[43] There is, however, neither authority for, nor logic to, this novel contention. Section 363(*l*) is simply an anti-forfeiture statute, which serves to prevent the "forfeiture, modification, or termination of the debtor's interest in such property" as a result of the debtor's financial condition, the filing of a bankruptcy case or the appointment of a bankruptcy trustee. *See* 11 U.S.C. § 363(*l*). As acknowledged by LMI itself, Section 363(l)'s effect is "directed solely at making so-called *ipso facto* or bankruptcy default clauses unenforceable."[44] Section 363(*l*) is simply irrelevant here.

---

[43]    LMI Br. at 31.

[44]    LMI Br. at 22.

Indeed, the transfer of insurance rights to the trust would not be a "use, sale, or lease of property" within the meaning of section 363(*l*), nor does LMI cite any cases to the contrary. Section 1123(a) makes a distinction between the *transfer* of interests in estate property and the *sale* of estate property. *Compare* 11 U.S.C. § 1123(a)(5)(B) (authorizing plan to provide for "transfer of * * * property of the estate to one or more entities * * *") *with* 11 U.S.C. § 1123(a)(5)(D) (authorizing plan to provide for "sale of * * * property of the estate * * *").

Even if the transfer of insurance rights to the trust created under the plan were a "use, s[ale] or lease [of] property" within the meaning of section 363(*l*), there is nothing in the Bankruptcy Code that subjects the provisions in section 1123(a) to those of section 363(*l*). In contrast, Congress added specific language in section 1123(b) that makes certain provisions therein "subject to" the administrative provisions under chapter 3 of the Bankruptcy Code, showing that if Congress intended to make specific parts of Section 1123 subject to chapter 3, it knew how to do so. *See* 11 U.S.C. § 1123(b)(2) (providing that a plan may, "subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease").

Finally, in this as in many of Appellants' arguments, LMI ignores that cases applying section 1123(a)(5) have uniformly applied that provision to authorize transfers to trusts irrespective of section 363(*l*) (or, for that matter, section 365, addressed below). *See, e.g.*, Combustion Eng'g, 391 F.3d at 219 n.27 (finding that assignment of insurance proceeds to section 524(g) trust notwithstanding any anti-assignment provisions in subject insurance policies is valid and enforceable pursuant to sections 541 and 1123(a)(5)); Kaiser, 343 B.R. at

95 (same); W. Asbestos Co., 313 B.R. at 462 (holding that insurance assets could be assigned

to section 524(g) trust pursuant to section 1123(a)(5)(B))[45]; Pittsburgh Corning Op. at 47-48

(same).

### E. Section 365 is not applicable.

LMI also argues that "neither section 363 nor section 1123 — nor any other

provision in the Bankruptcy Code — authorizes the Debtors to transfer rights under insurance

policies because those policies are not executory.[46] This argument — like the related

contention that only the executory contract provisions of section 365 can affect the bankruptcy

status of contract rights — is plainly wrong. As set forth throughout this brief, all cases to

address the issue have held to the contrary. Moreover, there are numerous provisions in the

Bankruptcy Code that allow debtors to restructure their obligations under non-executory

contracts.[47] *See, e.g.*, 11 U.S.C. §§ 510 (allowing equitable subordination of claims or

---

[45]    LMI's stated belief that Western Asbestos would not have been upheld on further review is simply unsupported speculation, and its comment that the Plan provides that the Trust is not a successor to the Debtor is irrelevant. LMI Br. at 16. While, as provided in the Plan, the Trust is not a successor to the Debtor with respect to all of its assets and liabilities or its operations, that is not to say that the Trust cannot be the successor to the Debtor with respect to certain assets and liabilities, such as to asbestos liabilities and the policies that cover those liabilities, as contemplated by section 524(g).

[46]    LMI Br. at 38 ("The Bankruptcy Code contains no provision allowing modification or assignment of *non-executory* contracts").

[47]    Additionally, in each of the cases LMI cites for the proposition that a debtor is bound by the terms of non-executory contracts, LMI Br. at 38-39, the court was never asked to consider preemptive provisions under the Bankruptcy Code in determining which terms a debtor's estate was bound by under the non-executory contract at issue. In fact, in the case of Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 885 F.2d 1149 (3d Cir. 1989), relied on by LMI, the court even acknowledged that "the text of the Bankruptcy Code embodies the principle that pre-petition contract rights are enforceable in a bankruptcy *(Footnote continued on next page.)*

interests), 544 (allowing avoidance of unperfected liens), 364(d) (allowing the priming of

existing liens), 552(a) (cutting off floating liens), 502(b)(7) (limiting claims under employment

contracts) and 506(b) (limiting claims for postpetition interest and fees to value of collateral).

Here, section 1123(a)(5) expressly permits the transfer of property of the estate

to implement a plan notwithstanding any otherwise applicable state law or contract right that

would prohibit the transfer.  The fact that section 365 of the Bankruptcy Code contains specific

provisions relating to *executory* contracts, including the ability to assign such contracts

notwithstanding an anti-assignment clause, in no way leads to the conclusion that, despite the

express preemption language in section 1123(a), Congress did not intend to preempt anti-

assignment provisions in a *non-executory* contract in connection with a transfer of property of

the estate to a successor entity to implement a plan, especially an entity succeeding to the

debtor's insured asbestos liabilities and whose establishment and purpose are specifically

contemplated by section 524(g).  Like section 363(*l*), section 365 is simply irrelevant here.[48]

## IV.    THE APPELLANT INSURERS SEEK A WINDFALL HERE.

Asbestos insurance policies are an important — and sometimes the primary —

asset in many asbestos bankruptcies.  But Appellants never explain how, if their interpretation

of sections 1123(a)(5)(B) and 524(g) were accepted, the Policies could be applied to the

liabilities covered thereunder without their consent, which they have no economic incentive to

give.  As Appellants are undoubtedly aware, their interpretation of their contract rights would

---

*(Footnote continued from previous page.)*
proceeding *except to the extent the Code specifically provides otherwise.*"  *Id.* at 1157
(emphasis added).

[48]    Even LMI does not contend section 365 applies, as LMI acknowledges that the
insurance contracts at issue "are non-executory."  LMI Br. at 38.

frustrate the purposes of section 524(g) of the Bankruptcy Code by restricting the ability of a section 524(g) trust to receive the benefits of available insurance rights, and thereby provide a windfall to insurers who are unjustly seeking to avoid coverage obligations under the applicable policies.

Specifically, Appellants never explain how a debtor's asbestos policies could stay with the debtor while the liabilities were transferred to a section 524(g) trust, while also preserving policy coverage for those liabilities.  Under such a scenario, if Appellants have their way, they could argue that the trust had asbestos liabilities but no coverage, while the Debtor had asbestos coverage but no liabilities.  Thus, Appellants seek a windfall, because they seek to use the bankruptcy to eliminate their insurance obligations.  *See, e.g.*, In re Fed. Press Co., 104 B.R. 56, 67 (Bankr. N.D. Ind. 1989) ("The court believes that, inasmuch as Federal Press has fully paid its premiums under the policies and fulfilled its duties insofar as possible prior to its insolvency and bankruptcy, excusing Columbia from liability under the policies would result in a windfall to Columbia, Centaur and Forum to which the insurance companies would not have been entitled but for Federal Press' insolvency and bankruptcy. Such a result would be unfair and severely detrimental to Federal Press, its creditors, and the many tort claimants who are seeking recovery from Federal Press.").  Ironically, the very state laws that Appellants argue protect the anti-assignment provisions in their policies also make clear that the mere fact of bankruptcy cannot abrogate the policies[49] —yet such an abrogation is the effect of the position advanced by Appellants.

---

[49]     *See, e.g.,* In re Vanderveer Estates Holding, LLC, 328 B.R. 18, 23-24 (Bankr. E.D.N.Y. 2005) (discussing 215 Ill. Comp. Stat. Ann. § 5/388 which states that all liability *(Footnote continued on next page.)*

If the result of seeking section 524(g) protection were the forfeiture of a debtor's asbestos insurance policies, a debtor with significant insurance assets could not utilize section 524(g) in the first place.[50]  Indeed, it would be ridiculous to suggest that a section 524(g) trust would be created without inclusion of existing insurance that covers asbestos claims — the one asset unavailable to a debtor's other creditors.  Such an outcome would frustrate Congress' intent to permit the creation of a trust to assume a debtor's asbestos liabilities because it could potentially force the debtor either to forego its insurance proceeds as a cost of establishing the trust or agree to the demands of insurers who are seeking to avoid or minimize coverage.

This case presents a perfect example of how the anti-assignment provisions in Appellants' policies could be used to thwart section 524(g).  The Debtors have billions of dollars in insurance coverage available to pay for losses related to asbestos claims.  This insurance coverage is an important asset that will fund the Trust.  Yet notwithstanding that all

---

*(Footnote continued from previous page.)*
insurance policies must provide that "the insolvency or bankruptcy of the insured shall not release the company from the payment of damages for injuries sustained or death resulting therefrom, or loss occasioned during the term of such policy"); Camp v. St. Paul Fire & Marine Ins. Co., 616 So. 2d 12, 15 (Fla. 1993) (discussing policy provisions) ("The language of the policy affirms that, even if the insured filed bankruptcy, [the insurer] would bear the duty to defend and pay off a claim up to the policy limits").

[50]     *Cf.* Babcock & Wilcox, 2004 WL 4945985, at *18 ("A contrary conclusion would allow insurers an absolute veto of a plan of any reorganization that involved an insured with asbestosis [sic] liability because of the anti-assignment clauses found in policies. Such an interpretation would allow insurers to gut the reorganization and channeling injunction provisions specifically provided for in § 524(g). No law has been cited by the insurers to support such a proposition. Authority does exist, however, to support the proposition that § 524(g) was adopted to foster reorganization.").

of their coverage defenses are preserved by the Plan,[51] Appellants seek to escape coverage obligations under their policies simply because the rights to proceeds under the policies are being transferred to the section 524(g) trust along with the asbestos liabilities. Appellants are clearly attempting to use the anti-assignment provisions in Appellants' policies to realize a windfall under their policies, in contravention of the objectives of section 524(g).

Even if there were no express preemption — and there clearly is — implied preemption of anti-assignment policy provisions would be warranted to prevent a result so inequitable and so inconsistent with the statutory scheme.   In re Tate, 253 B.R. 653, 671 (Bankr. W.D.N.C. 2000); *see also* In re Buttonwood Partners, Ltd., 111 B.R. 57, 61 (Bankr. S.D.N.Y. 1990) (holding that Bankruptcy Code would preempt federal thrift regulation to extent that regulation would "interfere with the ability of this Debtor to effectively reorganize under Chapter 11 and contradict the 'fresh-start' policy which underlies the Code").

## CONCLUSION

For the foregoing reasons, the Committee respectfully requests that the Court affirm the Bankruptcy Court's decision, dismiss Appellants' appeal with prejudice, and grant such other and further relief as required in the interests of justice.

---

[51]    385 B.R. at 567 ("[c]overage issues * * * are all preserved"), citing Plan § 10.4 Insurance Neutrality, Doc. No. 13660, at 152-55.

Respectfully submitted,

Dated: Wilmington, Delaware

June 18, 2008

CAMPBELL & LEVINE, LLC

/s/ Mark T. Hurford
Marla R. Eskin (No. 2989)
Mark T. Hurford (No. 3229)
800 N. King Street, Suite 300
Wilmington, Delaware 19801
Telephone:  (302) 426-1900

-and-

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue, 35th Floor
New York, New York 10052-3500
Telephone:  (212) 319-7125

-and-

CAPLIN & DRYSDALE, CHARTERED
Peter Van N. Lockwood
Walter B. Slocombe
Kevin C. Maclay
One Thomas Circle, N.W.
Washington, DC 20005
Telephone:  (202) 862-5000

Counsel to the Official Committee
of Asbestos Claimants

# EXHIBIT 1

**IN THE UNITED STATES BANKRUPTCY COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA**

In Re:

|  |  |
|---|---|
| Pittsburgh Corning Corporation, | Bankruptcy No. 00-22876 (JKF) |
|  | Chapter 11 |
| Debtor |  |

Related to Dkt. No. 2700, Second Amended Disclosure Statement to Accompany the Second Amended Plan of Reorganization Dated November 20, 2003, Jointly Proposed by Pittsburgh Corning Corporation, the Official Committee of Asbestos Creditors and the Future Claimants' Representative,[1]

Dkt. No. 3186, Second Amended Plan of Reorganization Dated November 20, 2003, and

Dkt. No. 4108, Order regarding briefs addressing the impact, if any, of *In re Combustion Engineering*, 391 F.3d 190 (3d Cir. 2004), on the proposed plan of reorganization

Dkt. No. 3033, Motion in Limine (No. Two) Re Plan Finding on Purported "Validity and Enforceability" of Corning's Proposed Assignment of Corning Plan Insurance Policy Rights filed on behalf of Lumbermens Mutual Casualty Company

**MEMORANDUM OPINION[2]**

Introduction

The matter before the court is the confirmation of the Second Amended Plan of Debtor

Pittsburgh Corning Corporation (hereafter "PCC" or "the Debtor").  We find that the plan is

---

[1]A redlined version was filed at Dkt. No. 2702 on April 21, 2004.  The Second Amended Disclosure Statement with Plan was also filed as an exhibit.

[2]This Memorandum Opinion constitutes the court's findings of fact and conclusions of law.  The court's jurisdiction will be discussed in the text.

1

unconfirmable as over-inclusive under the Court of Appeals' decision in *In re Combustion Engineering*, 391 F.3d 190 (3d Cir. 2004).  The plan would channel the independent claims against PPG and Corning, which it may not do.  We repeat much of the same evidence throughout this Memorandum Opinion for the sake of pinpointing relevant evidence to the issue under discussion.

The plan was accepted by the overwhelming majority of all voting classes of creditors and interest holders and satisfies both §1126 and §524g(2)(B)(ii)(IV)(bb).  There are two objections to confirmation:  the scope of the §524(g) injunction regarding alleged asbestos-related personal injury claims and future demands (hereafter collectively "claims") as to nondebtors PPG and Corning (Debtor's shareholders) and the assignment to the trust of certain insurance rights.  Property damage (i.e., "premises") claims are not in issue.  As to those objections that deal with the scope of the §524(g) injunction with respect to nondebtors, we find that claims against PPG and Corning alleging liability for personal injury sustained as a result of exposure to PCC's asbestos- containing product, Unibestos, can be channeled to a trust.  These claims are referred to in the Stipulated Findings of Fact ("SFF") as "PC-Relationship" claims.  *See* SFF ¶¶ 58, 72,[3] Dkt. No. 3603.

In addition to the "PC-Relationship" claims involving PCC's Unibestos product, there are claims against PPG for a product called "Pyrocal" and claims against Corning for a

---

[3]Some objectors argue that because PPG or Corning have not been found liable for PCC's products those liabilities cannot be channeled.  However, §524(g) speaks to allegations of liability, not findings.

2

product known as "Corhart."[4]  These are identified, respectively, as "Non-PC-Relationship"

claims and "Corning Fund" (or "Corhart") claims.  *See* note 4, *infra.*

As to PPG, Non-PC-Relationship claims do not involve Unibestos.  SFF ¶ 70.  As to

Corning, there exist PC-Relationship claims (those involving Unibestos), SFF ¶ 72, but only

one "conspiracy theory" claim, *see* discussion of Exhibit P-18, *infra*, because PC-

Relationship claims against Corning typically did not include a "conspiracy theory," which

we explain below.  Similarly, claims against Corning for Corhart[5] did not typically include

allegations against PCC, as evidenced by the fact that when Corning settled Corhart claims it

did not seek to include PCC in the release it obtained.  SFF ¶ 90.  PCC had no involvement

with Corhart.  *See* SFF ¶ 84.  The oddity, for this case, is that suits against PCC with respect

to the Corhart product do not name Corning as a defendant.  *See* SFF ¶ 247; Exhibits P-53, P-

54.

In addition to claims related to Pyrocal, Non-PC-Relationship claims against PPG also

include what we denominate "conspiracy theory" claims.  SFF ¶ 70.  PC-Relationship and

Non-PC-Relationship claims[6] against PPG allege joint and several liability with PCC based

---

[4]Unibestos and Pyrocal are asbestos-containing products manufactured by PCC and
PPG, respectively.  Corhart refers to a product of Corhart Refractories Company for which
Corning is alleged to have liability.  SFF ¶ 81.

[5]Corning and Hartford Empire Company formed Corhart Refractories Company in
1927.  SFF ¶ 82.  In the 1950s, Corning acquired all outstanding Corhart stock.  SFF ¶ 83.
Corning sold Corhart assets in 1985 but retained liability arising out of any Corhart product
sold while Corning owned Corhart.  SFF ¶ 83.

[6]*See, e.g.*, SFF ¶ 70 which, as to PPG, states in part:

The non PC-Relationship claims PPG settled historically arose
out of alleged exposure to . . . "Pyrocal" . . . .   In such cases,

(continued...)

3

on conspiracy, alter ego, piercing the corporate veil, domination and control, concert of action, common enterprise, aiding and abetting, *respondeat superior*, negligent provision of services, principal and agent, successor in interest, and other joint and/or several liability theories (hereafter sometimes referred to as "conspiracy theories"). *See, e.g.,* SFF ¶¶ 51-52, 56-61.

As will be explained, we find that PC-Relationship and Non-PC-Relationship claims as to PPG that included "conspiracy theory" claims are properly within the scope of §524(g) and can be channeled. PC-Relationship claims and "conspiracy theory" claims against Corning are properly within the scope of §524(g) and can be channeled. Corning Fund claims, which by definition exclude claims based on exposure to Unibestos or any other asbestos containing product manufactured, marketed or sold by PCC, cannot be channeled unless they also include a "conspiracy theory."

The assignment issues concern assignment of insurance policies or proceeds to the asbestos personal injury trust and what has been called "insurance neutrality" language. For the reasons explained *infra* we find that the assignments of certain rights to proceeds under policies and/or proceeds themselves are permissible and valid with respect to claims for losses that have already occurred. Regarding "insurance neutrality," the plan provides that

---

[6](...continued)
> the claimants also alleged that, with respect to asbestos, PPG was ... engaged in a civil conspiracy or joint enterprise with, or otherwise aided and abetted [PCC]. . . Claimants who filed such claims against PPG also included a PC-Relationship claim . . . .

With respect to Corning, there is at least one instance in which Corning is alleged to be liable with PCC, PPG, and others on "conspiracy" theories. *See* Exhibit P-18 and note 40, *infra*.

4

the court's findings, other than those regarding assignment, are not binding and will not have collateral estoppel effect on non-participating insurers in any coverage litigation regarding their coverage obligations.  *See* Second Amended Plan of Reorganization, §8.1.15.  *See also* SFF ¶ 21.  We find that the plan does not impermissibly assign the contested insurance proceeds or rights and that the plan is "insurance neutral."  That is, defenses to coverage are preserved and insurer rights and risks are unaffected.

<u>Case History and Plan Confirmation Process</u>

After PCC filed its Second Amended Plan of Reorganization, and after the hearing on confirmation of PCC's plan in this court, the United States Court of Appeals for the Third Circuit issued its decision in *In re Combustion Engineering*, 391 F.3d 190 (3d Cir. 2004). That decision provided both binding precedent and extensive guidance regarding the interpretation of §524(g) of the Bankruptcy Code.  Of direct relevance to PCC's Second Amended Plan of Reorganization is the Court of Appeals' determination that an asbestos channeling injunction is available only to nondebtor affiliates that meet the express conditions of §524(g) and that "the general powers of §105(a) cannot be used to achieve a result not contemplated by the more specific provisions of §524(g)."  *Combustion Engineering,* 391 F.3d at 236-37.  On February 2, 2005, this court entered an order permitting the parties to submit briefs addressing the impact, if any, of the *Combustion Engineering* decision of the Court of Appeals for the Third Circuit on the debtor's proposed plan of reorganization.  A hearing on the impact issue was held on March 16, 2005, *see* Transcript of 3/16/05, Dkt. No. 4215, (hereafter cited as "Tr. of ____") and at that time counsel for PCC asked for an additional 60 days to consider issues raised at that hearing.  At a hearing on April 15, 2005,

the Plan Proponents reported that they wished to go forward with the plan as written.  *See* Tr. of 4/15/05, Dkt. No. 4256.  At a hearing on February 28, 2006, *see* Tr. of 2/28/06, Dkt. No. 4734, this court gave the parties an opportunity to negotiate amendments to the plan inasmuch as the plan included §105 as an "enhancement" to the §524(g) injunction.  The court advised the parties that because the plan provided for an injunction under §105 in contravention of *Combustion Engineering*, it was unconfirmable.  Plan amendments were filed on March 17, 2006, Dkt. No. 4741, to delete those references, and certain insurers filed additional objections.

Briefs were filed by (i) Certain Insurers designated as "Interested Parties,[7] Dkt. No. 4149; (ii) ACE USA Insurers and Lumbermens Mutual Casualty Company, Dkt. No. 4173; (iii) PPG Industries, Inc. ("PPG"), one of two shareholders of PCC, Dkt. No. 4153; (iv) Employers Mutual Casualty Company, Dkt. No. 4154; (v) the Plan Proponents (PCC, ACC, FCR), Dkt. No. 4155; (vi) Certain Insurers,[8] Dkt. No. 4156; (vii) Corning Incorporated, the second shareholder of PCC, Dkt. No. 4157; and (viii) Estates of John W. Howiler and George Garren, Dkt. No. 4162.[9]  Argument was held and several status conferences were scheduled to permit the parties to determine whether a consensual resolution to the *Combustion*

---

[7]These interested parties are identified in the brief as Century Indemnity Company, Lumbermens Mutual Casualty Company, and Westchester Fire Insurance Company.

[8]These Certain Insurers are identified as Certain Underwriters at Lloyd's, London, Government Employees Insurance Company, London Market Insurers, Mt. McKinley Insurance Co., Northwestern National Insurance Company, Stonewall Insurance Company, Interested Parties Everest Reinsurance Company and North Star Reinsurance Corp.

[9]Argonaut Insurance Company filed a joinder to Certain Insurers' Brief.  Dkt. No. 4161.  ACE USA and Lumbermens filed a reply brief at Dkt. No. 4173.  PPG filed a reply to Certain Insurers' Memoranda, Dkt. No. 4176.  Certain Insurers filed a Consolidated Reply to Three Briefs Filed by Plan Proponents, PPG and Corning, Dkt. No. 4177.

*Engineering* issue could be reached. The parties have not been able to agree. Therefore this

court will address plan confirmation but first must address the impact of *Combustion*

*Engineering* on PCCs' Second Amended Plan.

In light of *Combustion Engineering*, the Plan Proponents deleted references to §105 in

the plan but not in their proposed findings of fact and conclusions of law.[10]  We stated at a

hearing on April 25, 2006, that the proposed findings related to §105 in lieu of §524(g) would

not be adopted. Tr. 4/25/06 at 15, 27, 31-32, Dkt. No. 4846. At that hearing, certain insurers

requested additional briefing with respect to whether, under facts dissimilar from those in

*Combustion Engineering*, a §524(g) injunction could issue that governs nonderivative,

independent claims. *Id.* at 29, 31-32. The request was granted. Argument on whether

§524(g) permits nonderivative claims to be channeled on the facts of this case was held on

July 21, 2006. *See* Tr. at Dkt. No. 4987.

The court has examined the Unibestos, Pyrocal and Corhart claims and finds that the

ruling of the Court of Appeals in *Combustion Engineering* does not bar the inclusion of those

claims in the proposed channeling injunction to the extent that (1) PCC is alleged to be liable

for Unibestos, Pyrocal or Corhart claims, (2) PPG or Corning is alleged to be liable for

Unibestos claims as a result of ownership or involvement with PCC, (3) PPG or Corning is

---

[10]The Notice of Amendments to Second Amended Plan, Dkt. No. 4741, includes references to ¶¶ 3,4, and 74-81 of proponents' proposed conclusions of law. The docket entry states that it is related to Dkt. No. 2700. We note that an additional reference to Dkt. No. 3603, the Stipulated Findings of Fact, should have been included in light of the references to that document. *See also* Dkt. No. 3634, Disputed Findings of Fact and Conclusions of Law Regarding Confirmation of the Second Amended Plan of Reorganization of Pittsburgh Corning Corporation, and Dkt. No. 3711, the Amended Disputed Findings of Fact and Conclusions of Law Regarding same.

alleged to be liable with PCC based on allegations of conspiracy, alter ego, piercing the

corporate veil, domination and control, concert of action, common enterprise, aiding and

abetting, *respondeat superior*, negligent provision of services, principal and agent, successor

in interest, and other joint and/or several liability theories. *See, e.g.,* SFF ¶¶ 51-52, 56-61, 72-

76.

      In other words, to the extent that PCC, PPG and Corning are alleged to be jointly and

severally liable for PCC's products (generally Unibestos) or conduct, or allegations against

them are based on conspiracy or other joint or several liability theories, we find that the

claims against the nondebtor entities are derivative and can be channeled under §524(g). The

parties stipulated that in asbestos cases in which all three entities (PCC, PPG, and Corning)

were named as defendants, cross claims were "asserted or deemed asserted" among and

between all defendants. SFF ¶ 94. Furthermore, PPG and Corning each filed proofs of claim

against PCC for contribution or indemnity regarding asbestos personal injury claims. SFF ¶

95. *See also* Exhibit P-51, Standing Order No. One in *In re Master Asbestos File*, District

Courts of Jefferson County, Texas.

      We deal first with one over-arching objection as to Corning. There was argument that

PCC had nothing to do with Corhart and, therefore, no Corhart claims could be channeled.

We disagree that there is no basis upon which Corhart claims can be channeled. PCC was

named as a co-defendant in 93 to 97 percent of the Corhart cases.[11] SFF ¶ 247. Insofar as

---

[11]At a hearing on July 21, 2006, counsel for Corning stated that "in over 97 percent of the Corhart claims against Corning the debtor is also named in the lawsuit." Dkt. No. 4987, Tr. 7/21/06, at 79. However, the Stipulated Finding of Fact at ¶ 247 does not support this contention, nor do the cited exhibits, P-53 and P-54, because Corning was not the named

      (continued...)

there are suits alleging liability of Corning with PCC for Corhart based on some "conspiracy theory" of liability, the claims can be channeled. The Corhart suits against PCC, however, named, *inter alia*, Corhart, PCC, and PPG as defendants, not Corning. *See, e.g.*, Exhibits P-53, P-54 cited in SFF ¶ 247.[12] William D. Eggers, Corning's general counsel and senior vice president, testified that Corning usually was not named as a defendant in Corhart cases. Tr. 5/4/04, Dkt. No. 3288, at 63.[13] Thus, even though Corhart claims against PCC can be channeled, insofar as the Corhart claims against PCC do not include Corning, Corning is not subject to the §524(g) channeling injunction. Further, to the extent that Corhart claims brought against Corning do not also assert conduct of PCC or allege liability derivative of PCC, those claims against Corning cannot be channeled.

As a threshold matter, we find that the standards for imposition of a channeling injunction are met in that under the plan a trust is to be created to assume PCC's liabilities based on asbestos, §524(g)(1)(B)(i)(I), the trust is to be funded by PCC's securities in whole or part, §524(g)(1)(B)(i)(II), (III), and the trust assets will be used to pay claims and demands, §524(g)(1)(B)(i)(IV). We also find that PCC "is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims" to be enjoined, §524(g)(1)(B)(ii)(I), that the actual amounts, numbers, and timing of such future demands cannot be determined, §524(g)(1)(B)(i)(II), pursuit of the claims in the

---

[11](...continued)
defendant.

[12]This was disputed as to relevance. We find it relevant. *See infra*.

[13]Mr. Eggers testified that he was sure Corning was named as a defendant in some Corhart cases, *id.*, but none were cited.

9

tort system will threaten the plan's purpose to deal equitably with claims and future demands, §524(g)(1)(B)(i)(III), and the plan complies with §524(g)(1)(B)(i)(IV) insofar as it sets forth terms with respect to the injunction to be issued.

We do not recite the evidence regarding the plan's compliance with §1129 because those factors are not in dispute except as to the insurance assignment and the scope of the §524(g) channeling injunction. The evidence supports confirmation under §1129 except as noted regarding the channeling injunction. Further, the plan, disclosure statement, balloting process and classification satisfy all of the requisite provisions of §§524g, 1123, 1124, 1125, 1126 1127, and 1128 of the Bankruptcy Code except as to the scope of the channeling injunction.

<u>Background</u>

Pittsburgh Corning Corporation, the Debtor ("PCC"), was formed in 1937 by PPG and Corning to develop, manufacture and sell glass building products. SFF ¶¶ 3, 29.[14] PPG and Corning have always been the sole shareholders of PCC, each owning fifty percent. PCC's board of directors has consisted of representatives of PPG and Corning. SFF ¶ 30. PCC's two principal products were glass blocks and FOAMGLAS®, a cellular glass insulation product. SFF ¶ 31. Neither contained asbestos. *Id.*

In addition to its other products, from 1962 to 1972, PCC manufactured and sold asbestos-containing molded pipe insulation called Unibestos. Unibestos was installed at work sites requiring high temperature insulation such as shipyards, naval facilities, oil refineries,

---

[14]Disputed Findings of Fact and Conclusions of Law were filed at Dkt. No. 3634 and amended at Dkt. No. 3711. Additional Stipulated Findings of Fact with respect to Northwestern National Insurance Company were filed at Dkt. No. 3733.

petrochemical plants and heavy industrial sites.  In 1972, PCC ceased all production of Unibestos.  SFF ¶¶ 35, 37, 39.


PPG is a global manufacturer and distributor of coatings, glass, chemicals and fiberglass.  SFF ¶ 33.  Most asbestos claims against PPG were PC-Relationship claims, SFF ¶ 68, even though, except for two de minimis sales of Unibestos by PPG's fiberglass division in August and October 1969 for sales prices of $384.00 and $292.80, respectively, PPG did not manufacture, distribute or sell Unibestos.  *Id.* at ¶ 40.  Non-PC-Relationship claims against PPG arose out of alleged exposure to asbestos containing products that PPG sold under the "Pyrocal" brand name.  SFF ¶ 70.  Non-PC-Relationship claims against PPG typically included allegations that it "was engaged, *inter alia*, in a civil conspiracy or joint enterprise with, or otherwise aided and abetted" PCC.  *Id.*

Corning manufactures and supplies specialty glass and glass ceramic products.  SFF ¶ 34.  Corning did not manufacture, distribute or sell Unibestos.  SFF ¶ 40.  It has, however, been subject to PC-Relationship claims on the same basis as PPG with respect to its ownership of PCC and the fact that its employees serve on PCC's board of directors.  SFF ¶ 76.  A more detailed description of the Corning claims will be addressed, *infra*.

PCC experienced an increase in asbestos claims in the late 1990s.  On April 16, 2000, it filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  As of the petition date, there were approximately 235,000 asbestos claims pending against PCC.  SFF ¶¶ 1, 2.

The Unibestos (PC-Relationship) Suits Against PCC, PPG, and Corning

11

In 1974, former employees of PCC's plant in Tyler, Texas, filed a series of lawsuits (the "Yandle/Kay" cases) in the United States District Court for the Eastern District of Texas against PCC, Corning, PPG, Dr. Lee Grant (at the time, Medical Director of PPG and Medical Consultant to PCC), and others.  The Yandle/Kay cases alleged, *inter alia*, injuries to the employees resulting from exposure to asbestos at the Tyler plant.  With respect to PPG and Corning, complaints were based in part on their awareness of conditions at PCC's plant and PPG's and Corning's failure to exercise their right to control PCC to "correct deficiencies."  SFF ¶ 43.  Over 2,000 claims ultimately were filed in the Yandle/Kay litigation which was settled for approximately $20 million.  Settlement payments were made by or on behalf of PCC, PPG and Corning.   SFF  ¶¶ 41, 42, 43, 44, 45.

After the Yandle/Kay settlement, an ever increasing number of cases alleging liability of PCC, PPG, Corning and others for asbestos exposure were filed.  For example, thousands of  temporary employees and business invitees of PCC's Tyler plant and residents living nearby filed another series of cases against PCC, PPG and Corning alleging liability of PPG and Corning for asbestos exposure.  SFF ¶¶ 46, 47.  These cases were also settled by PCC, PPG, and Corning for approximately $1.2 million, of which approximately five to ten percent was attributed to Corning.  SFF ¶ 47.

In a third series of suits, referred to as the *Barber* case, employees of PCC's Port Allegany plant sued the Debtor (PCC), PPG and Corning.  SFF ¶ 49.  Summary judgment in favor of PCC and Corning was issued by a Pennsylvania state trial court and PPG eventually settled the case.  SFF ¶ 49.  More cases alleging joint liability of PCC, PPG and Corning with respect to Unibestos exposure, in addition to those involving the Tyler and Port Allegany

manufacturing operations, were also filed.  SFF ¶ 50.  Some of these suits included claims against PPG and Corning arising from their ownership of a financial interest in PCC and their "alleged right to control and manage" PCC.  SFF ¶ 51.

In 1981, PCC had approximately 15,000 to 20,000 claims pending or open against it. By 1985, the number of claims had increased to between approximately 60,000 to 75,000, SFF ¶ 53.  Before the Petition Date, PCC defended and resolved more than 200,000 Unibestos claims at a cost of approximately $1.2 billion.  SFF ¶ 54.  As of the Petition Date, PCC had approximately 235,000 Unibestos claims pending against it.  SFF ¶ 55.  Approximately 116,000 claimants named PPG as a defendant and 11,400 claimants named Corning as a defendant, all regarding Unibestos.  SFF ¶ 56.

As will be explained, with respect to PC-Relationship claims, all of which are based on liability for PCC's Unibestos product, a channeling injunction with respect to PPG and Corning is appropriate.

### Claims Against PPG

PPG historically manufactured a limited number of asbestos-containing products and sold a limited number of asbestos-containing products manufactured by others.  SFF at ¶ 67. Most asbestos claims against PPG were PC-Relationship claims.  SFF ¶ 68.  PC-Relationship claims against PPG alleged liability based on, *inter alia*, the fact that (1) PPG is a fifty percent shareholder of PCC, (2) its employees were on PCC's board, (3) PPG provided services to PCC at various times, (4) PPG and PCC have joint insurance coverage, (5) PPG permitted PCC to participate in its insurance coverage program, and (6) provided certain services to

13

PCC, SFF ¶ 60.[15]  PPG has suffered only one adverse verdict on a "PC-Relationship" claim

and that was in the year 2000 in Texas where it was found to be ten percent liable with respect

to certain plaintiffs ("the *Sonnier* case").[16]  SFF ¶ 64.  Before 2000, it had never been found

liable for any Unibestos exposure claims.  SFF ¶ 63.  Other theories asserted against PPG

with respect to Unibestos liability included alter ego, piercing of the corporate veil, concert of

action, common enterprise, conspiracy and others, SFF ¶ 52, its ownership of a financial

interest in PCC and of its right to control and manage PCC, SFF ¶ 51.

"Non-PC-Relationship"[17] claims against PPG by definition exclude Unibestos.  Non-

PC-Relationship claims are those related to Pyrocal and generally included "conspiracy

theory" claims.  Pyrocal[18] is an asbestos-containing product sold by PPG but manufactured by

---

[15]These services included environmental and legal services and health and safety
advice through the activities of Dr. Lee B. Grant, PPG's medical director.  SFF ¶¶60, 43,
respectively.

[16]A week before the *Sonnier* verdict PPG had been found not liable on similar claims
in the same court.  Second Amended Disclosure Statement, Dkt. No. 2700, at 42.

[17]The Non-PC-Relationship claims against PPG are discussed in section VI.C of the
Second Amended Disclosure Statement, Dkt. No. 2700, at 41-46.  PCC argues that, because
complaints in asbestos-related lawsuits typically refer very generally to the basis for claims
against defendants, as is borne out by the examples filed in this case, it is not possible to state
the number of pending asbestos-related lawsuits against PPG that do not relate to Unibestos.
Second Amended Disclosure Statement, Dkt. No. 2700, at 46.  In addition, the theories
presented with respect to PPG liability include, *inter alia*, aiding and abetting PCC in
commission of a tort and civil conspiracy.  *Id.* at 41.  As discussed below, PCC argues that
these claims implicate the insurance that PPG shares with PCC.

[18]Pyrocal is the only asbestos-containing product that has ever given rise to a payment
by PPG and the total settlements in that regard have approximated $2 million over the years.
 SFF ¶ 70.  PPG sold Pyrocal from approximately 1968 to 1971.  Second Amended Disclosure
Statement, Dkt. No. 2700, at 43.  PPG  has never been found liable for any asbestos claims
allegedly arising out of products it manufactured.  Second Amended Disclosure Statement,
Dkt. No. 2700, at 43.  It has settled cases, as stated above, with respect to Pyrocal.  PPG's
(continued...)

PABCO Industrial Products Division of the Fibreboard Corporation,[19] a company not

affiliated with PPG.  SFF ¶¶ 70, 71; Second Amended Disclosure Statement, Dkt. No. 2700,

at 43.  The parties stipulated that claimants who filed Non-PC-Relationship claims against

PPG before PCC filed its bankruptcy petition also asserted "conspiracy theory" claims in an

attempt to establish PCC's liability for asbestos-related injuries based on PPG's relationship

with PCC.  Additional claims were based on theories of civil conspiracy, joint enterprise,

and/or aiding and abetting PCC, among other joint and several liability theories.  SFF ¶ 70.

Although the testimony established that in over thirty years, no separate Pyrocal claim has

been brought against PPG that did not also involve PCC, Tr. of May 5, 2004, Dkt. No. 3308,

at 134-35, Testimony of James Clarence Diggs, the parties stipulated that there were

approximately 800 "Asbestos PI Trust" claims against PPG that did not also include claims

against PCC.  SFF ¶ 61.

Regarding the "conspiracy theory" claims, the parties cite, in the Stipulated Findings

of Fact, *Connorty, et al. v. Owens Corning Fiberglas, et al.*, filed in the District Court of

Galveston County, Texas.  Exhibit P-15.  The complaint in *Connorty* identifies PCC and PPG

---

[18](...continued)
total sales of Pyrocal were less than $700,000.  SFF ¶ 70.  There were other products
containing asbestos that were allegedly manufactured, distributed and/or sold by PPG but in
much smaller quantities, and PPG received few if any claims with respect to those.  Second
Amended Disclosure Statement, Dkt. No. 2700, at 43.

[19]Fibreboard was a debtor in the Bankruptcy Court for the District of Delaware.  *See*
Case No. 00-3842-JKF.  An order was entered the day after the chapter 11 was filed directing
procedural consolidation and joint administration with Owens Corning, 00-3837-JKF, D. Del.
Its plan of reorganization was confirmed and the plan took effect on October 31, 2006.  *See In
re Owens Corning, et al.*, 00-3837, Bankruptcy Court for the District of Delaware, Dkt. No.
19659.

as products defendants, ¶¶ 5, 39, asserting joint and several products liability claims and

conspiracy claims, ¶¶ 72, 88.  In *Black v. A&M Insulations, et al.*, filed in Lake County,

Indiana, Exhibit P-53, PPG and PCC are defendants and it is alleged that, in addition to

manufacturing[20] or distributing Pyrocal, PPG, through PCC, "manufactured, produced and

sold" asbestos products, "including, but not limited to" Unibestos.  Exhibit P-53 at ¶ 8(bc).

The plaintiffs in *Black* alleged conspiracy, joint and several action, "and/or . . . tacit

agreement" as to all defendants.  Exhibit P-53 at ¶¶ 14, 16, 18-19.  *See also* Exhibit P-54

naming PCC and PPG and others as defendants, alleging joint and several liability, ¶ 12, and

conspiracy, ¶¶ 75-79, 83.

<u>Claims Against Corning</u>

Asbestos claims against Corning for PC-Relationship (Unibestos) claims rely on

theories which include Corning's status as a fifty percent shareholder of PCC, Corning's right

to control and manage PCC, SFF ¶ 51, and the fact that Corning employees were on PCC's

board of directors.  SFF ¶¶ 72, 76.  At the time of the bankruptcy filing, Corning had been

named as a defendant, along with PPG, in Unibestos/PC-Relationship cases involving about

11,400 claimants.  SFF ¶¶ 56, 75.[21]

---

[20]The parties stipulated that PPG sold Pyrocal and that Pyrocal was manufactured by a
third party.  SFF ¶ 70.

[21]Although Corning has never been held liable with respect to Unibestos, SFF ¶¶ 77-
78, §524(g) applies to <u>allegations</u> of liability, not findings, verdicts, judgments, etc.  *See* SFF
¶ 72 ("Corning has been named as a defendant in lawsuits by Claimants that allege that
Corning is liable for bodily injuries they allegedly sustained as a result of exposure to
Pittsburgh Corning's Unibestos product").  We also note that when PCC settled an asbestos
case, it typically obtained a release that included Corning with respect to Unibestos claims.
SFF ¶ 79.

In addition to PC-Relationship claims, Corning has also been alleged to have potential asbestos liability arising from a refractory brick product called "Corhart" distributed by Corhart Refractories Company, which Corning and Hartford Empire Company formed in 1927.  SFF ¶¶ 81-82.  As noted in note 5, *supra*, Corning acquired all outstanding Corhart stock in the 1950s and when it sold its Corhart assets in 1985 it retained liability with respect to Corhart products sold during the time that Corning owned Corhart.  SFF ¶ 83.  The type of refractory brick sold by Corhart was used in the steel industry in the construction of open hearth steel furnaces.  None of the products manufactured by Corhart contained asbestos, *id.* ¶ 88, but occasionally, for about 10 years starting in 1962, Corhart provided, without charge, spacer material for use between the bricks, upon customer request.  *Id.* ¶ 85.  The spacers, paper material alleged to contain asbestos, were supplied by third parties and were not manufactured by Corhart.  *Id.*  Corhart did not manufacture, sell or distribute any other asbestos-containing product.  *Id.* ¶ 88.

There are approximately 10,000 pending Corhart cases involving about 40,000 claimants.[22]  *Id.* ¶ 89.  It is not alleged that these cases name Corning as well.  The exhibits cited in Stipulated Finding of Fact 247, Exhibits P-53 and P-54, and the disclosure statement, Dkt. No. 2700 at 51, refer to PCC and Corhart regarding these cases, not Corning.  Approximately 21,000 Corhart claims were dismissed or discontinued without payment to any plaintiff; ten or eleven thousand Corhart claims settled for $3.1 million, an average of about

---

[22]The disclosure statement states that when it was filed there were 9,000 cases involving 36,500 claimants.  *See* Disclosure Statement, Dkt. No. 2700, at 51.  We rely on the Stipulated Findings of Fact with respect to the number of cases and claimants.  *See* note 25, *infra*.

three hundred dollars per claim.  SFF ¶ 89.  Corhart suffered an adverse verdict in one state

court trial in Maryland for a total amount of $60,000 with respect to four claimants.[23]  *Id.* ¶

91.  William Eggers, Corning's general counsel and senior vice president, testified that

Corhart and Unibestos claims will be paid from the same insurance program, Tr. 5/4/04, Dkt.

No. 3288, at 44-46, and that Corhart claims could "potentially lead to contribution claims,

cross claims" against PCC.  *Id.* at 46.  The record establishes only one "conspiracy theory"

---

[23]The disclosure statement filed in this case states

> Since Corning was first named as a defendant in cases involving
> PCC and Unibestos, it has defended the cases on the grounds
> that under the governing law, it could not be held liable for
> injuries allegedly caused by a product made, sold, and
> distributed by a  separate corporation, that it did not owe a duty
> to any person who claimed exposure to Unibestos, and that it
> was completely uninvolved in PCC's manufacture, sale, and
> distribution of Unibestos.

Dkt. No. 2700 at 48.  Corning obtained summary judgment rulings in its favor in 1991 with a
Texas federal court finding as a matter of law that there was no agency relationship between
Corning and PCC.  *Id.*  A Pennsylvania state court granted summary judgment to Corning in
an action by former plant workers claiming injury resulting from exposure to asbestos while
working for PCC.  *Id.*  However, §524(g) refers to <u>allegations</u> of liability which exist here.
The alleged liability is derivative of PCC insofar as allegations concern various theories of
joint and several liability.
    With respect to Corhart, although most cases have been voluntarily dismissed without
payment, a small percentage have been settled for relatively nominal amounts (in the range of
$500 to $1,500).  Dkt. No. 2700 at 51.  In 1991-92, in a trial with numerous defendants
including PCC, Corhart was dismissed without prejudice from the plaintiffs' case but
remained a defendant with respect to co-defendants' cross-claims.  At a subsequent trial on
the cross-claims Corhart's product was found to be defective.  *Id.*  As a result, Corhart
remains a defendant in what the disclosure statement refers to as "mini trials" in which
claimants must prove exposure and injury in order to be awarded compensation.  *Id.*  These
mini trials are apparently on-going.  *Id.*  Corhart also suffered an adverse verdict and was held
liable in the amount of $60,000 to four claimants in a consolidated trial in Maryland state
court in 1990.  *Id.*  When the disclosure statement was filed there were 9,000 Corhart cases
pending (10,000 according to the Stipulated Findings), involving about 36,500 claimants
(40,000 according to the Stipulated findings).  *Id.*

suit against Corning that includes PCC, Exhibit P-18, but that suit does not identify the product as Corhart.

That Corning and PPG expect this plan (and the relevant funds within) to pay claims against them that are not derivative of PCC is evident from the arguments of counsel. *See* Tr. of July 21, 2006, at 69, where Attorney Heller, on behalf of Corning, stated:

> As eligible nondebtor third parties entitled to injunctive relief we can - the shareholders can channel all of our asbestos related liabilities to the asbestos PI trust so long as the treatment is fair and equitable.

Later, in that proceeding, Ms. Ramsey, counsel for the Certain Cancer Claimants, reiterated, at 94:

> In the future the – the court can enjoin those types of claims, claims for derivative liability.  We have no quarrel with that.  What the argument that the shareholders [PPG and Corning] are urging on the court is because anybody's even made an allegation against them for – or just because they qualify for derivative liability for Unibestos, that all actions of all kinds for asbestos liability can be – can be enjoined by the court.

PCC never had any financial involvement or owned any interest in Corhart nor did it manufacture, sell, distribute, market or supply any Corhart product.  SFF ¶ 84.  Nonetheless, it is a named defendant in most of the Corhart asbestos liability suits, 93 to 97 percent.  SFF ¶ 247; Tr. 11/17/04, Dkt. No. 3770, at 196.  The parties dispute the relevance of this in light of the fact that Corhart, not Corning, is named as a defendant with PCC and PPG (and others).  *See* SFF ¶ 247 and Exhibits P-53, P-54.[24]  Plan Proponents argued that the fact of "possible

---

[24]Corning seems to rely, at least in part, on allegations of PCC's liability for injuries allegedly caused by exposure to Corhart.  Corning Incorporated's Memorandum of Law in

(continued...)

19

reduction of insurance coverage" made inclusion of Corhart claims necessary to the plan.

Thus, the Corning Fund claims provisions were included in the plan. Tr. 11/17/04, Dkt. No.

3770, at 196. We will address this in more detail *infra*. We merely note here that to the

extent the argument is that the channeling injunction is proper with respect to these suits as to

Corning because there will be an impact on insurance coverage as a result of the Corhart

claims, Tr. 10/20/04, Dkt. No. 3770, at 196, it is evident that such an impact will not occur

unless a separate contribution or indemnity action is brought. The stipulation is relevant

because, even though at least some of the suits against Corhart name PCC and PPG, *see*

Exhibits P-53, P-54, Corning is not named and a separate suit against Corning could be

required to establish Corning's liability or to affect the insurance shared between PCC and

Corning. The Court of Appeals in *Combustion Engineering* was very clear that related-to

jurisdiction does not exist when a separate lawsuit would be required to affect the bankruptcy

estate. 391 F.3d at 232.

The Combustion Engineering Decision and Related-to Jurisdiction

In this court's *Combustion Engineering* decision, 293 B.R. 459 (Bankr.D.Del. 2003),

*vacated* 391 F.3d 190 (3d Cir. 2005), it was recommended that the district court approve

Combustion Engineering's (hereafter "CE" or "Combustion Engineering") plan of

reorganization. Among the provisions of that plan was the creation of a trust pursuant to

---

[24](...continued)
Support of Plan Confirmation, Dkt. No. 4157, at 5, citing SFF ¶ 247. However, the exhibits cited in the Stipulated Finding of Fact, P-53 and P-54, are examples of suits against PCC, PPG and Corhart, not Corning. That Corning may, at some point, be found liable based on its prior ownership of Corhart does not provide the requisite basis for a finding that its liability is derivative of PCC's, inasmuch as a separate suit for contribution or indemnity would be required.

§524(g) of the Bankruptcy Code which channeled asbestos claims against CE as well as claims derivative of CE against its parent companies, Asea Brown Boveri, Inc. ("U.S. ABB") and ABB Limited, U.S. ABB's parent (together, "ABB" or the "parent companies"), and CE's affiliates ABB Lummus Global, Inc. ("Lummus") and Basic, Inc. ("Basic"). In addition, the plan provided for channeling nonderivative independent liabilities of Lummus and Basic under §105. CE had argued for the inclusion of the nonderivative independent liabilities of Basic and Lummus in the trust because CE's restructuring, and ABB's funding of the plan, were contingent upon the sale of Lummus free and clear of asbestos liabilities.

The bankruptcy court stated that Lummus and Basic did not meet the requirements of §524(g) except with respect to shared insurance. The bankruptcy court found that "§524(g) permits shared liabilities to be covered but does not permit the inclusion of nonderivative independent claims against Lummus and Basic that are not also claims against CE." 295 B.R. at 481. However, for several reasons, the bankruptcy court found it appropriate for Lummus and Basic to be included in the injunction and determined that it had authority under 11 U.S.C. §105(a) to enjoin third party claims against Lummus and Basic for their nonderivative independent liabilities. *Id.* at 483. The bankruptcy court recommended confirmation of the plan (after additional information was provided regarding notice to Lummus and Basic creditors) and the district court approved the plan in a modified confirmation order. *See* Revised Proposed Confirmation Order entered August 8, 2003, Wolin, J., Bankr. No. 03-10495, D. Del., Docket No. 1211. *See also* Oral Opinion, *id.*, Dkt. No. 1201. Some of the

Objecting Insurers and the Certain Cancer Claimants[25] appealed to the Court of Appeals.

On appeal, the Court of Appeals addressed whether the bankruptcy court had "related-to" jurisdiction over nonderivative independent claims against Lummus and Basic and thus could enjoin such claims pursuant to §105(a).   The court held:

> [b]ecause §524(g) expressly contemplates the inclusion of third parties' liability within the scope of a channeling injunction – and sets out the specific requirements that must be met in order to permit inclusion – the general powers of §105(a) cannot be used to achieve a result not contemplated by the more specific provisions of §524(g).

391 F.3d at 236-37 (footnotes omitted).  In light of our prior rulings, §105 is not implicated in this case.  Nonetheless, the Court of Appeals' *Combustion Engineering* decision governs the analysis of the propriety of an injunction in favor of nondebtors under §524(g).

The Court of Appeals cited *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984), as providing the seminal test for determining "related-to" jurisdiction over third party claims and noted that Congress intended to grant bankruptcy courts broad authority to deal with these matters.

> The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy*. . . .  An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling

---

[25]"Certain Cancer Claimants" were defined as "those individuals suffering from cancers caused by exposure to asbestos and the estates of individuals whose wrongful death was caused by asbestos exposure and who hold tort claims against Combustion Engineering . .. and identified in the Bankruptcy Rule 2019 Statement . . . ."  *In re Combustion Engineering, Inc., Motion for Reconsideration of Final Order Appointing Future Claimants' Representative*, Bankr. No. 03-10495, Dkt. No. 251, at 1.

and administration of the bankrupt estate.

*Combustion Engineering*, 391 F.3d at 226, quoting *Pacor v. Higgins*, 743 F.2d at 994

(emphasis in original; citations omitted). Applying the *Pacor* test to the facts in *Combustion

Engineering*, the Court of Appeals examined the third party claims in terms of (i) corporate

affiliation; (ii) financial contributions; (iii) related liability; and (iv) shared insurance. The

court found that a review of these factors in *Combustion Engineering* led to the conclusion

that there was no related-to jurisdiction in that case. Our application of these factors to the

instant case leads to the opposite conclusion, except with respect to Corhart claims as to

Corning and Pyrocal claims against PPG that do not also allege liability with PCC.

Citing *In re Resorts Int'l, Inc.*, 372 F.3d 154, 161 (3d Cir. 2004), the Court of Appeals

found that "[a]lthough ABB Limited's contributions to the Asbestos PI Trust may depend on

freeing Lummus and Basic of asbestos liability, and these contributions may inure to the

benefit of certain CE asbestos claimants, these factors alone do not provide a sufficient basis

for exercising subject matter jurisdiction." *Combustion Engineering*, 391 F.3d at 228. The

Court of Appeals also found that corporate affiliation between "lateral, peer companies in a

holding company structure" cannot alone provide sufficient grounds for subject matter

jurisdiction. *Id.* The court also stated that "§524(g) provides no specific authority to extend a

channeling injunction to include third-party actions against non-debtors where the liability

alleged is not derivative of the debtor." *Id.* at 236. The court therefore vacated the

confirmation order, making it clear that the asbestos channeling injunction protection is

available only to nondebtor affiliates that meet the §524(g) requirements. To the extent that

there is an identifiable third party that is "alleged to be directly or indirectly liable for the

23

conduct of, claims against, or demands on the debtor to the extent such alleged liability of

such third party arises by reason of," *inter alia*, its ownership of a financial interest in the

debtor, a past or present affiliate or predecessor in interest of the debtor, its involvement in

the management of the debtor or service as, *e.g.*, a director of the debtor, or its provision of

insurance to the debtor, a §524(g) injunction may issue.  11 U.S.C. §524(g)(4)(A).  In this

case more than one of these elements are met with respect to PPG and Corning.

<u>Shared Insurance</u>

We address first the major contention in this case – shared insurance.  The appellate

court continued its discussion in *Combustion Engineering* by looking at the insurance shared

among Combustion Engineering, Lummus and Basic and determined that there was "minimal

corporate affiliation" and only indirect effects on the plan on this basis.  The court stated that

it was "doubtful whether shared insurance would be sufficient grounds to find related-to

jurisdiction over independent claims" against the nondebtors.  391 F.3d at 232-33.  The court

in *Combustion Engineering* distinguished *CoreStates Bank, N.A. v. Huls Am. Inc.*, 176 F.3d

187 (3d Cir. 1999), because *CoreStates* "involved an intercreditor dispute that directly

concerned assets of the debtor's estate" and that was not the case in *Combustion Engineering*.

*Combustion Engineering*, 391 F.3d at 229-30.  We find in this case that, insofar as there is

shared insurance and joint liability is alleged, the insurance is property of the estate and can

be depleted as a result of suits against PPG and Corning for PC-Relationship or "conspiracy

theory" claims.  In *Combustion Engineering*, the Court of Appeals noted that claimants

holding independent claims against Lummus and Basic were not creditors of the debtor and

could not directly affect administration of the plan.  The court further noted that the dispute in

24

*CoreStates* involved estate assets and there were no findings in the lower courts' decisions in *Combustion Engineering* that independent nonderivative claims against Lummus and Basic would involve assets of the debtor. *Id.* at 230.

In the instant case, there was extensive testimony concerning insurance policies that cover all three entities. PCC, PPG and Corning introduced substantial evidence on the record concerning the interrelated insurance coverage. At least some of the policies are of record and there is no dispute with respect to the <u>language</u> of the policies but rather with the meaning or interpretation thereof. *See* Exhibit P-57 (list of policies); Exhibit P-20 (insurance naming PPG and PCC); Exhibit P-21 (insurance naming Corning and "affiliates" or "subsidiaries"). With respect to PPG, the parties stipulated that it and PCC have joint insurance coverage. SFF ¶ 60.

While it is disputed whether PCC is an "insured" under certain policies, certain facts are established by the evidence of record: (1) PPG and PCC are named insureds on some policies.[26] (2) Corning excess policies apply to it and its affiliates. PCC is an affiliate of

_____

[26]There are certain policies issued to Corning with respect to which PCC makes no claim and under which PCC is not an insured. Those include INA policies, SFF ¶¶ 136,140, and Lumbermens, SFF ¶ 145.

With respect to PPG, the London Market Insurers dispute whether PCC is covered "for the entire block [of time] for its asbestos liabilities." Tr. 5/3/04 at 37, Dkt. No. 3289. David Ellis, former Vice President, General Counsel and Secretary to PCC, testified that, until July 1, 1981, the excess policies did not contain an asbestos exclusion relating to Unibestos. Tr. 5/3/04, Dkt. No. 3290, at 58-59, 74-75. After that time excess insurers who shared coverage could take an asbestos exclusion but PCC's position is that the exclusion was "null and void" because insurers did not obtain required regulatory approval. *Id.* at 75. *See also* Tr. 5/5/04, Dkt. No. 3308, at 41-42 (Seymour). Again, this is a matter for coverage litigation. PPG claims no interest in the Lumbermens policies issued to Corning for which there is a dispute as to whether PCC is insured. SFF ¶ 146. PPG has not claimed an interest in any of the INA policies issued to Corning. SFF ¶ 136.

25

Corning.[27]  (3) Suits allege "conspiracy theory" and theories based on the corporate structure

and involvement.  With respect to PPG, the parties stipulated that there is joint insurance

coverage with PPG, SFF ¶ 60, but there may be disputes as to the time periods for which PCC

is covered.  Tr. 5/3/04, Dkt. No. 3289, at 37.

There is evidence of specific policies insuring both PPG and PCC and an award

against PPG for a Unibestos or Pyrocal claim paid through the applicable insurance policy

would reduce funds available to the bankruptcy estate, dollar for dollar.  *See* Tr. 5/5/04, Dkt.

No. 3308, at 36 (PCC covered as an insured under certain primary policies issued to PPG and

under excess policies issued to PPG),[28] *id.* at 43 (shared policies potentially provided

coverage for PC-Relationship claims and claims arising from alleged exposure to PPG's

products), *id.* at 65 (non-participating insurers' policies subject to assignment insure PPG and

PCC), *id.* at 104 (PPG has not been found liable for Pyrocal claims but has settled them and

the funds to pay the settlement amounts cover PPG and PCC) (testimony of Donald E.

Seymour); *id.* at 112 (PPG and its participating insurers will contribute $2.7 billion in

exchange for a §524(g) injunction) (testimony of James Clarence Diggs, PPG General

---

[27]"Affiliate" is defined by the Bankruptcy Code as, *inter alia*, an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor."  11 U.S.C. §101(2).  Although this indicates that Corning is an affiliate of PCC, the converse is also true.  Black's Law Dictionary defines "affiliate company" as one that is "effectively controlled by another company.  A branch, division, or subsidiary."  Black's Law Dictionary, 6th ed., at 58.  It is undisputed that Corning owns fifty percent of PCC.

[28]From a time before1962, (PCC began to manufacture Unibestos in 1962) until 1966 PCC shared primary insurance with PPG.  SFF ¶ 96.  PCC was also included as an insured under PPG's excess insurance program from a time period before PCC began to manufacture Unibestos in 1962 until 1986.  *Id.*

Counsel); Exhibits P-40 (Insurance Coverage Chart for PPG/PCC Policies 1970-86), P-57 (Policy Register); SFF ¶ 96. Claims against PPG typically included PC-Relationship claims, whether the alleged liability was based on PCC's Unibestos product or PPG's Pyrocal product. SFF ¶ 70. All claims against PPG alleging liability as a result of asbestos-containing products PPG manufactured or distributed implicate insurance shared with PCC. Disclosure Statement, Dkt. No. 2700, at 43. Donald E. Seymour, an attorney who represented PPG in negotiations in insurance coverage disputes, testified that the policies listed on Exhibit P-57 identify PCC and PPG as insureds. Tr. 5/5/04, Dkt. No. 3308, at 44-46.

Counsel for PPG summarized the evidence, and was not contradicted at the hearing, that there were policies before 1966 which were primary policies and not shared but that those were all settled and every policy subject to an assignment of rights and proceeds is shared. Tr. 5/6/04, Dkt. No. 3316, at 104. Moreover, the parties stipulated that shared insurance exists between PPG and PCC. SFF ¶ 107 (PPG obtained excess policies for PCC's benefit; these policies potentially provide products liability coverage to PPG to the extent PCC has not exhausted the limits; the policies also provide non-products coverage to PPG for claims that are covered).

For purposes of plan confirmation, we find that the evidence overwhelmingly establishes that, between PPG and PCC, shared insurance exists, although there may be a dispute as to time periods covered. Whether a particular policy applies or insures any given claim is left to coverage litigation.[29] Nonetheless, although the insurance is an asset of this

---

[29]In a reply brief concerning the impact of the *Combustion Engineering* decision on the plan now under consideration, Certain Insurers argue that because PCC had nothing to do

(continued...)

27

estate and will be affected by independent, nonderivative claims against PPG, we do not read

*Combustion Engineering* as permitting channeling of those claims. *See* 391 F.3d at 224, n.33.

The record in this case establishes that there are approximately 800 prepetition claims against

PPG alleging liability for asbestos personal injuries that do not involve PCC.

The parties stipulated that Corning has some insurance that does not apply to PCC.[30]

They further stipulated that PCC has not claimed coverage under any primary or excess

policies issued to Corning. *See* SFF ¶ 131. The Corning-London Market primary policies are

not exhausted so Corning has not yet asserted PC-Relationship, Corhart, or other asbestos-

related claims under these policies. SFF ¶ 133. Accordingly, the excess policies have not yet

come into play. The excess insurance policies procured by Corning for the period of 1962 to

1974 apply by their terms to any "subsidiary, associated, affiliated companies or owned and

controlled companies." SFF ¶ 128.[31] The London Market Insurers dispute that PCC qualifies

_____

[29](...continued)
with Pyrocal, and because the "conspiracy" theories applied not only to these three entities but to "dozens of other defendants" and if the conspiracy theory entitled PPG to a §524(g) injunction, PPG would be entitled to a §524(g) injunction in all the other asbestos-related bankruptcies. Dkt. No. 4177 at 5-6. Certain Insurers' argument ignores the fact that PPG is not a shareholder of, and does not share insurance with, those "dozens of other defendants."

[30]With respect to Corning, the London Market Insurers do not agree that PCC is a named insured under Corning policies. Tr. 5/3/04 at 37, Dkt. No. 3289. We note that the parties stipulated that Corning had primary, excess and umbrella insurance coverage protection through Insurance Company of North America, a predecessor to Century Indemnity Company (one of the ACE Insurers) from 1962 to 1969, SFF ¶¶ 134, 135, and that PCC is not an insured under these policies. SFF ¶ 136, 140. Another insurer, Lumbermens Mutual Casualty Company, issued primary insurance coverage to Corning from 1972 to 1985. SFF ¶ 141. PCC claims no interests under these policies and is not an insured. SFF ¶¶ 145.

[31]    The term "named insured" is often defined broadly in policies because many commercial policyholders are made up of different entities, each of which must be insured. Douglas R. Richmond, *The Additional Problems of Additional Insureds*, 33 Tort & Insurance.

(continued...)

as a "subsidiary" or "affiliate" under these policies. It is undisputed that Corning and PPG

each own part of PCC. The three entities, PCC, PPG, and Corning, are, without doubt,

"affiliates."[32] As an affiliate of Corning, PCC is a "named insured" as that term is used in the

Corning Affiliate Policies. Exhibit P-21.[33] By definition, in those policies, there is shared

---

[31](...continued)
L.J. 945, 947 (1998). *See generally John Deere Insurance. Co. v. Shamrock Indus., Inc.*, 929
F.2d 413, 417-18 (8th Cir. 1991)(definition of insured included "any entity coming under the
named insured's control over which it assumes active management").

[32]"Affiliate" under the Bankruptcy Code is defined in pertinent part as

> (A) entity that directly or indirectly owns, controls, or holds
> with power to vote, 20 percent or more of the outstanding
> voting securities of the debtor, other than an entity that holds
> such securities --
> > (i) in a fiduciary or agency capacity without sole discretionary power to
> > vote such securities; or
> > (ii) or solely to secure a debt, if such entity has
> > not in fact exercised such power to vote;
> (B) corporation 20 percent or more of whose outstanding voting
> securities are owned, controlled, or held with power to vote, by
> the debtor, or by an entity that directly or indirectly owns,
> controls, or holds with power to vote, 20 percent or more of the
> outstanding voting securities of the debtor, other than an entity
> that holds such securities – (see ¶¶  (i) and (ii) above).

11 U.S.C. §101(2). PCC is an affiliate of and owned partially by Corning.

[33]Paragraph 128 of the Stipulated Findings of Fact says

> For the period 1962 to 1974, Corning procured excess insurance
> policies, some of which listed as named insureds Corning and
> any Corning "subsidiary, associated, affiliated companies or
> owned and controlled companies . . ."

Under particular policies that cover affiliates, PCC is entitled to claim coverage. London
Market Insurers "Affiliate Policies" and Non-Affiliate Policies" are defined in SFF ¶ 129 as
follows:

(continued...)

insurance between Corning and PCC.  Thus, any payments by the insurers for asbestos-related

claims to or for the benefit of Corning would reduce the amount of potential coverage

available to PCC dollar for dollar, thereby reducing an asset of the estate.  Because of the

existence of excess coverage that would include PCC as an insured by virtue of the policies'

applicability to subsidiary or affiliated companies or those that are owned and controlled by

Corning, we find that the shared excess insurance will be affected if Corning exhausts the

primary policies.[34]  *See* Amended Disputed Findings of Fact . . ., Dkt. No. 3711, ¶ 310, at 203

("Corning Plan Insurers are required to indemnify Corning only in accordance with the terms

of the insurance contracts they issued to Corning"); SFF 128 (Corning's excess insurance

policies name Corning and any "subsidiary, associated, affiliated companies or owned and

controlled companies . . . .").  *See also* Exhibit P-21, SFF ¶ 128.  The court recognizes that

there is considerable dispute among the parties regarding insurance <u>coverage</u>.  *See, e.g.,*

---

[33](...continued)
London Market Insurers subscribed to certain excess insurance
policies in favor of Corning during the periods February 1,
1962[,] to February 1, 1965 (the "Affiliate Policies")[,] and
April 1, 1980[,] to April 1, 1983 (the "Non-Affiliate Policies")
[,] (collectively, the "Corning-London Policies").  *See* Ex. P-39
(Corning coverage chart).  The definition of "named assured" in
the Corning-London Policies expressly lists Corning, but not
PCC.  *See, e.g.* Ex. P-21 (unnumbered).

All decisions regarding the scope of coverage are left to coverage litigation.  This court is
determining, for purposes of plan confirmation only, whether an asset of PCC's estate
includes rights to claim coverage as an affiliate under these policies . We find that the estate
includes those rights as an asset.

[34]That Corning has never been <u>found</u> liable for a PC-Relationship claim is not the
controlling factor for purposes of a §524(g) injunction inasmuch as that section applies to
<u>alleged</u> liability.

Disputed Findings of Fact, Dkt. No. 3634.  However, the plan preserves all coverage claims and defenses.  We find for purposes of confirmation of PCC's plan that Corning's "affiliates" are covered by the policies that so provide and that PCC is an affiliate of Corning as that term is defined.  Thus, the shared insurance is an asset of this estate that will be affected by independent, nonderivative claims against Corning.  However, in those instances where the action is against Corhart and not against Corning and, in light of *Combustion Engineering*, because the effect on this estate will not occur without a separate action brought against Corning, the independent, nonderivative claims cannot be channeled.

These facts, coupled with PPG's and Corning's ownership of PCC, all have the potential to affect estate assets without the need for additional litigation, with the exception of those instances in which PCC, but not Corning, has been sued with respect to Corhart and those instances in which PPG has been sued with respect to Pyrocal alone.

As a result, PC-Relationship claims against Corning are properly channeled for the reasons stated above.  The analysis as to Corhart claims, however, does not so readily satisfy *Combustion Engineering*.   The evidence established that PCC was named in most Corhart cases but those suits do not name Corning.  *See* testimony of William D. Eggers, Tr. 5/4/04, Dkt. No. 3288, at 63.[35]  There is only one instance cited where there exists a claim alleging "conspiracy theories" with respect to Corning and PCC.  *See* Exhibit P-18.  Nonetheless, there is shared insurance between Corning and PCC.  The question is whether, under *Combustion Engineering*, that is enough to channel non-Unibestos, non-"conspiracy theory" Corhart

---

[35]Mr. Eggers testified that he was sure Corning was named as a defendant in some Corhart cases, *id.*, but none were cited.

claims solely against Corning or Corhart claims against PCC that do not also name Corning.

The evidence established that there have been no events that have affected Corning's insurance that also involve PCC. No Unibestos case involving Corning ever proceeded to trial. SFF ¶ 78. When PCC settled a Unibestos case, it got a release as to Corning. SFF ¶ 79. The Corhart claims against PCC do not involve Corning and there is no evidence that Corhart claims only against Corning are derivative of PCC. Corning's Corhart claims, therefore, cannot be channeled. For shared insurance to be affected on the basis of Corhart claims, Corhart would first have to suffer an adverse verdict, then seek contribution or indemnity from Corning by establishing that the liability arose from a time period in which Corning owned Corhart. Only if Corning's liability for indemnity or contribution is established would the insurance shared between it and PCC be affected. Under this scenario, the Corhart claims are Corning's independent, nonderivative liability and cannot be channeled, even though Corning shares insurance with PCC. *Combustion Engineering* held that related-to jurisdiction as to nondebtors does not exist when a separate suit would be required to have an effect on the bankruptcy estate. 391 F.3d at 226. *See Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984).

In *Pacor*, the civil proceeding was between two nondebtors and was a precursor to a potential third party claim for indemnity. The Corhart claims Corning seeks to channel likewise involve a suit by and between two third parties, i.e., a tort plaintiff against Corhart. Corning is not involved and its liability is not alleged or determined in that suit. Thus, those independent, nonderivative claims cannot be channeled.

Additional Discussion Regarding Combustion Engineering and §524g

Section 524(g)(4)(A)(ii) provides that the injunction to issue under that section may bar action against a third party that is identifiable from the injunction, *e.g.*, by name, and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor, to the extent the alleged liability arises due to (I) the third party's ownership of a financial interest in the debtor or a past/present affiliate thereof or predecessor (Corning and PPG both meet this factor); (II) the third party's involvement in the management of the debtor or a predecessor thereto or service as officer, director, employee of the debtor or a related party (Corning and PPG both meet this factor); (III) the third party's provision of insurance to the debtor or a related party (Corning and PPG both meet this factor); or (IV) the third party's involvement in a transaction changing the corporate structure or a loan or financial transaction affecting the condition of the debtor or a related party.[36] We note that §524(g)(4)(A)(ii) is written in the disjunctive. Therefore, the plain language indicates that a third party meeting any of the factors would qualify for the injunction.[37] Here, PPG and

---

[36]Although we need not determine whether Corning and/or PPG meet this factor, we note that PPG has been alleged to be liable with respect to non-Unibestos claims due to involvement in "a financial transaction" with PCC. *See* PPG Brief regarding the *Combustion Engineering* decision, Dkt. No. 4153, at 12.

[37]Certain Insurers, in their brief at Dkt. No. 4156, assert that subject matter jurisdiction is not an issue inasmuch as an injunction is not authorized by §524 or §105; *i.e.*, that there is no statutory basis for enjoining claims against PPG and Corning. We disagree. There clearly is jurisdiction to confirm plans pursuant to 28 U.S.C. §1334 and the reference to Title 11 cases to the bankruptcy courts, which the District Court has provided pursuant to 28 U.S.C. §157(a). There is jurisdiction to apply §524(g) to bankruptcy cases as a result. The insurers' argument is best viewed as one challenging the power of the court to enter an injunction based on the facts of this case. This court has the power to determine the scope of the injunction and to impose one when the facts establish that the elements of §524(g) are met.

ACE Insurers, at Dkt. No. 4149, interpret the *Combustion Engineering* decision as holding that there is no jurisdiction to issue a §524(g) injunction for nonderivative claims.

(continued...)

33

Corning each meet at least three of the four separate criteria.  That, however, is not the end of the inquiry.

As to PC-Relationship claims of PPG and Corning, we find that we have subject matter jurisdiction to adjudicate the issue of whether §524(g) applies to those claims.  We also find that PC-Relationship claims are the quintessential §524(g) claims as they are based on PCC's product and the nondebtors' involvement with PCC.  The PC-Relationship claims are not like those the Court of Appeals found troubling in *Combustion Engineering*.[38]  The court noted that the claims "reveal[ed] little evidence of derivative liability," 391 F.3d at 231, and pointed out that, although most asbestos claims against nondebtor Lummus also asserted claims against the debtor, only one Lummus claimant asserted derivative liability.  The Court of Appeals found that there was not a unity of interest between CE and Lummus.  Similarly, with respect to Corning and PCC, there has been cited only one instance of non-Unibestos derivative liability and that is the *Abernathy* suit, Exhibit P-18.  That single instance, as in

---

[37](...continued)
However, the claims in this case are, to a great extent, derivative claims.  The issue is whether all the claims Plan Proponents seek to channel are derivative.

[38]In a footnote the *Combustion Engineering* court stated:
> We note this provision is consistent with the purposes underlying §524(g).  The channeling injunction issued in the Johns-Manville bankruptcy, after which §524(g) was modeled . . . was limited to third-party actions against non-debtors in which the liability alleged was derivative of the debtor.  *See MacArthur Co. v. Johns-Manville*, 837 F.2d at 92-93 (2d Cir. 1988)(explaining that the channeling injunction applied only to "third parties [who] seek to collect out of the proceeds of Manville's insurance policies on the basis of Manville's conduct").

*Combustion Engineering*, 391 F.3d at 235, n. 47.

*Combustion Engineering*, is not enough to channel all Corning's non-Unibestos, non-"conspiracy theory" claims.

The Court of Appeals distinguished *In re Dow Corning*, 86 F.3d 482 (6th Cir. 1996), in which "related-to" jurisdiction was found based on the fact that there was a single product for which Dow Corning was either the manufacturer or the supplier. Because of that, the *Dow Corning* court found the requisite identity of interests and, therefore, "related-to" jurisdiction. In *Combustion Engineering* the claims asserted against the debtor, Lummus and Basic arose from different products which involved different asbestos-containing materials, and were sold to different markets. 391 F.3d at 231. Further, there was a lateral, peer corporate affiliation in *Combustion Engineering*, in a holding company structure. 391 F.3d at 228. The Court of Appeals found, however, that "[s]uch an affiliation could be relevant to the jurisdictional inquiry if supported by factual findings demonstrating that a suit against Basic or Lummus would deplete the estate or affect its administration." 391 F.3d at 228. There was also no inter-corporate involvement in *Combustion Engineering*, 391 F.3d at 235, as there is here, especially as between PPG and PCC which shared resources[39] and personnel on some occasions. *See* note 15, *supra.*

In the instant matter, we have more than a mere corporate affiliation between companies. PPG and Corning are the owners of PCC and actively participate in its management by membership on its board of directors. SFF ¶ 30. Section 524(g) requires, *inter alia*, that there be allegations of liability based on the conduct of, claims against, or

---

[39]It is also  undisputed that most of the $1.2 billion expended by PCC in the defense and indemnification of asbestos personal injury claims was paid through the excess insurance program that PCC and PPG shared.  SFF ¶ 97.

demands on PCC (the Debtor) and the PC-Relationship claims, and those alleging joint

liability on various theories, comport with the statutory mandate.   There are facts stipulated

by the parties that PPG and Corning have been named as defendants in lawsuits asserting

PPG's and Corning's responsibility for the actions of PCC.  *See, e.g.,* SFF ¶¶ 57, 61, 74, 75,

76.[40]   We have related-to jurisdiction to address these claims.

_____

[40]Paragraph 57 of the Stipulated Findings of Fact provides:
> In some of Pittsburgh Corning's Unibestos cases, claims for conspiracy, concert of action, and common enterprise were asserted against all the defendants in the cases, including Pittsburgh Corning, PPG, Corning, and/or Corhart, with respect to asbestos-containing products generally.

Paragraph 61 provides:
> As of the Petition Date, PPG was a defendant in asbestos-related lawsuits involving approximately 116,000 claimants. . . . The majority of these cases were PC-Relationship cases.  As of the Petition Date there were fewer than 30 Asbestos PI Trust Claims against PPG that did not also assert claims against the Debtor.

Citations omitted.

Paragraph 74 provides:
> Corning was named as a defendant along with Pittsburgh Corning and PPG in the five Texas Unibestos cases listed on Exhibit P-15.

Citations omitted.   (Note that, as stated above, the listing of five Texas cases is on Exhibit P–19 and the complaint at Exhibit P-15 does not use the word "Unibestos".)

Paragraph 75 provides:
> As of the Petition Date Corning was a defendant in Unibestos/PC-Relationship cases involving approximately 11,400 claimants.  Pittsburgh Corning is one of the co-defendants in all of these cases. . . .  Those cases, as against Corning, have been enjoined on account of the injunction issued in connection with the bankruptcy case.

(continued...)

In this case, PCC manufactured Unibestos which was a molded pipe insulation.  PPG sold but did not manufacture Pyrocal.  Corhart provided asbestos-containing spacers during the time it was a subsidiary of Corning but did not manufacture an asbestos-containing product.  Despite this "different product" similarity with *Combustion Engineering,* the situation here is dramatically at odds in several significant respects:  (1) there are allegations of joint and several liability, regardless of the product; (2) PPG and Corning owned PCC and had members on PCC's board of directors; (3) PPG provided services and personnel to PCC; (4) there are PC-Relationship claims against PPG and Corning; (5) theories of liability with respect to PPG (and one instance applicable to Corning) include those  based on "conspiracy" and other grounds that would impose joint liability and establish PPG's (and Corning's to the extent "conspiracy theories" are alleged against it) own knowledge and duty as to its own products; (6) theories of liability with respect to both PPG and Corning are based on, *inter alia*, their financial interest in PCC and their right, and alleged failure, to control PCC through their ownership interest.

In this case, PC-Relationship claims filed against all three entities, if proven, would give rise to joint and several liability with PCC and are the types of claims contemplated by §524(g).  That is, they are "derivative" of PCC.  Whether, after a trial, it would be established

---

[40](...continued)
Citations omitted.

> Paragraph 76 provides:
>> Asbestos claimants seeking to impose liability on Corning for Unibestos/PC-Relationship claims have relied upon, *inter alia,* the fact that Corning was a fifty percent shareholder of Pittsburgh Corning and the fact that employees of Corning were on Pittsburgh Corning's board of directors.

37

that the liability is in fact derivative, *i.e.*, that there is joint and several liability, is not the test.

The allegation is sufficient.  Section §524(g)(4)(A)(ii) provides that the channeling injunction

> shall be valid and enforceable [and] may bar any action directed
> against a third party who is identifiable from the terms of such
> injunction . . . *and is alleged to be directly or indirectly liable*
> *for the conduct of, claims against, or demands on the debtor"* to
> the extent such *alleged liability* of such third party arises by
> reason of –
>> (I) the third party's ownership of a financial interest in the debtor . . .;
>> (II) the third party's involvement in the management of the debtor . . .
> or service as an officer, director . . .;
>> (III) the third party's provision of insurance to the debtor or a related
> party; or
>> (IV) the third party's involvement in a transaction
> changing the corporate structure, or in a loan or other financial
> transaction affecting the financial condition, of the debtor . . . .

11 U.S.C. §524(g)(4)(A)(ii)(emphasis added).

Section 524(g) does not contain the word "derivative."  The term is defined in Black's

Law Dictionary as "[l]iability for a wrong that a person other than the one wronged has a right

to redress."  BLACK'S LAW DICTIONARY (8th ed. 2004).  The Oxford English Dictionary

defines "derivative" as "[c]haracterized by transmission, or passing from one to another" and

"[a] thing of derived character; a thing flowing, proceeding, or originating from another."

"Liability" is defined, *inter alia*, as "[a]n attribute or trait which sets one at a disadvantage;

hence, a burdensome or disadvantageous person or thing, a handicap."  *See*

http://dictionary.oed.com.  The American Heritage Dictionary of the English Language, 4th

ed., found at www.dictionary.reference.com, states the definition of "derivative" as "not

original; secondary" and "resulting from."  The claims against PPG and Corning that are

based on their shareholder status or joint liability theories fall within the definition of

derivative liability.  Some of the derivative claims are alleged to be as a result of "conduct of,

38

claims against, or demands on" PCC or based on nondebtors' participation in and control of

PCC. Section 524(g) requires only that such claims be <u>alleged</u>. 11 U.S.C. §524(g)(4)(A)(ii).

As to non-Unibestos cases based on "conspiracy theories," there was ample evidence

of allegations that PCC is jointly liable for injuries caused by products distributed or sold by

PPG. *See, e.g.*, Plan Proponents' Exhibit P-15, *Connorty v. Owens Corning, et al.*, ¶ 107

(alleging aiding and abetting); ¶¶ 109-09 (alleging that PPG is PCC's alter ego or its

principal); ¶¶ 39, 111 (PPG is successor in interest to PCC); Exhibit P-18, *Abernathy v.*

*ACandS, Inc. et al.*, ¶¶ 23-25, 67, 71, 76 (alleging that acts of PCC, PPG, Corning, and others

were done in concert); Exhibit P-53, Black v. A&M Insulations, *et al.*, ¶ 16 (alleging

conspiracy). Thus, the evidence supports entry of a §524(g) injunction for all claims that

allege joint and several liability between PCC and PPG. As to Corning, there was evidence of

one non-Unibestos "conspiracy theory" claim. Exhibit P-18. Such claims, to the extent they

exist, can be channeled. The Corhart claims against PCC that do not name Corning, the

claims against Corhart, and the claims against Corning for Corhart which do not include PCC

cannot be channeled.

<u>PPG Fund, Corning Fund, and Plan Provisions</u>

The plan proposes to pay asbestos personal injury claims through a trust to be funded

by PCC, PPG, and Corning.[41] There is no allegation that the contributions are insufficient to

---

[41]PCC is contributing the following to the Asbestos PI Trust:

(1) proceeds of insurance policies totaling over $293 million, comprised of amounts already collected and paid into the Interim Qualified Settlement Fund, and amounts which insurers have agreed or are obligated to pay post-confirmation pursuant to any pre-1981 PCC Settlement agreement;

(continued...)

---

[41](...continued)

>    (2)  assignment of PCC's claimed insurance rights against PPG Non-Participating Insurers, the Corning London and Home Policies, state insurance guaranty associations, and insolvent insurers;
>
>    (3) Dividend Payments (a term defined in the plan as "[s]uch dividends from Reorganized PCC to the shareholder of Reorganized PCC as the Board of Directors may approve from time to time");
>
>    (4) Assigned Claims (a term defined in the plan as "[a]ll Claims that [PCC] or Reorganized PCC may have for contribution or other causes of action against any Entity in connection with any Asbestos PI Trust Claim, including, without limitation, any Claims which [PCC] may have against any Entity that manufactures, distributes, or sells tobacco products.  Specifically excluded from the Assigned Claims are all Debtor-Released Claims.")

*See* SFF 155; Second Amended Plan, Dkt. No. 3186, at 6, 10-12.   "Debtor-Released Claims" are defined in the plan as, in essence, all claims and causes of action PCC has or may have with respect to which it has the power to grant a release with respect to any "Debtor-Released Party."  "Debtor-Released Party" includes PPG and Corning entities, affiliates, and others. *See* Second Amended Plan, Dkt. No. 3186, at 10-11.

PPG's contribution to the plan includes:

>    (1) $998 million in a series of annual cash payments beginning on a certain date;
>
>    (2)  assignment to the Asbestos PI Trust of the PPG Non-Participating Policy Rights with combined per occurrence limits of liability of about $500-$700 million; the PPG Insolvent Insurers Rights and PPG Insurance Guaranty Fund Rights with per occurrence limits of liability of approximately $315-$390 million;
>
>    (3)  payment of up to $30 million in legal fees and expenses incurred by the Asbestos PI Trust in pursuit of insurance proceeds assigned by PPG to the Asbestos PI Trust;
>
>    (4)  relinquishment of PPG's claims to more than $300 million in pre-1981 shared insurance proceeds;
>
>    (5)  1,388,889 restricted shares of PPG common stock, the value of which on

(continued...)

satisfy §524(g).  However, within the Asbestos PI Trust, separate funds will be maintained,

one for the benefit of PPG's creditors and another for the benefit of Corning's creditors.  The

Trust Distribution Procedures provide that PCC, PPG and Corning will contribute to the PCC

Asbestos PI Trust and that there will be a PCC Fund, a PPG Fund and a Corning Fund within

the trust.  The PPG Fund and the Corning Fund are to consist of a portion of the cash

———————————————

[41](...continued)
> May 4, 2004, was $82.1 million

> (6)  PPG's 50 percent equity interest in PCC; and

> (7)  PPG's 50 percent equity interest in Pittsburgh Corning Europe, N.V., with a value in excess of $80 million.

SFF ¶ 157.  Some of PPG's insurers will also contribute.  *See* SFF ¶¶ 162-67.

> Corning's contribution includes:

> (1)  a series of payments, subject to a prepayment discount of 5.5 percent, totaling not less than $165.85 million payable annually beginning at a certain time;

> (2)  25 million restricted shares of Corning common stock, the value of which on April 26, 2004, was $281,250,000;

> (3)  Corning's 50 percent equity interest in Pittsburgh Corning Europe, N.V., having a value in excess of $80 million;

> (4)  Corning's 50 percent equity interest in PCC:

> (5)  assignment of the Corning Plan Insurance Policy Rights which encompass claims for coverage against Corning Plan Insurance Policies with combined per occurrence limits of approximately $340 million and subject to all coverage defenses;

> (6)  release of Corning's claims against PCC's and PPG's insurance for Asbestos PI Trust Claims under the Insurance Claims Agreement.

SFF ¶ 168.

payments that each is to make to the PCC Asbestos PI Trust. *See* PCC Asbestos Personal

Injury Settlement Trust Distribution Procedures, Dkt. No. 2702, Exhibit B, at 2-5, ¶¶ 2.1,

2.1(a), 2.1(b), 2.1(c).

As to PPG, the Trust Funding Agreement requires, as a condition precedent to

payment obligations and releases and indemnification, this court to make a finding that

> Suits against PPG for Claims or Demands relating to asbestos or
> asbestos-containing products manufactured, distributed, or sold
> by Pittsburgh Corning or its affiliates are inextricably
> intertwined with suits against Pittsburgh Corning.[42]

Dkt. No. 2702, Exhibit F, ¶ 4 at 20. While we accept this as a fact that is supported by the

evidence so that the finding is appropriate, the plan is broadly termed and could be interpreted

to include independent claims against PPG and Corning.

"PPG Fund Claims," i.e., those that are to be paid from the PPG Fund, are defined in

the plan as

> Any Asbestos PI Trust Claims based on exposure to an asbestos
> containing product manufactured, marketed, sold or distributed
> by any PPG Entity for which any PPG Entity has direct or
> indirect liability. The PPG Fund Claims do not include any
> claims for damages based on exposure to Unibestos or any other
> asbestos-containing product manufactured, marketed or sold by
> [PCC].

Dkt. No. 2700, Exhibit 1, Second Amended Plan at 28. "PPG Entities" are defined to exclude

PCC and Corning. *Id.*

"Corning Fund Claims," i.e., those that are to be paid from the Corning Fund, are

defined as

---

[42]A substantially similar requirement exists as to Corning. Dkt. No. 2702, Exhibit I, ¶ 18, at 6. We accept this proposed finding as supported by the evidence.

> Any Asbestos PI Trust Claims based on exposure to an asbestos
> containing product manufactured, marketed, sold or distributed
> by Corhart or any other Corning Entity for which any Corning
> Entity has direct or indirect liability.  Corning Fund Claims do
> not include any claims for damages based on exposure to
> Unibestos or any other asbestos-containing product
> manufactured, marketed or sold by [PCC].

Dkt. No. 2700, Exhibit 1, Second Amended Plan at 16.  "Corning Entities" are defined to

include various entities but specifically exclude PCC and PPG.  *Id.* at 15.


"Asbestos Protected Parties" are defined to include "any PPG-Affiliated Party" and

"any Corning-Affiliated Party."  *Id.* at 10-11.  PPG and Corning Affiliated Parties are defined

to include, *inter alia*, past, present, future officers, directors, employees, consultants,

attorneys, accountants and other persons of each of the PPG and Corning Entities.  *Id.* at 15,

27.  The plan provides, as to PPG, that the PPG Trust Contribution is reasonable in

consideration of the channeling injunction "in view of the potential liability of the PPG

Entities for Asbestos PI Trust Claims not relating to asbestos or asbestos-containing products

manufactured, distributed, or sold by [PCC] or its predecessors or Affiliates for which [PCC]

would not otherwise share liability with the PPG Entities, including the potential defenses

available to each and the difficulties that holders of such Asbestos PI Trust Claims would

have in establishing such liability."  *Id.* at ¶ 8.1.23 at 54.  The identical provision is included

with respect to the Corning Entities.  *Id.* at ¶ 8.1.33 at 55-56.

Although the plan language includes the "direct/indirect" liability language of

§524(g), the terms of the plan are broad enough to include nonderivative, independent claims

of PPG and Corning that have nothing to do with PCC.  Thus, the plan cannot be confirmed.

43

As written, the plan runs afoul of the *Combustion Engineering* decision because it enjoins suits against the nondebtors PPG and Corning with respect to suits by tort claimants on actions that do not arise derivatively from PCC.

Based on the foregoing, we find that Corning and PPG are entitled to the channeling injunction for PC-Relationship claims, for Non-PC-Relationship claims arising from the "conspiracy theory" allegations such as concert of actions, conspiracy, alter ego, etc., but not for claims that allege absolutely no connection with, interest or involvement in PCC. Similarly, to the extent that Corning Fund claimants assert a "conspiracy theory" against PCC and Corning, those claims, too, may be channeled. However, the evidence does not establish that more than one such claim exists. As structured, the channeling injunction provided by this plan is not limited to those claims which satisfy §524(g) and may be channeled.

<u>Assignment</u>

In objections to the plan, certain insurers make much of the existence of anti-assignment clauses in their policies and the fact that rights to pursue coverage under policies are assigned without insurer consent through this plan. Some insurers also argue that there is no jurisdiction to permit an assignment to the trust of the policies that are at issue. We disagree. It is established in this circuit that assignment of policy <u>proceeds</u> is not prohibited by anti-assignment provisions in insurance policies. *In re Combustion Engineering, Inc.*, 391 F.3d at 218. Corning is assigning <u>only</u> proceeds. Dkt. No. 3186, Exhibit J, at ¶ II.B. Further, once an event occurs that gives rise to the insurer's liability under the policy, the policy itself can be assigned. PPG is assigning certain rights to proceeds. Dkt. No. 2702, Exhibit H. *See generally* 3 Couch on Insurance §35.7 (3d ed. 1999). *See also Viola v. Fireman's Fund*

44

*Insurance Co.*, 965 F.Supp. 654, 658 (E.D. Pa. 1997)("[u]nder Pennsylvania law, an insurer may not limit an insured's ability to assign . . . rights under a policy after the occurrence of the event which gives rise to the insurer's liability"). *See also National Memorial Services, Inc. v. Metropolitan Life Insurance Co.*, 49 A.2d 382 (Pa. 1946)(anti-assignment clause does not preclude beneficiaries of life insurance policy from assigning proceeds of policy after the event giving rise to liability; it applies only to assignments before liability). *See also OneBeacon America Insurance Co. v. A.P.I., Inc.* 2006 WL 1473004 at *2-*3 (D.Minn. May 25, 2006)(anti-assignment clauses are to protect insurer from increase in the risk it agreed to insure but assignment of loss does not expand risk to insurer, simply allows change in identity to "reconnect the policy's coverage to the insured loss;" most courts follow the risk/loss distinction to allow insured to assign loss); *R.L. Vallee, Inc. v. American Intern. Specialty Lines Insurance Co.*, 431 F.Supp.2d 428, 435 (D.Vt. 2006)(assignments after loss are permitted as there is no additional risk to insurer; anti-assignment clauses operate after loss occurs to limit the free assignability of claims which is not favored by the law). There is no dispute that the policies cover past periods. Thus, there will be no additional risk to the insurance companies by virtue of the assignments. Coverage issues, including, *inter alia*, proof that an event giving rise to liability occurred within the covered period before a specific policy can be accessed for coverage, are all preserved.

The rule enunciated in *National Memorial Services, supra,* that a non-assignment clause is unenforceable after the loss has occurred, was reiterated in *Egger v. Gulf Insurance*

45

*Co.*, 903 A.2d 1219 (Pa. 2006).[43]  In *In re Western Asbestos Company*, 313 B.R

———————————

[43]The Pennsylvania Supreme Court in *Egger* noted that *National Memorial Services* involved a life insurance policy but applied the rule to the facts before it involving personal injury and an excess insurance policy.  The court in *Egger* said:

> The logic behind the general rule is that post-loss assignments do not invalidate the policy, thereby changing the risks the insurer undertook to insure; rather, they assign the right to a money claim. See G. Couch, CYCLOPEDIA OF INSURANCE LAW § 35.7 (3d ed. 1995) ("The purpose of a no assignment clause is to protect the insurer from increased liability, and after events giving rise [*16] to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity.").

> While *Nat'l Mem'l* involved life insurance policies and the matter concerns an excess insurance policy, this distinction does not warrant a different outcome or analysis.  The triggering event for coverage in *Nat'l Mem'l* was the death of the insured.  Accordingly, we found that there was no "sound reason for the insurance company to forbid or limit an assignment by a beneficiary of the amount due him or her after the death of the insured." *Id.* at 382-83.

> However, with the Gulf excess insurance policy, there was no death of an insured; rather, Foulke purchased coverage to protect itself against an award of damages exceeding the limits of its primary liability policy with respect to its activities at the PECO plant.  Foulke provided plant protection and security services pursuant to its contracts with PECO.  Gulf insured these activities of Foulke through its issuance of an excess insurance policy, "which provides coverage for any sum the insured is obligated to pay for bodily injury arising out of an 'occurrence.'"  Trial Court Opinion at 2.  It is an "Occurrence" that triggers the obligation of Foulke. . . .

> Consequently, in parsing the terms of the policy, the triggering event for coverage was bodily injury occasioned by Foulke, which arose out of an Occurrence during the period of the policy. . . .

(continued...)

46

832, 858 (Bankr.N.D.Cal. 2003), the bankruptcy court concluded that under 11 U.S.C.

§1123(a)(5), policies or rights thereunder may be transferred to an asbestos personal injury

trust, whether or not state law would permit assignment.

In a subsequent opinion in the same case, *In re Western Asbestos Co*., 313 B.R. 456,

459 (Bankr.N.D.Cal. 2004), the court held that, with respect to causes of action that were

transferred to the trust pursuant to the plan of reorganization, court orders or a plan

confirmation order, the trust was designated as a successor to the debtors and a representative

of the chapter 11 estates.  Further, the court held that the trust was authorized as a matter of

law to appear in and act for debtors in pending actions and to pursue causes of action for the

benefit of holders of asbestos related claims.  The court found that under §1123(b)(3)(B), on

---

[43](...continued)

> In attempting to circumvent the principle that we articulated in *Nat'l Mem'l* that a restriction against a post-loss assignment is void, Gulf asserts that its loss did not arise until the jury reached its verdict and awarded damages in an amount exceeding the underlying $ 1,000,000.00 of primary insurance coverage . . .
>
> This argument lacks merit. First, as Appellee correctly notes, the term "by reason of liability imposed by law" could mean, for example:  (1) only after a judgment has been entered; (2) only after all appeals are exhausted and the verdict stands; (3) only after efforts to execute judgment have begun; (4) the occurrence upon which the liability is based (i.e., the death of Egger); or (5) only after the tender of primary coverage. . . . This demonstrates the ambiguity of the clause that Gulf cites as support for its argument that this term means the jury verdict.
>
> We have stated that where ambiguity exists in the interpretation of policy language, the ambiguity must be construed in favor of coverage.

*Egger v. Gulf Insurance. Co*., 903 A.2d at 1224-26 (citations omitted).

the effective date of the plan,

> the Trust shall be vested with and have the right to enforce
> against any Entity any and all such causes of action, with the
> proceeds of the recovery of any such actions related to
> insurance for Asbestos Related Claims (including, without
> limitation, the Coverage Litigation) to be paid to the respective
> Debtor . . . .

313 B.R. at 459.  The court concluded that insurance rights could be vested in the trust under

§1123(a)(5)(B), notwithstanding state law or contractual provisions to the contrary.  *Id.* at

462.  The court further ruled that the vesting of insurance rights in the trust "shall neither

diminish nor impair the enforceability of any of the Asbestos Insurance Policies against a

party that is not a Released Party."  *Id.*  Likewise, it would not expand rights.  We agree with

this analysis and adopt it here.

The PPG Insurance Proceeds Assignment Agreement, Exhibit H to Dkt. No. 2702,

provides that, with respect to any Asbestos PI Trust claims that have been channeled, PPG

assigns to the Asbestos PI Trust all of the Non-Participating Policy Rights under Non-

Participating Insurance Policies in any pending insurance coverage actions.  It applies by its

terms only to claims made before the "Funding Effective Date" which is defined in the PPG

Trust Funding Agreement.[44]  Under the preceding authorities, the assignment is permissible

and does not affect insurer rights or risks.

The Corning Insurance Proceeds Assignment Agreement clearly and

---

[44]If there is a stay of the plan confirmation order, the Funding Effective Date will be
the thirtieth business day after such a stay no longer exists.  Exhibit F to Dkt. No. 2702, PPG
Trust Funding Agreement, at 8, ¶ X.  Nonetheless, if all conditions precedent to
implementation of the plan have not been satisfied or waived when the Funding Effective
Date occurs, the Funding Effective Date will be the tenth day after conditions precedent are
satisfied or waived.  *Id.*

specifically applies only to proceeds of Corning Plan Insurance Policies, Exhibit J, Dkt. No.

3186, at ¶ II.B.  The Agreement explicitly states that "[n]othing herein shall be construed as a

transfer or assignment of the Corning Plan Insurance Policies themselves."  *Id.*  Because only

proceeds are assigned, the assignment by Corning does not infringe on insurers' rights,

notwithstanding anti-assignment clauses in the policies.

> Generally, non-assignment clauses are included in insurance
> policies for the protection of insurers. Such clauses are designed
> to guarantee that an increase of the risk of loss by a change of
> the policy's ownership cannot occur without the consent of the
> insurer. . . .  Because non-assignment clauses limit the amount
> of risk that the insurer may be forced to accept, courts will
> generally strike down an insured's attempt to assign its policy to
> a new insured. . . .  Consistent with the general purposes of non-
> assignment clauses, however, courts are reluctant to restrict the
> assignment of an insured's right to payment which has already
> accrued. . . .  Therefore, because an insured's right to proceeds
> vests at the time of the loss giving rise to the insurer's liability,
> restrictions on an insured's right to assign its proceeds  are
> generally rendered void.

*Continental Casualty Co. v. Diversified Indus.*, 884 F.Supp. 937, 946 (E.D. Pa.

1995)(citations omitted), relying in part on *National Memorial Services, Inc. v. Metropolitan*

*Life Insurance Company,* 49 A.2d 382 (Pa. 1946).

<u>Insurance Neutrality and Standing</u>

PCC contests the insurers' standing in this proceeding.  The Objecting Insurers are not

creditors.  Nonetheless, they contend that the plan does not contain language that is neutral as

to them and that the plan deprives them of defenses in coverage litigation.  PCC contends that

the insurers have no standing to object to the plan because their rights are not affected by this

plan.  The insurers clearly have standing to raise issues as to the plan to the extent it affects

their rights and obligations.  Beyond that, however, they lack standing.[45]  We have referred to

this concept as "insurance neutrality."  The plan was amended in light of insurers' concerns

that findings concerning the fair and equitable nature of contributions made to the asbestos

personal injury trust by PPG and Participating Insurers and Corning could affect the

Objecting Insurers' rights in subsequent coverage litigation.  Language was added to the

Second Amended Plan to indicate that, with respect to PPG, its contribution to the Asbestos

PI Trust "fully resolves and satisfies the PPG Entities' alleged and disputed liabilities for the

Asbestos PI Trust Claims . . . .  This finding, however, shall not be binding and shall not have

collateral estoppel effect on the PPG Non-Participating Insurers in any coverage litigation

regarding the insurance coverage obligations of the PPG Non-Participating Insurers."  Second

---

[45]In *In re Mid-Valley, Inc.*, 305 B.R. 425, 431 (Bankr.W.D.Pa. 2004), this court
discussed the three requirements that a party must establish to qualify as a "party in interest"
for Article III purposes:

> First, a plaintiff must demonstrate an "injury in fact," which is
> "concrete," "distinct and palpable," and "actual or imminent"  .
> . . .   Second, a plaintiff must establish "a causal connection
> between the injury and the conduct complained of – the injury
> has to be 'fairly trace[able] to the challenged action of the
> defendant, and not . . . th[e] result [of] some third party not
> before the court'" . . . . Third, a plaintiff must show the
> "'substantial likelihood'" that the requested relief will remedy
> the alleged injury in fact.

*See also McConnell v. Federal Election Comm'n*, 540 U.S. 93, 225-26 (2003)(minimum
constitutional requirements for standing are (1) injury in fact which is concrete, distinct and
palpable and actual or imminent, (2) a causal connection between the injury and the conduct
complained of; (3) substantial likelihood that the requested relief will remedy the alleged
injury).  Only those directly and adversely affected may appeal.  *Travelers Insurance Co. v.
H.K. Porter Co.*, 45 F.3d 737, 741 (3d Cir. 1995).  They would have standing to challenge
any part of the plan that affects their direct interests.  *In re Orlando Investors, LP*, 103 B.R.
593, 596 (Bankr.E.D.Pa. 1989), but the plan is insurance neutral as to them.  Because the plan
is insurance neutral, the insurers' rights are not affected and they do not have standing to
object.

Amended Plan of Reorganization, §8.1.15.  *See also* SFF ¶ 21.[46]  The identical language

appears with respect to Corning.  *See* Second Amended Plan of Reorganization, §8.1.26; SFF

¶ 22.[47]   The Case Management Order Related to the Second Amended Plan of

_____

[46]Paragraph 21 of the Stipulated Findings provides as follows:

> 21.  On December 17, 2003, the Court entered a Case
> Management Order related to the Second Amended Plan of
> Reorganization ("CMO").  Docket No. 2805.  Paragraph 10 of
> the CMO provides that:  "any estimation of asbestos liabilities
> of the Debtor and/or PPG and/or Corning and/or any entity
> affiliated with or related to the Debtor, PPG or Corning that
> occurs in the context of this bankruptcy proceeding shall not be
> binding and shall have no collateral estoppel effect on the PPG
> Non-Participating Insurers, the Corning Plan Insurers or the
> Corning Insurers (collectively, the Insurers) or on the Corning
> Entities or the PPG Entities regarding the insurance coverage
> obligations of the Insurers in any coverage dispute or coverage
> litigation.  The Insurers will not conduct any discovery related
> to such estimation in this Bankruptcy Case, nor shall the
> Insurers present any evidence or otherwise participate in any
> hearings or briefing in the Bankruptcy Case relating to such
> estimation (or voluntarily provide any information, assistance
> or cooperation or briefing relating to such estimation to anyone
> that is disputing that issue).  The Court finds that the Insurers
> did not participate in the estimation process or the discovery
> leading to same.  With the parties' consent, the Court's findings
> with respect to estimation shall apply only to Plan confirmation
> issues and not to issues of insurance coverage."  Id.  Paragraph
> 11 of the CMO provides:  "Any Plan and any order confirming
> any Plan shall include the language set forth in paragraph 10 of
> this Order.'  Id.

[47]Paragraph 22 of the Stipulated Findings provides:
> On December 18, 2003, the Court entered an order ruling that
> the issue of whether the Corning Trust Contribution is
> reasonable from an insurance coverage standpoint would not be
> litigated or determined in connection with Plan confirmation,
> that all discovery related to that issue would be preserved and
> addressed in the coverage litigation and any finding made by
> the Court with respect to whether the Corning Trust

(continued...)

51

Reorganization, Dkt. No. 2805, provides at ¶ 10:

> The Debtor, Corning. PPG, the Asbestos Claimants' Committee
> and the Future Claimants' Representative have agreed, and the
> Asbestos PI Trust is ordered to agree, that any estimation of the
> asbestos liabilities of the Debtor and/or PPG and/or Corning
> and/or any entity affiliated with or related to the Debtor, PPG,
> or Corning that occurs in the context of this bankruptcy
> proceeding shall not be binding and shall not have collateral
> estoppel effect on the PPG Non-Participating Insurers, the
> Corning Plan Insurers, or the Corning Insurers (collectively, the
> "Insurers") or on the Corning Entities or the PPG Entities
> regarding the insurance coverage obligations of the Insurers in
> any coverage dispute or coverage litigation. . .  With the parties'
> consent, the Court's findings with respect to estimation shall
> apply only to Plan confirmation issues and not to issues of
> insurance coverage.

This language clearly establishes that, to be confirmed, the Plan must be "insurance neutral."

Insurers' rights under the policies, including all defenses to coverage for particular

claims, are preserved.  Thus, the insurers' rights are protected and unimpaired in this plan.[48]

Still, the rights under the policies can be assigned.  Assignment of policy rights and proceeds

is permissible, particularly where the event giving rise to the insurers' obligation to pay has

---

[47](...continued)
> Contribution is "reasonable" or "fair and equitable" shall not be
> binding upon or have collateral estoppel effect upon the
> Corning Insurers in any insurance coverage litigation.  Docket
> No. 2806.

We note that PCC filed another set of technical amendments on a motion and an order was entered permitting those amendments to be made (*see* Dkt. Nos.  3120, 3185) but Corning Plan Insurers and PPG Non-Participating Insurers dispute that those amendments resolve their objections.  *See* SFF ¶ 23.

[48]We note that certain insurers argued that PPG and/or PCC may not have claims under certain policies for non-products liability, despite the fact that policies are shared between the two entities.  At a hearing on May 24, 2004, this court ruled that that was an issue for coverage litigation and not for purposes of plan confirmation.

arisen.  Counsel for the ACC pointed out as well that it would be the Asbestos PI Trust and not the Plan Proponents who would be making claims against insurance.  *See* Tr. 5/6/04, Dkt. No. 3316, at 106.

The Court of Appeals in *Combustion Engineering* remarked favorably on that plan's insurance neutrality provisions and took issue with the standing of Objecting Insurers who were granted similar protections in that plan of reorganization.  The Second Amended Plan of Reorganization in the instant case, like the plan at issue in *Combustion Engineering*, "broadly preserves insurers' pre-petition rights under the subject insurance policies" and will permit the Objecting Insurers to "dispute coverage under specific policies, and . . . raise any of the same challenges or defenses to the payment of claims available pre-petition." *Combustion Engineering*, 391 F.3d at 217.

Because the Second Amended Plan of Reorganization does not diminish the rights of the Objecting Insurers or increase their burdens under the subject insurance policies, the court finds that it is "insurance neutral."  As a result, the insurers have no standing to object to confirmation.

<u>Motion *in Limine*</u>

A motion *in Limine* was filed by Lumbermens Mutual Casualty Company regarding proposed findings in the plan relating to the validity and enforceability of Corning's proposed assignment of the Corning Plan Insurance Policy Rights.  Dkt. No. 3033, Motion *in Limine* (No. Two); Dkt. No. 3034; Brief in Support of Motion *in Limine* (No. Two).  In this motion Lumbermens seeks exclusion of evidence and rejection of argument "in support of the Plan Proponents' requested finding that Corning's proposed assignment of the 'Corning Plan

53

Insurance Policy Rights' is valid and enforceable." Dkt. No. 3034 at 2. The motion will be denied.

As noted, assignment of rights under an insurance policy or of the policy itself is permissible, notwithstanding an anti-assignment clause, after a loss has incurred. *See OneBeacon America Insurance Co. v. A.P.I., Inc.* 2006 WL 1473004 (D.Minn. May 25, 2006). In *OneBeacon*, *id.* at *2, the confirmation order provided that the debtor's insurance policies, rights thereunder, or proceeds from asbestos insurance coverage would vest in the Asbestos PI Trust on the plan effective date, notwithstanding state law or contractual provisions to the contrary. The confirmation order further provided that the enforceability of the policies would not be diminished or impaired and anti-assignment provisions would not be enforced. The court agreed with the debtor that because the loss had occurred, the bankruptcy court had not erred in rejecting the insurer's challenge to the trust operation. *Id.* at *3. In *In re A.P.I., Inc.*, 331 B.R. 828 (Bankr.D.Minn. 2005), the court held that insurers did not have standing to object to confirmation of a plan that assigned to the trust all the debtor's rights under liability insurance extant when the chapter 11 was filed inasmuch as the trust's administration of asbestos-related personal injury claims under the plan would not determine the rights or duties of any party or affect any duty or right. *Id.* at 830. *See also In re Western Asbestos Co.,* 313 B.R. 832 (Bankr.N.D.Cal. 2003). Here, Corning is assigning only proceeds. Because the assignment by Corning of proceeds of its policies is specifically permitted, *see Egger v. Gulf Insurance Co.*, 903 A.2d 1219 (Pa. 2006); *In re Western Asbestos Company,* 313 B.R 832, 858 (Bankr.N.D.Cal. 2003), the Motion *in Limine* will be denied.

**Conclusion**

The allegations against PCC, PPG and Corning as to liability for PCC's Unibestos product and as to joint and several liability ("conspiracy theories") unquestionably meet the requirement of §524(g)(4)(A)(ii) that "an injunction may bar any action directed against a third party who is . . . alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor."   Section 524(g)(4)(A)(ii) also provides a threshold requirement that third parties must meet before they may take advantage of this provision. The first two provisions of the threshold requirement, any one of which qualifies the third party under the section, are:

> (I) the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;
> (II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party.

There is no dispute that these two sections apply to PPG and to Corning.  The remaining two threshold requirements, provision of insurance to the debtor or involvement in certain financial transactions with the debtor, are contested by one or more parties.  We find that both PPG and Corning have provided insurance to PCC and qualify under the third provision as well.  We need not address the fourth factor because, as noted above, only one of the four requirements is needed to qualify the third party under §524(g)(4)(A), and both PPG and Corning qualify under at least the first two.  The assignment of policies and proceeds is permitted under the law in this circuit.

On March 17, 2006, PCC filed Amendments to the Second Amended Plan of Reorganization in Response to the Court's Directive at the February 28, 2006, Hearing, Dkt. No. 4741, which identifies proposed amendments to the Second Amended Plan and related exhibits as well as proposed conclusions of law previously submitted, which had references to §105 in connection with issuance of the §524(g) channeling injunction. Under the holding in *Combustion Engineering*, §105 cannot be used to extend the channeling injunction of §524(g) to asbestos-related personal injury claims that are independent nonderivative claims of nondebtor affiliates of PCC. 391 F.3d at 236. The amendments, to the extent they delete the references to §105, are accepted. The court finds that §105 is not a basis upon which to issue the channeling injunction as to PPG and/or Corning's nonderivative liabilities. The plan meets the standards for confirmation and for issuance of the channeling injunction to the extent addressed in this Memorandum Opinion. However, the problem lies in the plan provisions that are broad enough to cover independent claims of PPG and Corning. Inasmuch as it appears from the record that such independent claims exist as to Corning and PPG, the plan, which otherwise meets the confirmation standards of 11 U.S.C. §1129, cannot be confirmed.

### Epilogue

Because the court cannot extend the time to file an appeal on its own, under Fed.R.Bankr.P. 8002,[49] and because the issuance of this Memorandum Opinion and Order coincides with the imminence of the December holidays, if parties in interest require

---

[49]*See In re Barbel*, 2006 U.S. App. Lexis 30788 (3d Cir., December 14, 2006)(Not Precedential).

additional time to consider this Memorandum Opinion, the court will entertain a timely filed

motion to extend the time to file motions for reconsideration and/or appeal.

An appropriate order will be entered with respect to plan confirmation. A separate

order will be entered regarding Lumbermens Mutual Casualty Company's motion *in limine*.

DATE: **December 21, 2006**                    _Judith K. Fitzgerald_
                                              rmab
                                              Judith K. Fitzgerald
                                              United States Bankruptcy Judge

The Case Administrator will send copies of this Memorandum Opinion to all parties on the
current Service List.

## IN THE UNITED STATES BANKRUPTCY COURT FOR
## THE WESTERN DISTRICT OF PENNSYLVANIA

In Re:

|  |  |
|---|---|
| | Bankruptcy No. 00-22876 (JKF) |
| Pittsburgh Corning | Chapter 11 |
| Corporation, | |
| Debtor | Related to Dkt. No. 2700, Second Amended Disclosure Statement to Accompany the Second Amended Plan of Reorganization Dated November 20, 2003, Jointly Proposed by Pittsburgh Corning Corporation, the Official Committee of Asbestos Creditors and the Future Claimants' Representative, |

Dkt. No. 3186, Second Amended Plan of Reorganization Dated November 20, 2003, and

Dkt. No. 4108, Order regarding briefs addressing the impact, if any, of *In re Combustion Engineering*, 391 F.3d 190 (3d Cir. 2004), on the proposed plan of reorganization

Dkt. No. 3033, Motion in Limine (No. Two) Re Plan Finding on Purported "Validity and Enforceability" of Corning's Proposed Assignment of Corning Plan Insurance Policy Rights filed on behalf of Lumbermens Mutual Casualty Company

### ORDER DENYING PLAN CONFIRMATION

**AND NOW**, this **21st** day of **December**, **2006**, for the reasons expressed in the foregoing Memorandum Opinion, it is **ORDERED** that the Second Amended Plan of Reorganization is not confirmed.

It is **FURTHER ORDERED** that the court will entertain a timely filed motion to extend the time to file motions for reconsideration and/or appeal if filed pursuant to Fed.R.Bankr.P. 8002(c)(1).

1

It is **FURTHER ORDERED** that a status conference shall be held on **January 17, 2007,** at **1:00 p.m.** in Courtroom A, 54th Floor, US Steel Building, 600 Grant Street, Pittsburgh, Pennsylvania.

_Judith K. Fitzgerald_ rmab
Judith K. Fitzgerald
United States Bankruptcy Judge

The Case Administrator will send copies of this Memorandum Opinion to all parties on the current Service List.

2

# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COMBUSTION ENGINEERING, INC., | ) | Case No.: 03-10495 |
| | ) | |
| Debtor. | ) | |
| | ) | |

## COMBUSTION ENGINEERING, INC.'S

## PLAN OF REORGANIZATION

## AS MODIFIED THROUGH JUNE 4, 2003

**THIS PLAN PROVIDES, AMONG OTHER THINGS, FOR THE ISSUANCE OF INJUNCTIONS UNDER SECTIONS 105 AND 524(g) OF THE BANKRUPTCY CODE THAT RESULT IN THE CHANNELING OF ALL ASBESTOS-RELATED PERSONAL INJURY LIABILITIES.**

Dated: January 19, 2003

KIRKPATRICK & LOCKHART LLP
Jeffrey N. Rich
Philip H. Hecht
Robert N. Michaelson
Nanette C. Heide
599 Lexington Avenue
New York, NY 10022-6030
Telephone: (212) 536-4097
Facsimile: (212) 536-3901

PACHULSKI, STANG, ZIEHL, YOUNG,
JONES & WEINTRAUB P.C.
Laura Davis Jones (Bar No. 2436)
Curtis A. Hehn (Bar No. 4264)
Michael P. Migliore (Bar No. 4331)
919 N. Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Attorneys for Combustion Engineering, Inc.

*EXHIBIT B TO DISCLOSURE STATEMENT – PLAN OF REORGANIZATION*

### 7.2     The Asbestos PI Trust.

#### 7.2.1     *Creation of the Asbestos PI Trust*

On the Effective Date, the Asbestos PI Trust shall be created in accordance with the Plan Documents.  The Asbestos PI Trust shall be a "qualified settlement fund" within the meaning of Section 468B of the IRC and the regulations issued thereunder.  The purpose of the Asbestos PI Trust shall be to assume all Asbestos PI Trust Claims (whether now existing or arising  at any time hereafter) and to use the Asbestos PI Trust Assets to pay holders of Allowed Asbestos PI Trust Claims in accordance with the Asbestos PI Trust Agreement and the TDP, and in such a way that provides reasonable assurance that the Asbestos PI Trust will value and be in a financial position to pay, present and future Asbestos PI Trust Claims that involve similar claims in substantially the same manner, and to otherwise comply in all respects with the requirements of Section 524(g)(2)(B)(i) of the Bankruptcy Code.  On the Effective Date, all right, title and interest in and to the Asbestos PI Trust Assets and any proceeds or causes of action thereunder shall be transferred to and vested in the Asbestos PI Trust, free and clear of all Claims, Equity Interests, Encumbrances and other interests of any Entity without any further action of any Entity.

#### 7.2.2     *Appointment of Trustees*

Prior to or at the Effective Date, the Future Claimants' Representative and the Official Creditors' Committee appointed in the Chapter 11 Case, acting jointly, shall nominate the three initial Trustees of the Asbestos PI Trust, one of which shall be a resident of the State of Delaware (if a natural person) or which (in all other cases) have a principal place of business in Delaware.  The Bankruptcy Court, after notice and opportunity for hearing, shall appoint the initial Trustees to serve as Trustees of the Asbestos PI Trust in accordance with the Asbestos PI Trust Agreement, effective as of the Effective Date.

#### 7.2.3     *Appointment of Trust Advisory Committee Members*

Prior to or at the hearing with respect to the confirmation of the Plan, the Debtor, the CRC, the Future Claimants' Representative, and the ACC, if appointed, acting jointly, shall nominate the three initial members of the TAC.  On the Confirmation Date, effective as of the Effective Date, the Bankruptcy Court shall appoint the initial members of the TAC (and thereupon the TAC shall be formed) to serve as members of the TAC in accordance with the Asbestos PI Trust Agreement.

#### 7.2.4     *Transfer of CE Contribution*

On the Effective Date, CE shall (i) transfer to the Asbestos PI Trust the Excess Cash; (ii) deliver to the Asbestos PI Trust the secured convertible note as contemplated by the Term Sheet attached hereto as Exhibit A; and (iii) execute and deliver the Insurance Assignment Agreement as set forth in Section 7.2.8 herein.

*EXHIBIT B TO DISCLOSURE STATEMENT – PLAN OF REORGANIZATION*

### 7.2.10    *Transfer of Claims and Demands to the Asbestos PI Trust*

On the Effective Date, all liabilities, obligations, and responsibilities relating to all Asbestos PI Trust Claims shall be transferred to the Asbestos PI Trust.

### 7.2.11    **Books and Records**

The Asbestos PI Trust and its Representatives shall have reasonable access to all of the books and records of the Debtor, the Reorganized Debtor, and the Non-Debtor Affiliates who are domiciled in the United States (the "Domestic Non-Debtor Affiliates") to the extent that such books or records reasonably relate to any Asbestos PI Trust Assets or any Asbestos PI Trust Claims (the "Asbestos Books"). Such access to the Asbestos Books shall be afforded by the Debtor, the Reorganized Debtor, and the Domestic Non-Debtor Affiliates upon receipt of reasonable advance notice and during normal business hours. Asea Brown Boveri shall be solely responsible for any costs or expenses incurred pursuant to this Section. If the Debtor, the Reorganized Debtor, and the Domestic Non-Debtor Affiliates shall desire to dispose of any of the Asbestos Books, such parties shall, prior to such disposition, give a reasonable opportunity to the Asbestos PI Trust to segregate and remove such Asbestos Books as the Asbestos PI Trust may select. In addition, the Debtor, the Reorganized Debtor, and the Domestic Non-Debtor Affiliates shall permit the Asbestos PI Trust and its Representatives to conduct reasonable interviews of officers and employees concerning matters reasonably related to the Asbestos Books.

### 7.2.12    *Discharge of Liabilities to Holders of Asbestos PI Trust Claims*

Except as provided in the Plan Documents and the Confirmation Order, the transfer to, vesting in, and assumption by the Asbestos PI Trust of the Asbestos PI Trust Assets and the Asbestos Insurance Assignment as contemplated by the Plan, the ABB and the Non-Debtor Affiliate Settlement Agreement, and the Insurance Assignment Agreement among other things, on the Effective Date shall (1) discharge the Debtor and the Reorganized Debtor for and in respect of all Asbestos PI Trust Claims and (2) discharge, release and extinguish all obligations and liabilities of the Released Parties for and in respect of all Asbestos PI Trust Claims. On the Effective Date, the Asbestos PI Trust shall assume all Asbestos PI Trust Claims and shall pay the Allowed Asbestos PI Trust Claims in accordance with the TDP.

### 7.2.13    *Institution and Maintenance of Legal and Other Proceedings*

As of the Effective Date, the Asbestos PI Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Asbestos PI Trust. The Asbestos PI Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all actions arising from or related to the Asbestos Insurance Rights. The Insurance Contributors shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all actions arising from or related to their respective insurance rights to the extent permitted or required by the Insurance Assignment Agreement.

*EXHIBIT B TO DISCLOSURE STATEMENT – PLAN OF REORGANIZATION*

# EXHIBIT 3

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE | : | Jointly Administered |
| | : | Case No. 02-10429 (JKF) |
| Kaiser Aluminum Corporation, | : | |
| a Delaware corporation, *et al.*, | : | Chapter 11 |
| | : | |
| Debtors. | : | |
| | : | |

| | | |
|---|---|---|
| (Kaiser Aluminum Corporation) | : | (Case No. 02-10429 (JKF)) |
| (Kaiser Aluminum & Chemical Corporation) | : | (Case No. 02-10430 (JKF)) |
| (Akron Holding Corporation) | : | (Case No. 02-10431 (JKF)) |
| (Kaiser Aluminum & Chemical Investment, Inc.) | : | (Case No. 02-10433 (JKF)) |
| (Kaiser Aluminium International, Inc.) | : | (Case No. 02-10434 (JKF)) |
| (Kaiser Aluminum Properties, Inc.) | : | (Case No. 02-10435 (JKF)) |
| (Kaiser Aluminum Technical Services, Inc.) | : | (Case No. 02-10436 (JKF)) |
| (Kaiser Bellwood Corporation) | : | (Case No. 02-10437 (JKF)) |
| (Kaiser Micromill Holdings, LLC) | : | (Case No. 02-10439 (JKF)) |
| (Kaiser Texas Micromill Holdings, LLC) | : | (Case No. 02-10440 (JKF)) |
| (Kaiser Sierra Micromills, LLC) | : | (Case No. 02-10441 (JKF)) |
| (Kaiser Texas Sierra Micromills, LLC) | : | (Case No. 02-10442 (JKF)) |
| (Oxnard Forge Die Company, Inc.) | : | (Case No. 02-10443 (JKF)) |
| (Alwis Leasing, LLC) | : | (Case No. 02-10818 (JKF)) |
| (Kaiser Center, Inc.) | : | (Case No. 02-10819 (JKF)) |
| (KAE Trading, Inc.) | : | (Case No. 03-10145 (JKF)) |
| (Kaiser Aluminum & Chemical Investment | : | (Case No. 03-10146 (JKF)) |
| Limited (Canada)) | : | |
| (Kaiser Aluminum & Chemical Of Canada | : | (Case No. 03-10147 (JKF)) |
| Limited (Canada)) | : | |
| (Kaiser Center Properties) | : | (Case No. 03-10149 (JKF)) |
| (Kaiser Export Company) | : | (Case No. 03-10150 (JKF)) |
| (Texada Mines Ltd. (Canada)) | : | (Case No. 03-10152 (JKF)) |
| | : | |
| | : | SECOND AMENDED JOINT PLAN OF |
| | : | REORGANIZATION OF KAISER |
| | : | ALUMINUM CORPORATION, KAISER |
| | : | ALUMINUM & CHEMICAL |
| | : | CORPORATION AND CERTAIN OF |
| | : | THEIR DEBTOR AFFILIATES |

Gregory M. Gordon (TX 08435300)
Henry L. Gompf (TX 08116400)
Troy B. Lewis (TX 12308650)
Daniel P. Winikka (TX 00794873)
JONES DAY
2727 North Harwood
Dallas, Texas 75201
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100

Dated: September 7, 2005

Daniel J. DeFranceschi (DE 2732)
Kimberly D. Newmarch (DE 4340)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

(137)  **"Ordinary Course Professionals Order"** means the Order Authorizing Debtors and Debtors in Possession to Retain, Employ and Pay Certain Professionals in the Ordinary Course of Their Businesses entered by the Bankruptcy Court on or about March 19, 2002, as subsequently revised.

(138)  **"Other Debtor"** means an Alumina Subsidiary Debtor or KBC, as the case may be.

(139)  **"Other Unsecured Claims"** means Unsecured Claims other than Claims classified in Class 4, Subclass 9A or Class 10.

(140)  **"PBGC"** means the Pension Benefit Guaranty Corporation, a wholly-owned United States government corporation and an agency of the United States of America that administers the defined benefit pension plan termination insurance programs under Title IV of ERISA.

(141)  **"PBGC Claims"** means the Claims (excluding any Administrative Claims) of the PBGC against the Debtors arising from or related to the pension plans that were or are maintained by the Debtors or Other Debtors and guaranteed by the PBGC, as such Claims are allowed pursuant to the PBGC Settlement Agreement.

(142)  **"PBGC Settlement Agreement"** means the agreement among KACC and the PBGC, dated as of October 14, 2004, as the same may have been or may be modified, amended or supplemented.

(143)  **"Petition Date"** means as to any Debtor, the date on which the Reorganization Case of such Debtor was commenced.

(144)  **"PI Channeling Injunction"** means, as applicable, the Asbestos PI Channeling Injunction, the CTPV PI Channeling Injunction, the NIHL PI Channeling Injunction or the Silica PI Channeling Injunction.

(145)  **"PI Insurance Assets"** means:  (a) rights to receive proceeds from Included PI Trust Insurance Policies in respect of Channeled Personal Injury Claims; and (b) the Cash paid or to be paid pursuant to settlement agreements with any PI Insurance Company entered into prior to the Effective Date in respect of Included PI Trust Insurance Policies and allocable to payment of Channeled Personal Injury Claims, including the Insurance Settlement Escrow Funds.

(146)  **"PI Insurance Company"** means any insurance company, insurance broker or syndicate insurance broker, guaranty association or any other entity that may have liability under an Included PI Trust Insurance Policy, including any reinsurers with respect to claims covered by an Included PI Trust Insurance Policy, *provided, however,* PI Insurance Company shall not include any Protected Party.

(147)  **"PI Insurance Coverage Action"** means any claim, cause of action or right of the Debtors or any of them, under the laws of any jurisdiction, against any PI Insurance Company, arising from or related to: (a) any such PI Insurance Company's failure or refusal to provide or pay under an Included PI Trust Insurance Policy in respect of a Channeled Personal Injury Claim; (b) failure or refusal of any PI Insurance Company to compromise and settle any Channeled Personal Injury Claim under or pursuant to any Included PI Trust Insurance Policy; or (c) the interpretation or enforcement of the terms of any Included PI Trust Insurance Policy in respect of a Channeled Personal Injury Claim.

(148)  **"PI Insurer Coverage Defenses"** means all defenses at law or in equity that any PI Insurance Company of an Included PI Trust Insurance Policy may have under applicable non-bankruptcy law to provide insurance coverage to or for Channeled Personal Injury Claims or Trust Expenses of the Funding Vehicle Trust or any PI Trust that have been channeled to or assumed by or incurred by the Funding Vehicle Trust or a PI Trust, respectively, pursuant to the Plan, except for (a) any defense that the transfer of the Debtors' rights as to Included PI Trust Insurance Policies pursuant to the Plan is invalid or unenforceable or otherwise breaches the terms of such coverage and (b) any defense that the drafting, proposing, confirmation or consummation of a plan of reorganization (as opposed to the terms, operation, effect or unreasonableness of any of the Plan or the Exhibits to the Plan) and/or the discharge and/or release of the Debtors from liability for Channeled Personal Injury Claims pursuant to the Plan

books and records prior to the first anniversary of the Effective Date, or if the Funding Vehicle Trust so requests, Reorganized KACC may (and will, if the Funding Vehicle Trust so requests, but at the sole cost and expense of the Funding Vehicle Trust) destroy any such books and records, including any in the possession of KACC's former counsel. Until such books and records are so transferred or destroyed, Reorganized KACC will maintain such books and records in the same manner it maintains them as of the Effective Date and will make them available to the Funding Vehicle Trust, at its request, during normal business hours and upon reasonable notice. Notwithstanding any other provision of the Plan, the cost and expense of so maintaining such books and records will be borne by Reorganized KACC; *provided, however*, that any cost or expense incurred by Reorganized KACC in connection with any such request by the Funding Vehicle Trust will be reimbursed by the Funding Vehicle Trust. Additionally, Reorganized KACC will not unreasonably withhold consent to the Funding Vehicle Trust's retention of the professional services of KACC's former counsel, including Heller Ehrman LLP and KACC's National Coordinating Counsel (Wharton Levin Ehrmantraut & Klein, P.A.). The Debtors will request that the Bankruptcy Court, in the Confirmation Order, rule that such transfer of books and records and retention of such professional services does not result in the destruction or waiver of any applicable privileges pertaining to such books, records and professional services. If the Bankruptcy Court does not so rule, at the option of the Funding Vehicle Trust, Reorganized KACC will, at the sole cost and expense of the Funding Vehicle Trust, retain the books and records and enter into arrangements to permit the Funding Vehicle Trust to have access to such books, records and professional services.

     e.     **Assumption of Certain Liabilities and Obligations by the Funding Vehicle Trust**

     (i)     **Channeled Personal Injury Claims and Trust Expenses**

On the Effective Date, the Funding Vehicle Trust will assume all liability and responsibility for its Trust Expenses, and the Reorganized Debtors will have no further financial or other responsibility or liability therefor. The Funding Vehicle Trust shall advocate in any and all actions and proceedings brought against the Reorganized Debtors that involve Channeled Personal Injury Claims that such Claims are and have been channeled to the applicable PI Trust, and the Funding Vehicle Trust Agreement shall provide that the Funding Vehicle Trust shall cooperate with the Reorganized Debtors in any and all such actions and proceedings. Each Reorganized Debtor will be entitled to indemnification from the Funding Vehicle Trust for any out-of-pocket fees and expenses and attorneys' fees and expenses, judgments, settlements or other liabilities arising from or reasonably incurred by or on behalf of such Reorganized Debtor on or after the Effective Date in connection with any action, suit or proceeding related to Channeled Personal Injury Claims, whether civil, administrative or arbitrative, including without limitation any liability for indemnification or contribution for such Claims prosecuted against such Reorganized Debtor.

     (ii)     **Insurance-Related Obligations**

The Funding Vehicle Trust's pursuit of PI Insurance Assets as to Channeled Personal Injury Claims and Trust Expenses of the Funding Vehicle Trust or any PI Trust, as contemplated by the Plan and by the Funding Vehicle Trust Agreement, shall be undertaken by the Funding Vehicle Trust in such a manner so as not to cause the Reorganized Debtors or other Kaiser Companies, including Trochus Insurance Company, to become obligated, whether directly to the PI Insurance Company as to which claim is made by the Funding Vehicle Trust or indirectly through claims made by such PI Insurance Company as against other insurance companies, to pay any amounts in the form of, or pursuant to, self insured retentions, premiums, deductibles, retrospective premium adjustments, reinsurance, security or collateral arrangements or other charges, costs, fees or expenses (if any) (collectively, the "Insurance-Related Claims"). The Funding Vehicle Trust shall defend any Insurance-Related Claim made against the Reorganized Debtors or other Kaiser Companies. To effectuate this obligation of the Funding Vehicle Trust, the Funding Vehicle Trust shall either, at the Funding Vehicle Trustees' option, (a) pay any Insurance-Related Claim adjudicated or determined by binding arbitration on behalf of the Reorganized Debtor or other Kaiser Company or (b) reduce the amount that any PI Insurance Company is adjudicated or determined by binding arbitration to be obligated to pay under an Included PI Trust Insurance Policy that triggers the financial obligations of the Reorganized Debtors or other Kaiser Companies described above, as is necessary to eliminate either a direct right of recovery by that PI Insurance Company or an indirect right of recovery that such PI Insurance Company has been adjudicated or determined by binding arbitration to be entitled to as against the Reorganized Debtors or other Kaiser Companies, including Trochus Insurance Company and pay out of pocket fees and expenses and attorneys' fees and expenses incurred by the Reorganized Debtor or other Kaiser Company including Trochus

Insurance Company on or after the Effective Date; *provided, however*, that the amount payable under (a) above shall not exceed the amount paid by such PI Insurance Company under that Included PI Trust Insurance Policy to the Funding Vehicle Trust. Additionally, in consideration for the transfer of the PI Insurance Assets to the Funding Vehicle Trust and in furtherance of the purposes of the Funding Vehicle Trust and the Plan, on the Effective Date the Funding Vehicle Trust will assume all liability and responsibility for obligations under any agreements pursuant to which funds have or will be paid in respect of insurance settlements for the benefit of holders of any Channeled Personal Injury Claims, and any escrow or other agreements entered into in connection therewith, to the full extent contemplated by such settlement agreements, and the Reorganized Debtors will have no further financial or other responsibility or liability therefor. The Funding Vehicle Trust will cooperate with the Reorganized Debtors and use commercially reasonable efforts to take or cause to be taken all actions and to do or cause to be done all things that the Reorganized Debtors may reasonably consider necessary, appropriate or desirable to effectuate such assumption.

### f.    Cooperation with Respect to Insurance Matters

The Reorganized Debtors will cooperate with the Funding Vehicle Trust and use commercially reasonable efforts to take or cause to be taken all actions and to do or cause to be done all things that the Funding Vehicle Trust may reasonably consider necessary, appropriate or desirable to effectuate the transfer of assets contemplated by Section 5.1.d to the Funding Vehicle Trust. By way of enumeration and not of limitation, the Reorganized Debtors will be obligated: (i) to provide the Funding Vehicle Trust with copies of insurance policies and settlement agreements included within or relating to the PI Insurance Assets; (ii) to provide the Funding Vehicle Trust with other information in the Reorganized Debtors' possession necessary, appropriate or desirable to the Funding Vehicle Trust in connection with its efforts to obtain insurance coverage for Channeled Personal Injury Claims; and (iii) to execute further assignments or allow the Funding Vehicle Trust to pursue claims relating to the PI Insurance Assets in a Reorganized Debtor's name (subject to appropriate disclosure of the fact that the Funding Vehicle Trust is doing so and the reasons why it is doing so), including by means of arbitration, alternative dispute resolution proceedings or litigation, to the extent necessary or helpful to the efforts of the Funding Vehicle Trust to obtain insurance coverage under the PI Insurance Assets for Channeled Personal Injury Claims. To the extent the transfer to the Funding Vehicle Trust of any of the PI Trust Assets within the scope of clause (a) of Section 1.1(151) is determined to be invalid by a court of competent jurisdiction, upon request by the Funding Vehicle Trust and at the cost of the Funding Vehicle Trust, the Reorganized Debtors shall (i) take all reasonable actions with respect to such assets, including prosecution of any PI Insurance Coverage Action, for the benefit of, and to the extent reasonably requested by, the Funding Vehicle Trust and (ii) immediately transfer any amounts recovered under or on account of any such assets to the Funding Vehicle Trust. The Funding Vehicle Trust will be obligated to compensate the Reorganized Debtors for costs reasonably incurred on or after the Effective Date in connection with providing assistance to the Funding Vehicle Trust pursuant to this Section 5.1.f, including but not limited to out-of-pocket costs and expenses, consultant fees and attorneys' fees. Action taken pursuant to this Section 5.1.f shall not be deemed to waive and shall not be a waiver of any applicable privilege as against any third party.

### g.    PI Insurance Coverage Actions

Any PI Insurance Coverage Action and the claims and causes of action asserted or to be asserted therein shall be preserved for the benefit of the Funding Vehicle Trust for prosecution either by Reorganized KACC or the Funding Vehicle Trustees (as mutually agreed by such parties) subsequent to the Effective Date and in accordance with the Funding Vehicle Trust Agreement. As of the date subsequent to the Effective Date on which the Funding Vehicle Trustees confirm in writing to the Reorganized Debtors that the Funding Vehicle Trust is in a position to assume such responsibility, such actions, along with the rights and obligations of the Debtors and the Reorganized Debtors with respect to Included PI Trust Insurance Policies and claims thereunder, to the extent that such policies and claims relate to Channeled Personal Injury Claims (but not as to any other claims covered thereby) and subject to the transferability without prejudice of such policies and claims, shall be transferred to and vested in the Funding Vehicle Trust, as the representative of the Debtors' Estates, the Funding Vehicle Trust being appointed by the Bankruptcy Court in accordance with section 1123(b)(3) of the Bankruptcy Code without any further action by the Debtors or Reorganized Debtors, the Funding Vehicle Trust or the Bankruptcy Court. Such PI Insurance Coverage Actions shall be so vested free and clear of all liens, security interests and other claims or causes of action, except for PI Insurer Coverage Defenses or as otherwise provided in the Plan. Until such time as the PI Insurance Coverage Actions have become vested in the Funding Vehicle Trust, Reorganized KACC shall be entitled to prosecute any PI Insurance Coverage Action; *provided, however*, that any compromise or settlement of any such

action shall require the consent of the Funding Vehicle Trustees and the approval of the Bankruptcy Court. The Funding Vehicle Trust will be obligated to compensate the Reorganized Debtors for costs reasonably incurred in connection with the prosecution of any PI Insurance Coverage Action pursuant to this Section 5.1.g, including but not limited to out-of-pocket costs and expenses, consultant fees and attorneys' fees. Upon vesting in the Trust, the prosecution of the PI Insurance Coverage Actions shall be governed by the Funding Vehicle Trust Agreement. Notwithstanding anything to the contrary contained herein, the Funding Vehicle Trust shall not compromise or settle insurance coverage under any Included PI Trust Insurance Policy other than with respect to Channeled Personal Injury Claims or Trust Expenses of the Funding Vehicle Trust or of any PI Trust.

### 5.2 Asbestos PI Trust

#### a. Creation of the Asbestos PI Trust

(i)      On the Effective Date, Reorganized KACC, the Asbestos PI Trustees, the members of the Asbestos PI TAC and the Future Asbestos Claimants' Representative will execute the Asbestos PI Trust Agreement and the Asbestos PI Trust will be created. The purpose of the Asbestos PI Trust will be to, among other things, (A) direct the processing, liquidation and payment of all Asbestos Personal Injury Claims in accordance with the Asbestos Distribution Procedures and (B) preserve, hold, manage and maximize the assets of the Asbestos PI Trust for use in paying and satisfying Asbestos Personal Injury Claims, all in accordance with Plan, the PI Trust Funding Agreement and the Asbestos PI Trust Agreement.

(ii)      The Asbestos PI Trust is intended to be treated for U.S. federal income Tax purposes as a "qualified settlement fund" as described within section 1.468B-1 of the Treasury Regulations, as more specifically provided for under the Asbestos PI Trust Agreement. Accordingly, for all U.S. federal income Tax purposes the transfer of assets to the Asbestos PI Trust will be treated as a transfer to a trust satisfying the requirements of section 1.468B-1(c) of the Treasury Regulations by the Debtors and the Funding Vehicle Trust, as transferors, for distribution to holders of Asbestos Personal Injury Claims and in complete settlement of such Claims. Any income on the assets of the Asbestos PI Trust will be treated as subject to Tax on a current basis, and all distributions pursuant to the Plan will be made net of provision for Taxes and subject to the withholding and reporting requirements set forth in the Plan and the Asbestos PI Trust Agreement.

(iii)      The Asbestos PI Trustees will be the "administrator" (as defined in section 1.468B-2(k) of the Treasury Regulations) of the Asbestos PI Trust and will be required by the Asbestos PI Trust Agreement to (A) timely file such income Tax and other returns and statements and timely pay all Taxes required to be paid from the assets in the Asbestos PI Trust as required by law and in accordance with the provisions of the Plan and the Asbestos PI Trust Agreement, (B) comply with all withholding obligations, as required under the applicable provisions of the IRC and of any state law and the regulations promulgated thereunder, (C) meet all other requirements necessary to qualify and maintain qualification of the Asbestos PI Trust as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations, and (D) take no action that could cause the Asbestos PI Trust to fail to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations. The Asbestos PI Trust Agreement will provide that the Reorganized Debtors will have no rights to any refunds or reversion with respect to any assets of the Asbestos PI Trust or any earnings thereon.

(iv)      Within 60 days after the Effective Date (but not later than February 14th of the calendar year following such date), Reorganized KACC will obtain a Qualified Appraisal of (A) the fair market value of the common stock of Kaiser Trading transferred to the Asbestos PI Trust pursuant to Section 5.2.d and (B) any New Common Stock theretofore received by the Asbestos PI Trust in respect of the 70.5% of the KFC Claim that is to be transferred on the Effective Date to the Asbestos PI Trust pursuant to Section 4.2.f of the Intercompany Claims Settlement and Section 5.2.d.

(v)      Following the funding of the Asbestos PI Trust and the receipt of such Qualified Appraisal (and in no event later than February 15th of the calendar year following the Effective Date), Reorganized KACC will provide or cause to be provided to the Asbestos PI Trustees a "§ 1.468B-3 Statement" in accordance with section 1.468B-3 of the Treasury Regulations. Following any subsequent transfers of Cash or other property to

the Asbestos PI Trust, the transferor will provide or cause to be provided to the Asbestos PI Trustees a "§ 1.468B-3 Statement" on or before February 15th of the calendar year following the date of each such transfer.

      b.     **PI Trust Funding Agreement**

      On and after the Effective Date, the Asbestos PI Trustees, on behalf of the Asbestos PI Trust, will perform or cause to be performed all obligations of the Asbestos PI Trust under the PI Trust Funding Agreement.

      c.     **Appointment of Asbestos PI Trustees; Asbestos PI TAC**

      Pursuant to the Confirmation Order, the Bankruptcy Court will confirm the appointment of the individuals selected as contemplated by the Asbestos PI Trust Agreement to serve as the initial Asbestos PI Trustees and as the initial members of the Asbestos PI TAC effective as of the Effective Date.

      d.     **Transfer of Certain Property to the Asbestos PI Trust**

      On the Effective Date, (i) 94 shares of Kaiser Trading and (ii) 70.5% of KFC Claim will be issued or transferred or caused to be issued or transferred by Reorganized KAC to the Asbestos PI Trust and such assets shall be automatically and without further act or deed, vested in and assumed by the Asbestos PI Trust. The Asbestos PI Trust will be entitled to receive its Pro Rata Share of the New Common Stock distributable to holders of Claims in Class 9 on account of its 70.5% of the KFC Claim (which is an Allowed General Unsecured Claim in Class 9) and to receive distributions from the Funding Vehicle Trust in accordance with the PI Trust Funding Agreement.

      e.     **Assumption of Certain Liabilities and Obligations by the Asbestos PI Trust**

      On the Effective Date the Asbestos PI Trust will assume all liability and responsibility for all Asbestos Personal Injury Claims and its Trust Expenses, and the Reorganized Debtors will have no further financial or other responsibility or liability therefor. The Asbestos PI Trust shall advocate in any and all actions and proceedings brought against the Reorganized Debtors that involve Asbestos Personal Injury Claims that such Claims are and have been channeled to the Asbestos PI Trust, and the Asbestos PI Trust Agreement shall provide that the Asbestos PI Trust shall cooperate with the Reorganized Debtors in any and all such actions and proceedings. The Asbestos PI Trust will cooperate with the Reorganized Debtors and use commercially reasonable efforts to take or cause to be taken all actions and to do or cause to be done all things that the Reorganized Debtors may reasonably consider necessary, appropriate or desirable to effectuate such assumption. Each Reorganized Debtor and each other Kaiser Company will be entitled to indemnification from the Asbestos PI Trust for any out-of-pocket fees and expenses and attorneys' fees and expenses, judgments, settlements or other liabilities arising from or reasonably incurred by or on behalf of such Reorganized Debtor or other Kaiser Company on or after the Effective Date in connection with any action, suit or proceeding related to Asbestos Personal Injury Claims, whether civil, administrative or arbitrative, including but not limited to indemnification or contribution for such Claims prosecuted against such Reorganized Debtor or other Kaiser Company. Upon the request of the Funding Vehicle Trust, the Asbestos PI Trust shall (i) provide to the Funding Vehicle Trust any authorization or assignment of rights from the Asbestos PI Trust that the Funding Vehicle Trust may reasonably consider necessary, appropriate or desirable to permit the Funding Vehicle Trust to pursue recovery under any Included PI Trust Insurance Policy in respect of Asbestos Personal Injury Claims or Trust Expenses of the Asbestos PI Trust and (ii) otherwise cooperate with the Funding Vehicle Trust and use commercially reasonable efforts to take, or cause to be taken, all other actions and to do, or cause to be done, all other things that the Funding Vehicle Trust may reasonably consider necessary, appropriate or desirable to effect such recovery, including providing to the Funding Vehicle Trust information relating to Asbestos Personal Injury Claims available to the Asbestos PI Trust and required to be provided or otherwise made available by the Funding Vehicle Trust pursuant to any insurance settlement agreement assumed by the Funding Vehicle Trust pursuant to Section 5.1.e.

# EXHIBIT 4

1

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

------------------------------------    Chapter 11
In Re:
                                    Bankr. Case No. 03-10495 (JKF)
COMBUSTION ENGINEERING, INC.,
                                        CONFIRMATION HEARING
        Debtor.                          and BENCH OPINION
------------------------------------

                              July 31, 2003
                              Newark, New Jersey

B E F O R E:

        HONORABLE ALFRED M. WOLIN, USDJ

Pursuant to Section 753 Title 28 United States Code, the
following transcript is certified to be an accurate record as
taken stenographically in the above-entitled proceedings.

JACQUELINE KASHMER
Official Court Reporter

                    JACQUELINE KASHMER, C.S.R.
                    OFFICIAL COURT REPORTER
                         P. O. Box 12
                      Pittstown, NJ 08867
                        (609) 656-2595

1    Judge Fitzgerald delayed her final order to solicit additional

2    evidence of notice to claimants.

3         This Court has and will continue the course set by

4    Judge Fitzgerald.  The parties have been afforded adequate

5    opportunity to voice their positions, positions that have

6    already been fully developed and presented before the

7    Bankruptcy Court.  But this Court will not aid those who would

8    subvert this plan for their only parochial purposes by causing

9    delay through unnecessary litigiousness.  While the specifics

10   of the issues raised will be dealt with later in this opinion,

11   the Court is satisfied that any objection or appeal based on

12   the proposition that due process has not been afforded is

13   spurious and must be denied.

14        Turning to the specific issues, the Court will first

15   consider the appeals and objections of the insurers.  As

16   noted, the plan assigns the right to any insurance proceeds to

17   the personal injury trust.  The insurers contend that this

18   violates anti-assignment provisions in their policies and

19   impermissibly varies their rights under their insurance

20   policies.

21        The plan proponents contend that the assignment of

22   proceeds does not equal assignment of a policy.  The Court

23   agrees.  Assignment of a right to receive proceeds does not

24   change any risk that was insured against.  Moreover, all

25   substantive rights of the insurers were expressly preserved

# EXHIBIT 5

[Nos. 03-3392, 03-3414, 03-3415, 03-3425, 03-3436, 03-3437,
03-3445, 03-3446, 03-3450, 03-3451, 03-3452, 03-3468, 03-3492, and 03-3558]

# In the
# United States Court of Appeals
### for the
# Third Circuit

IN RE: COMBUSTION ENGINEERING INC.

THE TRAVELERS INDEMNITY COMPANY, *et al.*

*Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE CIVIL ACTION NO. 03-CV-00754

## BRIEF OF THE TRAVELERS APPELLANTS

Tobey M. Daluz
BALLARD SPAHR ANDREWS &
  INGERSOLL, LLP
919 North Market Street, 17th Floor
Wilimington, DE  19801-3034
(302) 252-4440
(302) 252-2566 (fax)

Stuart D. Rosen
G. Eric Brunstad, Jr.
  *Counsel of Record*
BINGHAM McCUTCHEN LLP
One State Street
Hartford, CT  06103-3178
(860) 240-2700
(860) 240-2818 (fax)

Rheba Rutkowski
Terry Klein
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, Massachusetts 02110
(617) 951-8000
(617) 951-8736 (Fax)

*Attorneys for The Travelers Indemnity Company and certain affiliates and
Travelers Casualty and Surety Company f/k/a The Aetna Casualty and Surety
Company*

failed to demonstrate how a damage claim by the Insurers would be paid under the Plan.

The record shows that the Proponents only considered the unsecured claims set forth in their schedules in providing for Class 4 claims. JA1212 (NT 5/2/03 at 163 (Zilly)). The Plan provides no mechanism for the payment of other claims. Indeed, the Plan does not even appear to provide an adequate means to pay scheduled claims. Either way, the Plan is not feasible.

### 6.    The Plan impermissibly purports to alter the Insurers' rights.

The district court erred as a matter of law in concluding that rights under the policies could be assigned without the Insurers' consent. As a procedural matter, the court erred in reaching this conclusion outside a properly commenced adversary proceeding. Fed. R. Bankr. P. 7001; *McKay*, 732 F.2d at 47-48; *Conxus Communications*, 262 B.R. at 899.

Moreover, as a matter of well-established law, a contract of insurance cannot be modified without the consent of all parties. *E.g.*, *J.M.P.H. Wetherell v. Sentry Reinsurance, Inc.*, 743 F. Supp. 1157, 1170 (E.D. Pa. 1990); *Murray v. John Hancock Mut. Life Ins. Co.*, 165 Pa. Super. 514, 516, 69 A.2d 182, 183 (1949).

Even if assignment were possible (which it is not), that would not change the Insurers' rights under their policies, as the Bankruptcy Code does not expand a debtor's rights against others beyond what they were at the commencement of the case, and courts in bankruptcy cases long have recognized that they lack the power to alter the rights and obligations of insurers. *E.g.*, *Foothill Capital Corp. v. Clare's Food Market, Inc. (In re Coupon Clearing Serv., Inc.)*, 113 F.3d 1091, 1099 (9th Cir. 1997) ("The nature and extent of a debtor's interest in property is determined by state law, with the estate having no greater rights in property than those held by the debtor prior to bankruptcy."); *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) ("[W]hatever rights a debtor has in property at the

# EXHIBIT 6

Nos. 03-3392, 03-3414, 03-3415, 03-3425, 03-3436, 03-3437, 03-3445,
03-3346, 03-3450, 03-3451, 03-3452, 03-3468, 03-3492 and 03-3558 (Consolidated)

# In the
# United States Court of Appeals
# for the Third Circuit

**RECEIVED**
**SEP 2 6 2003**
**U.S.C.A. 3rd. CIR.**

In Re: COMBUSTION ENGINEERING, INC.

*Debtor;*

FIRST STATE INSURANCE COMPANY; HARTFORD ACCIDENT & INDEMNITY COMPANY; TRAVELERS INDEMNITY COMPANY AND CERTAIN AFFILIATES AND TRAVELERS CASUALTY & SURETY COMPANY F/K/A THE AETNA CASUALTY & SURETY COMPANY; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON AND CERTAIN LONDON MARKET COMPANIES; CONTINENTAL CASUALTY COMPANY & TRANSPORTATION INSURANCE COMPANY; ONEBEACON AMERICA INSURANCE COMPANY F/K/A COMMERCIAL UNION INSURANCE COMPANY; CENTURY INDEMNITY COMPANY; PACIFIC EMPLOYERS INSURANCE COMPANY; CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA; THE NORTH RIVER INSURANCE COMPANY; TIG INSURANCE COMPANY; EVANSTON INSURANCE COMPANY; EVEREST REINSURANCE COMPANY F/K/A PRUDENTIAL REINSURANCE CO.; ALLSTATE INSURANCE COMPANY; ALLIANZ INSURANCE COMPANY; AND CERTAIN CANCER CLAIMANTS,

*Appellants,*

v.

COMBUSTION ENGINEERING, INC., ASEA BROWN BOVERI, INC., THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF COMBUSTION ENGINEERING, INC., AND DAVID T. AUSTERN, FUTURE CLAIMANTS' REPRESENTATIVE,

*Appellees.*

On Appeal From The United States District Court For The District Of Delaware
Judge Alfred M. Wolin, by designation

## BRIEF OF APPELLEE THE OFFICIAL COMMITTEE OF
## UNSECURED CREDITORS OF COMBUSTION ENGINEERING, INC.

| | | |
|---|---|---|
| Michael R. Lastowski | Joseph D. Frank | Elihu Inselbuch |
| Duane Morris LLP | David V. Goodsir | Caplin & Drysdale, |
| 1100 North Market Street, | Freeborn & Peters LLP | Chartered |
| Suite 1200 | 311 South Wacker Drive, | 399 Park Avenue, 36th Fl. |
| Wilmington, Delaware | Suite 3000 | New York, New York |
| 19801 | Chicago, Illinois 60606 | 10022 |
| (302) 657-4900 | (312) 360-6000 | (212) 319-7125 |

*Counsel for The Official Committee of Unsecured Creditors of Combustion Engineering, Inc.*

Insurers' arguments, the neutrality clause does not create ambiguity, but rather provides that neutrality flows both ways, clarifying any ambiguity created by the non-impairment clause, which Certain Insurers otherwise would have tried to exploit to their advantage.

## VIII. ARGUMENT

### A.    The District Court Correctly Held That The Asbestos Insurance Rights May Be Assigned As A Matter Of Law, Despite Any Anti-Assignment Clauses.

The District Court properly held that, under the Plan, the Debtor's rights to insurance proceeds may be assigned to the Asbestos PI Trust as a matter of law, despite any clauses that may be present in the policies restricting their assignment without Certain Insurers' consent ("anti-assignment" clauses).    (JA00037-38, District Court's Bench Opinion at 145-146).   Certain Insurers wrongly argue that the Plan is unconfirmable because the District Court "erred as a matter of law in concluding that rights under the policies could be assigned without Certain Insurers' consent." (*See* Travelers' Brf. at 25).

In rejecting the same arguments below, the District Court began by correctly concluding that assignment of insurance rights is not the same as assignment of the policies. (JA00037, District Court's Bench Opinion at 145).  As the District Court held, "[a]n anti-assignment provision in a contract that would bar an assignment to a new entity created by the reorganization of a debtor, but that affects none of the

11

apply only to assignments before loss, and do not prevent an assignment after loss.").[4]

Second, even if Certain Insurers were correct that they must consent to the assignment of rights to proceeds, Section 1123(a)(5)(B) of the Bankruptcy Code specifically preempts non-bankruptcy law restrictions on the ability of the Debtor to implement a plan of reorganization, which, in this case, involves a transfer of rights from the Debtor's estate to the Asbestos PI Trust. Certain Insurers concede that their insurance policies are not executory contracts. (*See* Travelers' Brf. at 27) ("general liability insurance policies under which, *as here*, the insured has no further obligation to pay premiums for asbestos claims, are not executory in nature") (emphasis added). The rights under a non-executory contract are automatically transferred to a debtor's estate as a result of the filing of the petition, which the anti-assignment clause cannot prevent or restrict. *See* 11 U.S.C. § 541 (automatically transferring assets of a debtor to the debtor's estate); *In re Feiereisen*, 56 B.R. 167, 169 (Bankr. D. Or. 1985). Further, Section 1123(a)(5)(B) provides in relevant part that, "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall ... provide adequate means for the plan's

---

[4]     *See also, e.g.,* 6B Appleman, INSURANCE LAW & PRACTICE § 4269 (1995) (rights under policy freely assignable as a chose in action); *Antal's Restaurant, Inc. v. Lumbermen's Mut. Cas. Co.,* 680 A.2d 1386, 1388 (D.C. 1996) (emphasizing the "general aversion of the law to limitations on the free assignability of claims."); *Citicorp Industrial Credit, Inc. v. Federal Ins. Co.,* 672 F. Supp. 1105, 1106-07

# EXHIBIT 7

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

Global Industrial Technologies, Inc., *et al.*    Bankruptcy No.  02-21626-JKF

       Debtor(s)              Chapter 11

                                  **Related to Doc. No. 6375, Debtors' Motion to Strike Certain Insurers' Objections to GIT Plan and Witness Designations for Lack of Standing**

## MEMORANDUM ORDER

**AND NOW**, this **21st** day of **September, 2007**, we address the motion of Global Industrial Technologies, Inc. ("GIT") and its subsidiaries (collectively "Debtors") to strike objections and witness designations filed by Hartford Accident and Indemnity Company, First State Insurance Company, and Twin City Fire Insurance Company (collectively "Hartford") and California Union Insurance Company, International Insurance Company, and Westchester Insurance Company (collectively "California Union").  Debtors assert that the Insurers lack standing inasmuch as they are not creditors of Debtors and that all insurer prepetition rights are preserved through insurance neutrality provisions in the plan.[1]  We agree.

With respect to the request to strike the Insurers' witness designations, as to those witnesses who testified we gave appropriate weight to their testimony in the Memorandum Opinion and Order addressing confirmation.  We note that some of the witnesses designated by Insurers did not testify and some were also designated by other parties and did testify.

---

[1]Objections with respect to the propriety of the APG Silica Trust and Silica Channeling Injunction are addressed in this court's Memorandum Opinion and Order of this date.

1

Therefore, that part of Debtors' motion to strike that addresses Insurers' witness designations is **denied as moot.**

Debtors' motion to strike Insurers' objections based on insurance neutrality and assignment is **granted**. With respect to the insurance neutrality objections, the Debtors included "insurance neutrality" provisions as technical amendments to the Plan.[2] We find that those provisions are adequate to protect insurers' contractual rights.

We also find that, although the Plan assigns to the APG Silica Trust the Debtors' rights to coverage for APG Silica Claims under certain insurance policies, including those issued by Hartford and California Union, the assignment is authorized by law.

It is established in this circuit that assignment of policy proceeds is not prohibited by anti-assignment provisions in insurance policies. *In re Combustion Engineering*, 391 F.3d 190 (3d Cir. 2004). Furthermore, once an event occurs that gives rise to the insurer's liability under the policy, the policy itself can be assigned. *See generally* 3 Couch on Insurance §35.7 (3d ed. 1999). *See also Viola v. Fireman's Fund Insurance Co.*, 965 F.Supp. 654, 658 (E.D. Pa. 1997)("[u]nder Pennsylvania law, an insurer may not limit an insured's ability to assign . . . rights under a policy after the occurrence of the event which gives rise to the insurer's liability"). The court in *Viola* also noted as follows:

---

[2]*See* §§4.4.1, 4.4.2, 4.4.3, Proposed Modifications to the Third Amended Plans of Reorganization Dated December 28, 2005, of North American Refractories Company and its Subsidiaries and Global Industrial Technologies, Inc. and its Subsidiaries, GIT Doc. No. 6244. Debtors assert in their motion that although they sought input from Hartford, California Union, and other insurers regarding insurance neutrality provisions, none provided comment. In the course of issuing our Memorandum Opinion and Order with respect to confirmation of the GIT Plan this court examined various filings of Hartford, California Union, and other insurers but their focus was on the necessity and fairness of the Silica Trust and APG Silica Trust and Silica Channeling Injunction.

2

> [a]fter a loss has occurred, the right of the insured or his successor in interest to the indemnity provided in the policy becomes a fixed and vested right; it is an obligation or debt due from the insurer to the insured, subject only to such claims, demands, or defenses as the insurer would have been entitled to make against the original insured.

965 F.Supp. at 653 (citation omitted).

See also *National Memorial Services v. Metropolitan Life Insurance Co.*, 49 A.2d 382 (Pa. 1946)(anti-assignment clause does not preclude beneficiaries of life insurance policy from assigning proceeds of policy after the event giving rise to liability; it applies only to assignments before liability). *See also OneBeacon America Insurance Co. v. A.P.I., Inc.* 2006 WL 1473004 at *2-*3 (D.Minn. May 25, 2006)(anti-assignment clauses are to protect insurer from increase in the risk it agreed to insure but assignment of loss does not expand risk to insurer, simply allows change in identity to "reconnect the policy's coverage to the insured loss;" most courts follow the risk/loss distinction to allow insured to assign loss); *R.L. Vallee, Inc. v. American Intern. Specialty Lines Insurance Co.*, 431 F.Supp.2d 428, 435 (D.Vt. 2006)(assignments after loss are permitted as there is no additional risk to insurer; anti-assignment clauses operate after loss occurs to limit the free assignability of claims which is not favored by the law).

To the extent that in this case the events occurred giving rise to liability there will be no additional risk to the insurance companies by virtue of the assignments. Coverage issues, including, *inter alia*, proof that an event giving rise to liability occurred within the covered period before a specific policy can be accessed for coverage, are all preserved.[3]

---

[3]GIT's Plan expressly provides that no entity is precluded from asserting any claims, defenses, etc., with respect to APG Silica Trust Policies except those based on arising out of anti-assignment provisions. *See* § 4.4.1, GIT Doc. No. 6244. Based on the state of the law, this

(continued...)

3

The rule enunciated in *National Memorial Services, supra,* that a non-assignment clause is unenforceable after the loss has occurred, was reiterated in *Egger v. Gulf Insurance Co.*, 903 A.2d 1219 (Pa. 2006).

The Pennsylvania Supreme Court in *Egger* noted that *National Memorial Services* involved a life insurance policy but applied the rule to the facts before it involving personal injury and an excess insurance policy.  The court in *Egger* said:

> The logic behind the general rule is that post-loss assignments do not invalidate the policy, thereby changing the risks the insurer undertook to insure; rather, they assign the right to a money claim.  See G. Couch, CYCLOPEDIA OF INSURANCE LAW § 35.7 (3d ed. 1995) ("The purpose of a no assignment clause is to protect the insurer from increased liability, and after events giving rise [*16] to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity.").

> While *Nat'l Mem'l* involved life insurance policies and the matter concerns an excess insurance policy, this distinction does not warrant a different outcome or analysis.  The triggering event for coverage in *Nat'l Mem'l* was the death of the insured.  Accordingly, we found that there was no "sound reason for the insurance company to forbid or limit an assignment by a beneficiary of the amount due him or her after the death of the insured."  *Id.* at 382-83.

> However, with the Gulf excess insurance policy, there was no death of an insured; rather, Foulke purchased coverage to protect itself against an award of damages exceeding the limits of its

---

[3](...continued)
provision is appropriate.  Further, the Plan provides that no insurer's legal, equitable, or contractual rights, except enforcement of anti-assignment provisions, are affected.  *Id.* at §4.4.2. The Plan also provides that issue or claim preclusion cannot be asserted against any insurer regarding any APG Silica Claim or Demand based on "submission, valuation, resolution and/or payment of any APG Silica Trust Claim by the APG Silica Trust" and that submission of such a claim and the valuation, resolution or payment of same by the Trust is "wholly without prejudice to any and all rights of the parties in all other contexts or forums [sic], and shall not be deemed (unless otherwise determined by a Court of competent jurisdiction) to be a triggering event for liability under any APG Silica Trust Policy."  *Id.* at §4.4.3.

primary liability policy with respect to its activities at the PECO plant. Foulke provided plant protection and security services pursuant to its contracts with PECO. Gulf insured these activities of Foulke through its issuance of an excess insurance policy, "which provides coverage for any sum the insured is obligated to pay for bodily injury arising out of an 'occurrence.'" Trial Court Opinion at 2. It is an "Occurrence" that triggers the obligation of Foulke. . . .

Consequently, in parsing the terms of the policy, the triggering event for coverage was bodily injury occasioned by Foulke, which arose out of an Occurrence during the period of the policy. . . .

In attempting to circumvent the principle that we articulated in *Nat'l Mem'l* that a restriction against a post-loss assignment is void, Gulf asserts that its loss did not arise until the jury reached its verdict and awarded damages in an amount exceeding the underlying $ 1,000,000.00 of primary insurance coverage . . .

This argument lacks merit. First, as Appellee correctly notes, the term "by reason of liability imposed by law" could mean, for example: (1) only after a judgment has been entered; (2) only after all appeals are exhausted and the verdict stands; (3) only after efforts to execute judgment have begun; (4) the occurrence upon which the liability is based (i.e., the death of Egger); or (5) only after the tender of primary coverage. . . . This demonstrates the ambiguity of the clause that Gulf cites as support for its argument that this term means the jury verdict.

We have stated that where ambiguity exists in the interpretation of policy language, the ambiguity must be construed in favor of coverage.

*Egger v. Gulf Insurance. Co*., 903 A.2d at 1224-26 (citations omitted).

In *In re Western Asbestos Company*, 313 B.R 832, 858 (Bankr.N.D.Cal. 2003), *aff'd* 2004 WL 1944792 (N.D.Cal. April 16, 2004), the bankruptcy court concluded that under 11 U.S.C. §1123(a)(5), policies or rights thereunder may be transferred to an asbestos personal injury trust, whether or not state law would permit assignment.

5

In a subsequent opinion in the same case, *In re Western Asbestos Co.*, 313 B.R. 456, 459 (Bankr.N.D.Cal. 2004), the court held that, with respect to causes of action that were transferred to the trust pursuant to the plan of reorganization, court orders or a plan confirmation order, the trust was designated as a successor to the debtors and a representative of the chapter 11 estates. Further, the court held that the trust was authorized as a matter of law to appear in and act for debtors in pending actions and to pursue causes of action for the benefit of holders of asbestos related claims. The court found that under §1123(b)(3)(B), on the effective date of the plan,

> the Trust shall be vested with and have the right to enforce against any Entity any and all such causes of action, with the proceeds of the recovery of any such actions related to insurance for Asbestos Related Claims (including, without limitation, the Coverage Litigation) to be paid to the respective Debtor . . . .

313 B.R. at 459. The court concluded that insurance rights could be vested in the trust under §1123(a)(5)(B), notwithstanding state law or contractual provisions to the contrary. *Id.* at 462. The court further ruled that the vesting of insurance rights in the trust "shall neither diminish nor impair the enforceability of any of the Asbestos Insurance Policies against a party that is not a Released Party." *Id.* Likewise, it would not expand rights. We agree with this analysis and adopt it here.

In *Mid-Valley, Inc., et al.*, 305 B.R. 425 (Bank.W.D.Pa. 2004), this court held that objecting insurers had no standing to object to the plan because they were not affected by the filing of the bankruptcy - all their defenses were preserved and they were not creditors of the debtors in that case. To the extent the Insurers herein are parties in interest because some day they may face liability if the Trust pays a claim, there is no case in controversy at this time.

> One element of the "bedrock" case-or-controversy requirement is that plaintiffs must establish that they have standing to sue. . . . On

6

many occasions, we have reiterated the three requirements that
constitute the "irreducible constitutional minimum" of standing. . .
. First, a plaintiff must demonstrate an "injury in fact," which is
"concrete," "distinct and palpable," and "actual or imminent." . . . .
Second, a plaintiff must establish "a causal connection between the
injury and the conduct complained of - the injury has to be 'fairly
trace[able] to the challenged action of the defendant, and not . . .
th[e] result [of] some third party not before the court'" . . . . Third,
a plaintiff must show "'the substantial likelihood' that the
requested relief will remedy the alleged injury in fact."

*McConnell v. Federal Election Commission,* 540 U.S. 93, 225 (2003)(citations omitted).

In *In re Kaiser Aluminum Corp.*, 343 B.R. 88 (D.Del. 2006), in affirming the Bankruptcy

Court on the issue of assignment of insurance polices, the District Court for the District of

Delaware permitted the debtor in that case to assign insurance proceeds to a non-asbestos

personal injury trust pursuant to 11 U.S.C. §1123(a) "which expressly provides for the

preemption of nonbankruptcy law." *Id.* at 95.  In *Kaiser* the nonbankruptcy law addressed was

that purporting to limit or restrict a debtor's rights to assign interests in insurance policies.

Further, relying on *Combustion Engineering*, the District Court in *Kaiser* held that §1123(a)

preempts the anti-assignment clauses in insurance policies.  *Kaiser, supra*, 343 B.R. at 95.

In the case before us, the Insurers have suffered no injury in fact and the injury they

assert will occur in the future is not imminent.  All coverage defenses and contractual rights of

insurers are preserved.  They are not required, and have not been asked, to contribute anything to

the APG Silica Trust.  The anti-assignment clauses in the insurance policies are preempted by

the Bankruptcy Code.

It is **FURTHER ORDERED** that counsel for Debtor(s) shall immediately serve a copy

of this Memorandum Opinion and Order on the all parties on the current Service List and any

other parties in interest and shall file proof of service forthwith.

7

Judith K. Fitzgerald
United States Bankruptcy Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| FEDERAL-MOGUL GLOBAL INC., T&N LIMITED, *et al.*, | ) ) ) | Chapter 11 |
| Reorganized Debtors. | ) ) ) | Bankruptcy Case No. 01-10578 |
| CERTAIN UNDERWRITERS AT LLOYDS, LONDON, *et. al.*, | ) ) ) | Civil Action Nos. 08-0229 and 08-0230 |
| Appellants, | ) ) | Judge Joseph H. Rodriguez |
| v. | ) ) | |
| FEDERAL-MOGUL GLOBAL INC., *et al.*, | ) ) | |
| Appellees. | ) ) | |

## CERTIFICATE OF SERVICE

I, Mark T. Hurford, of Campbell & Levine, LLC, hereby certify that on June 18, 2008 I caused a copy of the *Brief of Appellee Official Committee of Asbestos Claimants* to be served upon the individuals listed on the attached service list in the manner indicated.

Dated: June 18, 2008

CAMPBELL & LEVINE, LLC


*/s/Mark Hurford*_____
Mark T. Hurford (DE No. 3299)
800 North King Street
Suite 300
Wilmington, DE 19801
(302) 426-1900

Laura Davis Jones, Esq.
James E. O'Neill, Esq.
Pachulski, Stang, Ziehl, & Jones, P.C.
919 North Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705
*VIA HAND DELIVERY*

Richard William Riley, Esq.
Duane Morris LLP
1100 North Market Street
Suite 1200
Wilmington, DE 19801
*VIA HAND DELIVERY*

Michael William Yurkewicz, Esq.
Klehr, Harrison, Harvey, Branzburg &
Ellers LLP
919 Market St.
Suite 1000
Wilmington, DE 19801
*VIA HAND DELIVERY*

James L. Patton, Jr., Esq.
Edwin J. Harron, Esq.
Young, Conaway, Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
*VIA HAND DELIVERY*

Richard L. Schepacarter, Esq.
Trial Attorney
Office of U.S. Trustee
J. Caleb Boggs Federal Buiding
844 North King Street
Room 2207, Lockbox 35
Wilmington, Delaware 19801
*VIA HAND DELIVERY*

James S. Yoder, Esq.
White and Williams LLP
824 N. Market Street, Suite 902
P.O. Box 709
Wilmington, DE 19899-0709
*VIA HAND DELIVERY*

Sean J. Bellew, Esq.
Cozen O'Connor
1201 N. Market Street
Suite 1400
Wilmington, DE 19801
*VIA HAND DELIVERY*

Bruce E. Jameson, Esq.
Prickett, Jones & Elliott, P.A.
1310 King Street
Wilmington, Delaware 19899
*VIA HAND DELIVERY*

John D. Demmy, Esq.
Stevens & Lee, P.C.
1105 North Market Street, 7th Floor
Wilmington, DE 19801
*VIA HAND DELIVERY*

James F. Conlan, Esq.
Larry J. Nyhan, Esq.
Jeffrey C. Steen, Esq.
Kevin T. Lantry, Esq.
Kenneth P. Kansa, Esq.
Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
*VIA FIRST CLASS MAIL*

Michael S. Davis, Esq.
Jantra Van Roy, Esq.
Zeichner Ellman & Krause LLP
575 Lexington Avenue
New York, New York 10022
*VIA FIRST CLASS MAIL*

{D0114022.1 }

Michael A. Shiner, Esq.
Tucker Arensberg, P.C.
1500 One PPG Place
Pittsburgh, PA 15222
*VIA FIRST CLASS MAIL*

Steven M. Crane, Esq.
Berks Crane Robinson & Seal LLP
515 South Figueroa Street, Suite 1500
Los Angeles, California 90071
*VIA FIRST CLASS MAIL*

Russell W. Roten, Esq.
Duane Morris LLP
633 W. 5th Street, Suite 4600
Los Angeles, CA 90071
*VIA FIRST CLASS MAIL*

Eileen T. McCabe, Esq.
Mendes & Mount LLP
750 Seventh Avenue
New York, New York 10019-6829
*VIA FIRST CLASS MAIL*

Elit R. Felix, II, Esq.
Margolis Edelstein
The Curtis Center, 4th Floor
601 Walnut Street
Philadelphia, PA 19106-3304
*VIA FIRST CLASS MAIL*

Leonard P. Goldberger, Esq.
Stevens & Lee, P.C.
1818 Market Street, 29th Floor
Philadelphia, PA 19103
*VIA FIRST CLASS MAIL*

David C. Christian II, Esq.
William J. Factor, Esq.
Seyfarth Shaw LLP
131 S. Dearborn Street, Suite 2400
Chicago, Illinois 60603
*VIA FIRST CLASS MAIL*

Craig Goldblatt, Esq.
Nancy L. Manzer, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., NW
Washington, D.C. 20006
*VIA FIRST CLASS MAIL*

William J. Bowman, Esq.
James P. Ruggeri, Esq.
Edward B. Parks, II, Esq.
Hogan & Hartson LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
*VIA FIRST CLASS MAIL*